1  | SHEPPARD, MULLIN, RICHTER &
HAMPTON LLP
2  |  A Limited Liability Partnership
    Including Professional Corporations
3  | Ori Katz (SBN: 209561)
    Aaron J. Malo (SBN: 179985)
4  | Robert K. Sahyan (SBN: 253763)
    Four Embarcadero Center, 17th Floor
5  | San Francisco, CA  94111-4109
    Telephone: (415) 434-9100
6  | Facsimile: (415) 434-3947

7  | COUNSEL TO DEBTORS

8  | WINSTON & STRAWN LLP
    John D. Fredericks (SBN:  168309)
9  | Justin E. Rawlins (SBN:  209915)
    101 California Street, 39th Floor
10 | San Francisco, CA  94111-5802
    Telephone:    (415) 591-1000
11 | Facsimile:    (415) 591-1400

COUNSEL TO FOURTH THIRD LLC

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (SBN: 143717)
Shirley S. Cho (SBN: 192616)
10100 Santa Monica Blvd., 11th Floor
Los Angeles, CA  90067-4100
Telephone:    (310) 277-6910
Facsimile:    (310) 201-0760

COUNSEL TO OFFICIAL COMMITTEE OF
UNSECURED CREDITORS

ENGLISH & GLOVEN, APC
Donald A. English, Esq. (SBN: 115569)
550 West C Street, Suite 1800
San Diego, CA  92101
Telephone:  (619) 338-6610
Facsimile:  (619) 338-6657

COUNSEL TO INVESTMENT FUNDING,
INC.

12

13

14

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SANTA ANA DIVISION

15 | In re:

16 | MMFX CANADIAN HOLDINGS, INC., *et al.*,

17 |                 Debtors.

18 |   ☐ Affects MMFX Canadian Holdings, Inc.

19 |   ☒ Affects MMFX International Holdings,
        Inc.

20 |

21 |   ☒ Affects Fasteel Corporation

22 |   ☒ Affects MMFX Steel Corporation of
        America

23 |

24 |   ☒ Affects MMFX Technologies
        Corporation

25 |

26 |   ☐ Affects all Debtors

Case No. 8:10-bk-10083-RK

Chapter 11

**(Jointly Administered with Case Nos.:
10-bk-10085; 10-bk-27570; 10-bk-27571; and
10-bk-27572)**

**JOINT DISCLOSURE STATEMENT IN
SUPPORT OF FIRST AMENDED JOINT
PLAN OF REORGANIZATION
PROPOSED BY (1) DEBTORS;
(2) OFFICIAL COMMITTEE OF
UNSECURED CREDITORS; (3) FOURTH
THIRD LLC; AND (4) INVESTMENT
FUNDING, INC.**

Date:   June 7, 2011
Time:   10:00 a.m.
Place:  United States Bankruptcy Court
        411 West Fourth Street
        Santa Ana, CA 92701
        Courtroom 5D

1

2

| **IMPORTANT DATES** |
| --- |
| ☐   Date by which Ballots must be received:  **July 8, 2011, at 5:00 p.m. (Pacific Time)**. |
| ☐   Date by which objections to Confirmation of the Plan must be filed and served:  **July 8, 2011, at 5:00 p.m. (Pacific Time)**. |
| ☐   Hearing on Confirmation of the Plan:  **July 22, 2011, at 9:00 a.m. (Pacific Time)**. |

**11 U.S.C. § 1125(b) PROHIBITS SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE PLAN UNLESS A COPY OF THE PLAN, OR A SUMMARY THEREOF, IS ACCOMPANIED OR PRECEDED BY A COPY OF A DISCLOSURE STATEMENT APPROVED BY THE BANKRUPTCY COURT.  THIS PROPOSED DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT, AND, THEREFORE, THE FILING AND DISSEMINATION OF THIS PROPOSED DISCLOSURE STATEMENT IS NOT INTENDED TO BE, NOR SHOULD IT BE CONSTRUED AS, AN AUTHORIZED SOLICITATION PURSUANT TO 11 U.S.C. § 1125 AND RULE 3017 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE.  NO SUCH SOLICITATION WILL BE MADE EXCEPT AS AUTHORIZED PURSUANT TO SUCH LAW AND RULES.**

Dated:  June 7, 2011

# TABLE OF CONTENTS

Page

I. EXECUTIVE SUMMARY ............................................................................ 1

II. INTRODUCTION ................................................................................... 2

III. VOTING INSTRUCTIONS AND OBJECTIONS TO THE PLAN ........................................ 5

    A.    Voting Instructions ....................................................................... 5

    B.    Objections to the Plan ................................................................... 7

IV. DISCLAIMER ..................................................................................... 7

V. OVERVIEW OF THE CHAPTER 11 PROCESS AND THE PLAN ........................................ 10

    A.    The Chapter 11 Process, the Plan and Confirmation ............................... 10

    B.    Overview of the Proposed Plan ....................................................... 12

        1.    General Structure of the Plan. ................................................. 12

        2.    Continuation of the Investment Banking Process ......................... 13

        3.    Bidding Procedures under the Investment Banking Process.............. 14

        4.    Confirmation Hearing to Approve Scenario A or Scenario B ............. 18

        5.    Estimated Recoveries ........................................................... 18

        6.    Summary of Classification of Treatment of Claims and Interests .......... 21

VI. DEBTORS' CHAPTER 11 CASES ................................................................. 26

    A.    Events Leading Up To The Filing Of The Chapter 11 Petition ..................... 26

        1.    Historical Background of the Debtors........................................ 26

        2.    Equity ............................................................................. 28

        3.    The MMFX Steel Product ...................................................... 28

        4.    Incurrence of Debt for the Welland Facility ................................ 30

        5.    Market Downturn and the Canadian Bankruptcy Filing .................. 30

        6.    The Initial Debtors' Bankruptcy Filing ...................................... 31

        7.    The New Debtors' Bankruptcy Filing........................................ 32

| | | | |
|---|---|---|---|
| B. | | The Debtors' Management | 32 |
| C. | | Significant Post-Petition Events | 33 |
| | 1. | Significant Motions Filed | 33 |
| | 2. | Appointment of Creditors' Committee | 40 |
| | 3. | Filing of Schedules and Setting of Claims Bar Dates | 41 |
| | 4. | Meeting of Creditors | 42 |
| | 5. | KPMG's Retention as an Investment Banker | 42 |
| | 6. | The Marketing Process | 43 |
| | 7. | The Objection to Claims of Fourth Third | 44 |
| | 8. | Settlement of Claims of Investment Funding | 45 |
| | 9. | The Retention of Professionals | 45 |

VII. DESCRIPTION OF PLAN .......................................................................... 46

| | | | |
|---|---|---|---|
| A. | | Structure of the Plan | 46 |
| B. | | Summary of the Plan | 47 |
| | 1. | Scenario A. | 47 |
| | 2. | Scenario B. | 48 |
| C. | | Corporate Governance of the Reorganized Debtors | 49 |
| | 1. | Post-Confirmation Management and Operation | 49 |
| | 2. | Interest Holder Rights | 50 |
| D. | | Substantive Consolidation | 50 |
| E. | | Reorganized Capital Structure Created by the Plan | 51 |
| F. | | Classification and Treatment of Claims and Interests under the Plan | 51 |
| | 1. | Treatment of Unclassified Claims Against All Debtors under Scenario A and Scenario B | 51 |
| | 2. | Treatment of Classified Claims Against and Interests in All Debtors Under Scenario A and Scenario B | 53 |
| G. | | Executory Contracts and Unexpired Leases | 57 |

1.    Assumption...................................................................... 57

2.    Rejection........................................................................ 58

3.    Assumption Obligations. ................................................. 58

4.    Effect of Confirmation Order. ........................................ 59

5.    Post-Petition Agreements. .............................................. 59

6.    Modifications to Plan Supplement. ................................. 59

H.    Provisions Governing Distributions ........................................... 60

1.    Distributions by the Debtors. ......................................... 60

2.    Estimation...................................................................... 60

3.    Distributions on Account of Claims Allowed After the Effective
Date. ............................................................................. 60

4.    Distributions in Cash...................................................... 62

5.    Undeliverable Distributions. .......................................... 62

6.    Unclaimed Distributions. ............................................... 62

7.    Setoff. ........................................................................... 62

8.    Taxes. ............................................................................ 63

9.    De Minimis Distributions............................................... 63

10.   Preservation of Causes of Action. .................................. 64

I.    Conditions Precedent................................................................. 64

1.    Conditions to Confirmation............................................ 64

2.    Conditions to Effectiveness............................................ 65

3.    Waiver of Conditions. .................................................... 66

J.    Effects of Confirmation............................................................. 66

1.    Binding Effect. .............................................................. 66

2.    Property Revests Free and Clear. .................................... 67

3.    Releases by the Debtors. ................................................ 67

4.    *Discharge and Permanent Injunction.* ........................... 69

|  |  | 5. | *Limitation of Liability.* | 70 |
|  |  | 6. | *Exoneration and Reliance.* | 70 |
|  | K. | Retention of Jurisdiction | | 70 |
|  | L. | Amendment and Withdrawal of Plan | | 72 |
|  | M. | Miscellaneous | | 73 |

VIII. CERTAIN RISK FACTORS TO BE CONSIDERED ........................................ 76

|  | A. | General Considerations | 77 |
|  | B. | Certain Bankruptcy Considerations | 77 |
|  | C. | Claims Estimations | 78 |
|  | D. | Conditions Precedent to Consummation | 78 |
|  | E. | Disclosure Regarding Potentially Illiquid Securities and Funding Obligations | 78 |
|  | F. | Competition | 78 |
|  | G. | Cyclicality | 78 |
|  | H. | Reliance on Key Personnel | 79 |
|  | I. | Litigation | 79 |
|  | J. | Certain Tax Considerations | 79 |

IX. APPLICABILITY OF FEDERAL AND OTHER SECURITIES LAWS .............................. 79

X. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ......................... 80

|  | A. | U.S. Federal Income Tax Consequences to the Debtors | 82 |
|  | B. | U.S. Federal Income Tax Consequences to Claim Holders | 85 |

XI. FEASIBILITY OF THE PLAN AND THE BEST INTERESTS OF CREDITORS ............. 86

|  | A. | Feasibility of the Plan | 86 |
|  | B. | Acceptance of the Plan | 87 |
|  | C. | Best Interests Test | 87 |
|  | D. | Liquidation Analysis | 88 |
|  | E. | Confirmation Without Acceptance of All Impaired Classes: The |

"Cramdown" Alternative ........................................................................ 90

XII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ....... 91

    A.    Alternative Plan(s) of Reorganization .................................................. 91

    B.    Liquidation under Chapter 7 or Chapter 11 ........................................ 91

XIII. SOLICITATION; VOTING PROCEDURES .......................................................... 92

    A.    Parties in Interest Entitled to Vote .................................................... 92

    B.    Classes Entitled to Vote to Accept or Reject the Plan ........................ 93

    C.    Solicitation Order ............................................................................. 93

    D.    Waivers of Defects, Irregularities, Etc. .............................................. 93

    E.    Withdrawal of Ballots; Revocation ................................................... 94

    F.    Voting Rights of Disputed Claimants ................................................ 95

    G.    Further Information; Additional Copies .............................................. 96

XIV. RECOMMENDATION AND CONCLUSION ......................................................... 97

# I.

## EXECUTIVE SUMMARY

MMFX Technologies Corporation ("Technologies"), Fasteel Corporation ("Fasteel"), MMFX Steel Corporation of America ("Steel Corp."), and MMFX International Holdings, Inc. ("International"), debtors and debtors in possession (collectively, the "Debtors"), the Official Committee of Unsecured Creditors (the "Committee"), Fourth Third LLC ("Fourth Third"), and Investment Funding, Inc. ("Investment Funding"), and together with the Debtors, Committee and Fourth Third, the "Proponents") have proposed a First Amended Joint Chapter 11 Plan of Reorganization (as may be amended, the "Plan") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), and submit this Disclosure Statement in support of the Plan (the "Disclosure Statement").  A copy of the Plan is attached as Exhibit "A" to this Disclosure Statement.

As described in this Disclosure Statement, the Plan envisions two potential scenarios by which the Debtors will reorganize.  The Plan envisions the continuance of the Debtors' current investment banking process, seeking solicitation of bids to invest in, license or acquire some or all of the Debtors' assets (the "Investment Banking Process").  In the event there is a Successful Bid under the Investment Banking Process, the Debtors will restructure and provide for recoveries to Holders of Allowed Claims and Holders of Interests in accordance with Scenario A.  In the event the Debtors cannot secure and obtain Court approval of a Successful Bid on or before July 22, 2011 (i.e., at the conclusion of the Investment Banking Process), the Debtors will restructure and provide recoveries to Holders of Allowed Claims in accordance with Scenario B.  Scenario B is premised upon Fourth Third and Investment Funding's converting their Allowed General Unsecured Claims to equity and providing the Reorganized Debtors with the Exit Facility, thus positioning the Debtors for success going forward, benefitting creditors who will continue to transact business with the Reorganized Debtors.  The Exit Facility would provide a minimum of $1,000,000 to be made available to fund payments to Holders of Allowed General Unsecured Claims, Allowed Priority Tax Claims and Allowed Non-Tax Priority Claims, which the Proponents currently estimate should be sufficient to make a minimum of a sixty percent (60%)

1  distribution to Holders of Allowed General Unsecured Claims.  Depending upon the results of the

2  Debtors' operations and ability to meet budget forecasts through the Effective Date, and the

3  accuracy of the Proponents assumptions regarding  the total amount of the DIP Loan, Allowed

4  Secured Claims and Allowed Administrative Claims against the Debtors' Estates, and the amount

5  of Allowed Priority Tax Claims, Allowed Non-Tax Priority Claims and Allowed General

6  Unsecured Claims, the Proponents currently estimate that the proceeds of the Exit Facility may be

7  sufficient to pay all Allowed General Unsecured Claims in full plus interest.  If the proceeds of the

8  Exit Facility are not sufficient to pay the Holders of Allowed General Unsecured Claims in full

9  plus interest, the Committee, Fourth Third and Investment Funding will engage in further

10  negotiations, the outcome of which will be to provide Holders of General Unsecured Claims with

11  a recovery under the Plan equal to or greater than what would be achieved based upon the funds

12  available to pay Holders of General Unsecured Claims from the Exit Facility as presently

13  committed.

14  THE PROPONENTS OF THE PLAN, INCLUDING THE OFFICIAL COMMITTEE OF

15  UNSECURED CREDITORS, RECOMMENDS THAT THE HOLDERS OF CLAIMS AND

16  INTERESTS ENTITLED TO VOTE SUBMIT A BALLOT TO ACCEPT THE PLAN.  The

17  Proponents believe that incorporating the two alternative scenarios will maximize value.  The Plan

18  allows for both the continuation and conclusion of a robust and complete investment banking

19  process and, to the extent such process is not successful, preservation of the Debtors' ability to

20  confirm a plan of reorganization within a reasonable timeframe, avoiding significant

21  administrative expenses and maximizing returns to Holders of Allowed Claims.

22  **II.**

23  **<u>INTRODUCTION</u>**

24  The Proponents submit this Disclosure Statement in connection with solicitation of

25  acceptances and rejections with respect to the Plan.  The definitions contained in the Bankruptcy

26  Code are incorporated in this Disclosure Statement by this reference.  In addition, all capitalized

27  terms not defined herein have the meaning ascribed to them in the Plan, and such definitions are

28  incorporated herein by reference.

1    The purpose of this Disclosure Statement is to set forth information (a) regarding the

2   history of the Debtors, their business, and their chapter 11 cases (the "Cases"), (b) concerning the

3   Plan and alternatives to the Plan, (c) advising Holders of Claims and Holders of Interests of their

4   rights under the Plan, (d) assisting Holders of Claims and Holders of Interests who are entitled to

5   vote on the Plan in making an informed judgment regarding whether they should vote to accept or

6   reject the Plan, and (e) assisting the Bankruptcy Court in determining whether the Plan complies

7   with the provisions of chapter 11 of the Bankruptcy Code and should be confirmed.

8    By Order dated June 7, 2011, the Bankruptcy Court, after notice and a hearing, approved

9   this Disclosure Statement as containing adequate information of a kind and in sufficient detail to

10   enable hypothetical, reasonable investors typical of the Debtors' creditors to make an informed

11   judgment on whether to accept or reject the Plan.  THE BANKRUPTCY COURT'S APPROVAL

12   OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A

13   DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS

14   OF THE PLAN, NOR DOES IT MEAN THAT THE BANKRUPTCY COURT RECOMMENDS

15   EITHER ACCEPTANCE OR REJECTION OF THE PLAN.  No solicitation of votes may be

16   made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code.  In

17   voting on the Plan, creditors and interest holders should not rely on any information relating to the

18   Debtors other than that contained in this Disclosure Statement, the Plan, and all exhibits to either.

19   Certain of the statements contained in this Disclosure Statement, by nature, are forward-looking

20   and contain estimates and assumptions.  There can be no assurance that such statements will

21   reflect actual outcomes.  If any inconsistency exists between the Plan and the Disclosure

22   Statement, the terms of the Plan are controlling.

23    You are urged to review both this Disclosure Statement and the Plan in making your

24   decision about whether to accept the Plan.  Particular attention should be paid to the provisions

25   affecting or impairing your rights as a Holder of a Claim or Holder of an Interest.

26    The Plan divides Claims and Interests into Classes based on their respective legal priority.

27   Only Holders of Claims allowed under section 502 of the Bankruptcy Code, or temporarily

28   allowed for voting purposes under Bankruptcy Rule 3018, whose Claims are in those Classes of

1  Claims that are Impaired under the Plan are entitled to vote to accept or reject the Plan.  A Class is

2  Impaired if the legal, equitable, or contractual rights of the Claims or Interests in the Class are

3  altered.  Classes of Impaired Claims or Interests that are not entitled to receive or retain any

4  property under the Plan, however, are deemed to have rejected the Plan pursuant to section

5  1126(g) of the Bankruptcy Code and, therefore, are not entitled to vote on the Plan.  Classes of

6  Claims that are Unimpaired (i.e.,  those Classes whose legal, equitable, or contractual rights are

7  not altered) are conclusively presumed to have voted to accept the Plan pursuant to section 1126(f)

8  of the Bankruptcy Code and, therefore, are not entitled to vote on the Plan.  The following chart

9  summarizes which Classes of Claims and Interests are Impaired and which Classes of Claims are

10  Unimpaired under the Plan.

| CLASS DESCRIPTION | DESCRIPTION OF CLAIMS OR INTERESTS IN CLASS | IMPAIRED/ UNIMPAIRED | VOTING STATUS |
|---|---|---|---|
| Class 1<br>Priority Non-Tax Claims | All Claims entitled to priority under section 507(a)(3), (4), (5), (6) or (7) of the Bankruptcy Code | Unimpaired | Deemed to Accept Plan |
| Class 2<br>Secured Claims | All claims to the extent secured by a lien on any Debtor's interest in Collateral | Unimpaired | Deemed to Accept Plan |
| Class 3<br>General Unsecured Claims | All Claims that are not Secured Claims, Administrative Claims, Priority Tax Claims, Priority Non-Tax Claims or Claims or Claims or Interests in another Class herein | Impaired | Entitled to Vote on the Plan |
| Class 4<br>Intercompany Claims | All Intercompany Claims shall be either (i) reinstated, in full or in part, but which reinstatement shall not alter the treatment provided to General Unsecured Claims, or (ii) discharged and extinguished. | Impaired | Deemed to Reject the Plan |
| Class 5<br>Subordinated Claims | Under Scenario A, Subordinated Claims shall receive the treatment set forth under the Successful Bid (if any).  Under Scenario B, Subordinated Claims shall be discharged and extinguished. | Impaired | If Scenario A, Entitled to Vote on the Plan.  If Scenario B, Deemed to Reject the Plan |

| CLASS DESCRIPTION | DESCRIPTION OF CLAIMS OR INTERESTS IN CLASS | IMPAIRED/ UNIMPAIRED | VOTING STATUS |
|---|---|---|---|
| Class 6 Interests | Under Scenario A, existing Interests shall receive the treatment set forth under the Successful Bid (if any).  Under Scenario B, all existing Interests shall be cancelled on the Effective Date. | Impaired | If Scenario A, Entitled to Vote on the Plan.  If Scenario B, Deemed to Reject the Plan |

## III.

## VOTING INSTRUCTIONS AND OBJECTIONS TO THE PLAN

### A.    Voting Instructions

If you are a Holder of a Claim in Classes 3 or 5, or a Holder of an Interest in Class 6, accompanying this Disclosure Statement is a Ballot for casting your vote(s) on the Plan and a pre-addressed envelope for the return of the Ballot.  BALLOTS FOR ACCEPTANCE OR REJECTION OF THE PLAN ARE BEING PROVIDED ONLY TO HOLDERS OF CLAIMS AND INTERESTS IN CLASSES LISTED IN THE ABOVE CHART THAT ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN.  If you are the Holder of a Claim or Interest in one or more of the said Classes and (a) did not receive a Ballot, (b) received a damaged or illegible Ballot, or (c) lost your Ballot, or if you are a party in interest and have any questions concerning the Disclosure Statement, any of the Exhibits hereto, the Plan, or the voting procedures in respect thereof, please contact either Sheppard Mullin Richter & Hampton LLP, Attn:  Robert Sahyan, Esq., Four Embarcadero Center, Suite 1700, San Francisco, California 94111, Telephone (415) 434-9100; E-mail: rsahyan@sheppardmullin.com or Winston & Strawn LLP, Attn:  Justin E. Rawlins, 333 South Grand Avenue, 38th Floor, Los Angeles, California 90071; Telephone: (213) 615-1700; E-mail: jrawlins@winston.com.

The Ballot form that you received does not constitute a proof of Claim.  If you are in any way uncertain whether or if your Claim has been correctly scheduled, you should review the Debtors' Schedules that are on file with the Bankruptcy Court located at 411 West Fourth Street, Santa Ana.  In accordance with certain orders of the Bankruptcy Court, the following dates have

1   been established as the Bar Dates by which Holders of Claims must file proofs of claim against the

2   applicable Debtor(s):

| Applicable Debtor(s) Against Which Claim is Asserted | Bar Date |
|---|---|
| International | June 15, 2010 for Claims other than those of governmental units and certain other Claims; July 5, 2010 for Claims of Governmental Units. |
| Technologies, Fasteel, and Steel Corp. | May 13, 2011 for Claims other than those of Governmental Units; June 13, 2011 for Claims of Governmental Units. |

VOTING ON THE PLAN BY EACH HOLDER OF A CLAIM OR INTEREST
ENTITLED TO VOTE IS IMPORTANT.  EACH SUCH CREDITOR OR INTEREST HOLDER
SHOULD READ THIS DISCLOSURE STATEMENT WITH ITS EXHIBITS, INCLUDING
THE PLAN, WHICH IS EXHIBIT "A" HERETO, IN ITS ENTIRETY.  AFTER CAREFULLY
REVIEWING THESE DOCUMENTS, PLEASE FOLLOW THE DIRECTIONS FOR VOTING
CONTAINED ON THE BALLOT, AND RETURN THE BALLOT IN THE ENVELOPE
PROVIDED.  TO BE COUNTED, YOUR BALLOT MUST BE SIGNED AND RECEIVED BY
**July 8, 2011, AT 5:00 P.M.** (PACIFIC TIME) (THE "BALLOTING DEADLINE") AT THE
ADDRESS SET FORTH ON THE PRE-ADDRESSED ENVELOPE ENCLOSED WITH YOUR
BALLOT.

Parties who elect to vote on the Plan should complete and sign the ballot in accordance
with the instructions thereon, being sure to check the appropriate box entitled "Accept the Plan" or
"Reject the Plan."  BALLOTS THAT ARE PROPERLY EXECUTED BUT FAIL TO INDICATE
WHETHER THE VOTING PARTY ACCEPTS OR REJECTS THE PLAN WILL BE DEEMED
TO CONSTITUTE ACCEPTANCE OF THE PLAN.  FAILURE BY A HOLDER TO DELIVER
A DULY COMPLETED AND SIGNED BALLOT WILL CONSTITUTE AN ABSTENTION BY
SUCH HOLDER WITH RESPECT TO A VOTE ON THE PLAN.  ABSTENTIONS WILL NOT
BE COUNTED AS EITHER ACCEPTANCES OR REJECTIONS OF THE PLAN.

1    Votes cannot be transmitted orally or by facsimile or e-mail.  Accordingly, you are urged

2    to return your signed and completed Ballot promptly.  Ballots not received by the Balloting

3    Deadline and unsigned Ballots will not be counted.

4    **B.    Objections to the Plan**

5    The Bankruptcy Court has scheduled a hearing on confirmation of the Plan for **July 22,**

6    **2011 at 9:00 a.m.** (Pacific Time) at the United States Bankruptcy Court for the Central District of

7    California, Santa Ana Division, Courtroom 5D, 411 West Fourth Street, Santa Ana, California

8    92701-4593.  Any objections to confirmation of the Plan must be in writing and filed with the

9    Bankruptcy Court, and served so as to be received by 5:00 p.m. (Pacific Time) on **July 8, 2011**,

10    upon the following: (1) counsel to the Debtors, Sheppard Mullin Richter & Hampton LLP, Four

11    Embarcadero Center, Suite 1700, San Francisco, California 94111, Telephone (415) 434-9100,

12    Attn:  Ori Katz, Esq. and Robert Sahyan, Esq.; (2) Office of the United States Trustee, Ronald

13    Reagan Federal Building & United States Courthouse, 411 W. Fourth Street, Suite 9041, Santa

14    Ana, California 92701, Attn: Nancy Goldberg, Esq., (3) counsel to the Committee, Pachulski

15    Stang Ziehl & Jones LLP, 10100 Santa Monica Boulevard, 11th Floor, Los Angeles, California

16    90067, Attn: Jeffrey Pomerantz, Esq.; (4) counsel to Fourth Third LLC,  Winston & Strawn LLP,

17    101 California Street, 39th Floor, San Francisco, California 94111-5802, Attn: John Fredericks,

18    Esq. and Justin E. Rawlins, Esq.; and (5) counsel to Investment Funding, Inc., English & Gloven,

19    a professional corporation, 550 West C Street, Suite 1800, San Diego, CA  92101, Attn:  Donald

20    A. English, Esq.

21    **IV.**

22    **DISCLAIMER**

23    **THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY**

24    **BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN.  PLEASE READ**

25    **THIS DOCUMENT WITH CARE.  THE PURPOSE OF THE DISCLOSURE**

26    **STATEMENT IS TO PROVIDE "ADEQUATE INFORMATION" OF A KIND, AND IN**

27    **SUFFICIENT DETAIL, AS FAR AS IS REASONABLY PRACTICABLE IN LIGHT OF**

28    **THE NATURE AND HISTORY OF THE DEBTORS AND THE CONDITION OF THE**

1    DEBTORS' BOOKS AND RECORDS, THAT WOULD ENABLE A HYPOTHETICAL

2    REASONABLE INVESTOR, TYPICAL OF HOLDERS OF CLAIMS OR INTERESTS OF

3    THE RELEVANT CLASS, TO MAKE AN INFORMED JUDGMENT CONCERNING

4    THE PLAN.  SEE 11 U.S.C. § 1125(a).  UNLESS OTHERWISE INDICATED, THE DATE

5    OF ALL OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE

6    STATEMENT IS AS OF JUNE 6, 2011.

7       FOR THE CONVENIENCE OF CREDITORS AND INTEREST HOLDERS, THIS

8    DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, BUT THE

9    PLAN ITSELF QUALIFIES ANY SUMMARY.  IF ANY INCONSISTENCY EXISTS

10    BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE TERMS OF THE

11    PLAN ARE CONTROLLING.

12       NO REPRESENTATIONS CONCERNING THE DEBTORS, THEIR FINANCIAL

13    CONDITION, OR ANY ASPECT OF THE PLAN ARE AUTHORIZED OTHER THAN AS

14    SET FORTH IN THIS DISCLOSURE STATEMENT.  ANY REPRESENTATIONS OR

15    INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE OR REJECTION OF THE

16    PLAN, WHICH ARE OTHER THAN AS CONTAINED IN OR INCLUDED WITH THIS

17    DISCLOSURE STATEMENT, SHOULD NOT BE RELIED UPON BY YOU IN

18    ARRIVING AT YOUR DECISION.

19       THE FINANCIAL INFORMATION CONTAINED HEREIN, UNLESS

20    OTHERWISE INDICATED, IS UNAUDITED.  THE PROPONENTS ARE UNABLE TO

21    WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS

22    WITHOUT INACCURACIES.  IN CONNECTION WITH PREPARING THIS

23    DISCLOSURE STATEMENT, THE NON-DEBTOR PROPONENTS HAVE RELIED ON

24    INFORMATION PROVIDED BY THE DEBTORS BECAUSE THE NON-DEBTOR

25    PROPONENTS DO NOT CONTROL OR HAVE POSSESSION OF ALL DOCUMENTS

26    AND MATERIALS OF THE DEBTORS OR HISTORICAL KNOWLEDGE

27    CONCERNING THE DEBTORS AND THEIR AFFAIRS.  GREAT EFFORT, HOWEVER,

28    HAS BEEN MADE TO ENSURE THAT ALL SUCH INFORMATION IS PRESENTED

1  FAIRLY.  IN PARTICULAR, THE NON-DEBTOR PROPONENTS HAVE RELIED ON

2  CERTAIN STATEMENTS, REPRESENTATIONS AND INFORMATION PROVIDED BY

3  THE DEBTORS BECAUSE THE NON-DEBTOR PROPONENTS DO NOT CONTROL

4  OR HAVE POSSESSION OF ALL DOCUMENTS AND MATERIALS OF THE DEBTORS

5  OR HISTORICAL KNOWLEDGE CONCERNING THE DEBTORS AND THEIR

6  AFFAIRS.  THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT

7  IS INCLUDED HEREIN SOLELY FOR PURPOSES OF SOLICITING ACCEPTANCES

8  OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER

9  THAN TO DETERMINE HOW TO VOTE ON THE PLAN.

10  THE PROFESSIONALS WHO HAVE ASSISTED IN PREPARATION OF THIS

11  DISCLOSURE STATEMENT HAVE RELIED UPON INFORMATION PROVIDED BY

12  THE DEBTORS' MANAGEMENT, EMPLOYEES AND OTHER PROFESSIONALS IN

13  CONNECTION WITH PREPARATION OF THIS DISCLOSURE STATEMENT.

14  ALTHOUGH THE PROFESSIONALS WHO HAVE ASSISTED IN PREPARATION OF

15  THIS DISCLOSURE STATEMENT HAVE PERFORMED CERTAIN LIMITED DUE

16  DILIGENCE IN CONNECTION WITH THE PREPARATION OF THIS DISCLOSURE

17  STATEMENT, THEY HAVE NOT, EITHER INDEPENDENTLY OR COLLECTIVELY,

18  VERIFIED ALL OF THE INFORMATION CONTAINED HEREIN.

19  ALTHOUGH A COPY OF THE DISCLOSURE STATEMENT HAS BEEN

20  SERVED ON THE SECURITIES AND EXCHANGE COMMISSION ("SEC") AND THE

21  SEC HAS BEEN GIVEN AN OPPORTUNITY TO OBJECT TO THE ADEQUACY OF

22  THE DISCLOSURE STATEMENT, THIS DISCLOSURE STATEMENT HAS NOT BEEN

23  REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE

24  "SECURITIES ACT"), OR APPLICABLE STATE SECURITIES LAWS.  NEITHER THE

25  SEC NOR ANY STATE REGULATORY AUTHORITY HAS PASSED UPON THE

26  ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT, THE EXHIBITS

27  HERETO, OR THE STATEMENTS CONTAINED HEREIN.

28

1    THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE

2    CONSTRUED AS LEGAL, BUSINESS, OR TAX ADVICE.  TO ENSURE COMPLIANCE

3    WITH REQUIREMENTS IMPOSED BY THE INTERNAL REVENUE SERVICE, WE

4    INFORM YOU THAT (A) ANY UNITED STATES FEDERAL TAX ADVICE

5    CONTAINED HEREIN WAS NOT INTENDED OR WRITTEN TO BE USED, AND

6    CANNOT BE USED, FOR THE PURPOSE OF AVOIDING UNITED STATES FEDERAL

7    TAX PENALTIES, (B) ANY SUCH ADVICE WAS WRITTEN TO SUPPORT THE

8    PROMOTION OR MARKETING OF THE TRANSACTION OR MATTER ADDRESSED

9    HEREIN AND (C) ALL CREDITORS AND/OR INTEREST HOLDERS SHOULD SEEK

10    ADVISE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN

11    INDEPENDENT TAX ADVISOR.  THERE IS NO LIMITATION IMPOSED ON ANYONE

12    READING THIS DISCLOSURE STATEMENT ON DISCLOSURE OF THE TAX

13    TREATMENT OR TAX STRUCTURE OF ANY TRANSACTION.  NOTHING IN THIS

14    DISCLOSURE STATEMENT MAY BE USED OR REFERRED TO IN PROMOTING,

15    MARKETING OR RECOMMENDING A PARTNERSHIP OR OTHER ENTITY,

16    INVESTMENT PLAN, OR ARRANGEMENT TO ANY PERSON.  ALL CREDITORS

17    AND/OR INTEREST HOLDERS SHOULD CONSULT THEIR OWN LEGAL COUNSEL

18    AND/OR ACCOUNTANT(S) AS TO LEGAL, TAX, AND OTHER MATTERS

19    CONCERNING THEIR CLAIMS OR INTERESTS.

20                                      **V.**

21                **OVERVIEW OF THE CHAPTER 11 PROCESS AND THE PLAN**

22    A.        **The Chapter 11 Process, the Plan and Confirmation**

23        Chapter 11 of the Bankruptcy Code contains numerous provisions, the general effect of

24    which is to provide debtors with "breathing space" within which to propose a plan to address their

25    obligations to third parties.  The filing of a chapter 11 bankruptcy petition creates a bankruptcy

26    "estate" comprising all of the property interests of the debtor.  Unless a trustee is appointed by the

27    Bankruptcy Court (no trustee has been appointed in these Cases), a debtor remains in possession

28    and control of all its assets as a "debtor in possession."  The debtor may continue to operate its

1  business in the ordinary course on a day-to-day basis without Bankruptcy Court approval.

2  Bankruptcy Court approval is only required for various enumerated kinds of transactions (such as

3  certain financing transactions) and transactions out of the ordinary course of a debtor's business

4  (such as the sale of the Debtors' assets).  The filing of the bankruptcy petition gives rise to what is

5  known as the "automatic stay" that, generally, enjoins creditors from taking any action to collect

6  or recover obligations owed by a debtor prior to the commencement of a chapter 11 case.  The

7  Bankruptcy Court can, however, grant relief from the automatic stay under certain specified

8  conditions or for cause.

9       A chapter 11 plan may provide for the reorganization of the debtors or the orderly

10  liquidation and administration of the assets of the debtors' estates.  A plan provides, among other

11  things, for the treatment of the allowed claims against and allowed equity interests in the debtors.

12       "Confirmation" is the technical term for a bankruptcy court's approval of a plan of

13  reorganization.  At the Confirmation Hearing, in order to confirm the Plan, the Proponents must

14  demonstrate that they have met the requirements of section 1129 of the Bankruptcy Code.  If the

15  Bankruptcy Court determines that all of the requirements of section 1129 have been satisfied, the

16  Bankruptcy Court will enter an order confirming the Plan.  The Debtors believe that the Plan

17  satisfies all the statutory requirements of Chapter 11 of the Bankruptcy Code, including section

18  1129 of the Bankruptcy Code.

19       Voting on a Plan is tabulated by Class.  An impaired Class of Claims that votes will have

20  accepted the Plan if (a) the holders (other than any holder designated by the Bankruptcy Court

21  based on their vote or its solicitation not being in good faith under section 1126(e) of the

22  Bankruptcy Code) of at least two-thirds in amount of the Claims actually voting in such Class

23  have voted to accept the Plan and (b) the holders (other than any holder designated under section

24  1126(e) of the Bankruptcy Code) of more than one-half in number of the Claims actually voting in

25  such Class have voted to accept the Plan.

26       Section 1129(b) permits the confirmation of a plan of reorganization notwithstanding the

27  non-acceptance of a plan by one or more impaired classes of claims or equity interests.  Under that

28  section, a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and

1   is "fair and equitable" as to each non-accepting class.  The Proponents reserve the right to request

2   confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code in the event that not

3   all impaired classes of Claims vote to accept the Plan in accordance with section 1126 of the

4   Bankruptcy Code.

5         **B.**    **Overview of the Proposed Plan**

6         The following is a brief overview of the material provisions of the Plan and is qualified in

7   its entirety by reference to the full text of the Plan.  For a more detailed description of the terms

8   and provisions of the Plan, see Article VII below.

9         1.    General Structure of the Plan.

10        Prior to the bankruptcy filing of the New Debtors, they received three proposals from

11  interested parties (including a proposal from Fourth Third and Investment Funding) which

12  contemplated a return for Holders of Interests.  Such offers and other factors have led the Debtors

13  to believe that the value of the Debtors' Assets may be sufficient to pay all Holders of Allowed

14  Claims in full plus interest and provide a return for Holders of Interests.  Thus, as discussed

15  below, the Debtors retained KPMG effective February 1, 2011 to pursue strategic alternatives

16  designed to maximize value for creditors and stakeholders.

17        The Debtors' operations have resulted in significant losses since inception.  The

18  Committee, Fourth Third and Investment Funding were concerned whether the Investment

19  Banking Process would be successful and whether the Debtors' would have sufficient liquidity to

20  complete the process.  As a result, the Committee, Fourth Third and Investment Funding reached

21  agreement on the terms of a reorganization plan (the "Creditor Plan") pursuant to which Fourth

22  Third and Investment Funding would convert their General Unsecured Claims to equity in the

23  reorganized entity and provide financing sufficient to satisfy Allowed Claims in full based upon a

24  series of assumptions regarding the amount of Allowed Claims, the profitability of the Debtors'

25  operations leading up to confirmation of the plan, mounting Administrative Claims (including

26  professional fees), and how soon a plan could be confirmed.

27        The Committee, Fourth Third and Investment Funding requested that the Debtors support

28  the Creditor Plan and agreed to build the Investment Banking Process into the Creditor Plan to

1   enable the Debtors to continue soliciting transactions that would provide more value to the

2   Debtors than that being offered by the Creditor Plan, but setting deadlines in the Investment

3   Banking Process that the Committee, Fourth Third and Investment Funding believed were

4   necessary to avoid further potential Administrative Claims against the Estates.  The Debtors

5   initially declined to join in the Creditor Plan for a few reasons, including, among other things, the

6   Debtors' concern that the Creditor Plan would not provide sufficient time for the Investment

7   Banking Process to conclude.  After further negotiations, the Debtors, Fourth Third, Investment

8   Funding and the Committee reached an agreement on numerous key issues, including a timeline

9   for the Investment Banking Process.  Further, Fourth Third and Investment Funding agreed to

10  compromise their General Unsecured Claims by more than $9 million in the event the Debtors can

11  secure Court approval of a Successful Bid on or before July 22, 2011, and payment to Fourth

12  Third and Investment Funding on or before August 5, incentivizing any potential bidders by

13  lowering the minimum price they must pay.  Their complete agreement was embodied in a

14  Restructuring Support Agreement and Term Sheet among the Proponents that has been approved

15  by the Bankruptcy Court.  Their agreement will be implemented by this Plan

16          2.      <u>Continuation of the Investment Banking Process</u>

17          The Plan contemplates the continuation of the Investment Banking Process on a time line

18  that the Debtors believe will provide KPMG with sufficient time to attract an investment proposal

19  which provides value for Holders of Claims and Interests.  Specifically, the Investment Banking

20  Process provides for the following deadlines to solicit higher and better offers (as compared to the

21  offer embodied in <u>Scenario B</u>):

22          a.      Bids shall be due on or before July 15, 2011;

23          b.      Selection of the Successful Bid, including at the conclusion of an auction if

24                  appropriate, shall take place on or before July 20, 2011;

25          c.      Court approval of any Successful Bid shall take place on or before July 22,

26                  2011.

27          The deadlines set forth above may not be altered without the consent of all of the

28  Proponents.

3.    Bidding Procedures under the Investment Banking Process

The Investment Banking Process also provides for the following bidding procedures

    a.    Minimum Bid:  No bid will be considered unless it provides for payment on or before August 5, 2011 of cash consideration available for distribution on account of Allowed Administrative Claims, Allowed Secured Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims and Allowed General Unsecured Claims equal to or greater than the sum of:

        (A)    the greater of (i) $3.6 million or such lesser amount necessary to pay in full the DIP Loan, Allowed Secured Claims, Allowed Administrative Claims (including all investment banking fees, i.e. the $500,000 KPMG success fee), Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims and Allowed General Unsecured Claims (other than those of Fourth Third and Investment Funding), including any amounts necessary to fund Disputed Claims reserves in full; or (ii) the amount necessary to satisfy the DIP Loan, Allowed Secured Claims, Allowed Administrative Claims and $1 million to fund the payment of Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims and Allowed General Unsecured Claims  (other than those of Fourth Third and Investment Funding), including any amounts necessary to fund Disputed Claims reserves in full;

plus;

        (B)    $45.5 million on account of Fourth Third's Allowed Claim (the "Fourth Third Discounted Payoff", which represents an agreed, discounted payoff solely under Scenario A  provided

1         payment is received in good and sufficient funds on or

2         before August 5, 2011), plus,

3      (C)  $8.5 million on account of Investment Funding's Allowed

4         Claim (the "Investment Funding Discounted Payoff" which

5         represents an agreed, discounted payoff provided payment is

6         received in good and sufficient funds on or before August 5,

7         2011), plus

8      (D)  reimbursement of Fourth Third's and Investment Funding's

9         reasonable documented expenses incurred directly relating to

10        pursuit of the Plan up to an aggregate cap of $175,000 (the

11        "Reimbursement Cap"); plus

12      (E)  an amount to be determined by the Proponents to allow the

13        estates to object to Claims and make distributions if the

14        Successful Overbid does not contemplate confirmation of the

15        Plan.

16 Fourth Third and Investment Funding retain the right, in their sole discretion, to accept less

17 consideration than what is set forth above in paragraph B.3(a)(A)-(C), provided, however, such

18 lesser bid must provide for recoveries to General Unsecured Creditors greater than the General

19 Unsecured Creditor Recovery.

20    b.  Qualified Bidder:  Any party making a bid must be first designated as a

21      Qualified Bidder, which determination shall be made in consultation with

22      all Proponents.  For purposes of the Plan or any auction, "Qualified Bidder"

23      shall mean that such bidder must:

24    i.  be able to demonstrate the financial capacity to consummate the

25      contemplated transaction on or before August 5, 2011;

26    ii.  be reasonably likely, able, and willing to consummate the

27      transaction on or before August 5, 2011;

28

<div style="margin-left:2em">

iii.    pay a good faith cash deposit in the form of a cashier's check or wire transfer in an amount not less than the greater of $1,000,000 or 2% of the total consideration offered; upon a Qualified Bidder being declared the winning and best bid at auction or otherwise, the Qualified Bidder's deposit shall become non-refundable and credited toward the purchase price, after which date, Fourth Third and Investment Funding shall be entitled to reimbursement of reasonable expenses incurred directly relating to their pursuit of the Plan up to the Reimbursement Cap.

c.    <u>Other Bid Requirements</u>:  In order to be considered, each bid must:

i.    make an irrevocable offer in the form of an executed agreement,

ii.    not contain any financing or due diligence contingencies,

iii.    be a binding and unconditional commitment to close and fund a transaction by August 5, 2011, subject only to entry of appropriate orders by the Bankruptcy Court, and

iv.    be on terms that are consistent with the treatment of Allowed Administrative Claims, Allowed Secured Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims and Allowed General Unsecured Claims as set for in Plan <u>Scenario A</u> as set forth below.

d.    <u>Other Bid Procedures</u>:  The Debtors, in their business judgment but in consultation with the other Proponents, may set such other deadlines or requirements in connection with the Investment Banking Process as are appropriate or necessary.  The Proponents shall be consultation parties on all aspects of the Investment Banking Process and the bid procedures, including the determination of whether a bidder is a Qualified Bidder and if a bid meets the Minimum Bid and Other Bid Requirements.  All materials

</div>

1    relating to qualifying any bidder and any bids themselves shall be

2    distributed by the Debtors to all Proponents.

3    e.    Selection of Successful Bid:  The decision regarding the best bid (the

4    "Successful Bid") shall be made by the Debtors in their sole discretion,

5    provided that no bid may be considered unless it is made by a Qualified

6    Bidder and it meets the Minimum Bid and Other Bid Requirements, and

7    provided that the Committee, Fourth Third, and Investment Funding shall

8    retain standing to object to the Successful Bid on any and all grounds.  If

9    the Committee, Fourth Third, Investment Funding, or any or all of them,

10    raise an objection to a Successful Bid, and such objection is the sole cause

11    of a delay of the consummation of the transaction outlined by the

12    Successful Bid and such objection is also ultimately overruled by the Court,

13    then the resultant delay caused by such objection shall not be considered in

14    determining whether the timelines set forth in the Plan have been met,

15    provided, however, the timeline for payment of the Fourth Third

16    Discounted Payoff and the Investment Funding Discounted Payoff shall not

17    be extended unless Fourth Third and Investment Funding (and not the

18    Committee) raised the overruled objection to the Successful Bid.

19    f.    Reservation of Rights: The Committee, Fourth Third, and Investment

20    Funding reserve their right to object to any aspect of the Bid Procedures or

21    the Investment Banking Process.  Any disputes amongst the Proponents

22    with regards to the whether a bidder is a Qualified Bidder, whether a Bid

23    meets the Minimum Bid Requirements or Other Bid Requirements, or any

24    of the Other Bid Procedures shall be resolved by the Bankruptcy Court.  If

25    such an objection is the sole cause of a delay in the process under Scenario

26    A, but is eventually overruled by the Bankruptcy Court, the resultant delay

27    shall not be considered in determining whether the timelines set forth in the

28    Plan have been met, provided, however, the timeline for payment of the

1     Fourth Third Discounted Payoff and the Investment Funding Discounted

2     Payoff shall not be extended unless Fourth Third and Investment Funding

3     (and not the Committee) raised the overruled objection.

4         4.     Confirmation Hearing to Approve Scenario A or Scenario B

5     By the time of the Confirmation Hearing (which shall occur on or prior to July 22, 2011),

6     either (a) the Debtors will have secured a Successful Bid, in which case the Court will consider

7     approval of such bid and proceeding under Scenario A (including confirmation of the Plan to the

8     extent the Successful Overbid contemplates confirmation of the Plan), or (b) the Debtors will not

9     have secured a Successful Bid (or the Bankruptcy Court has declined to approve the Successful

10    Bid), in which case the Court will consider confirmation of the Plan under Scenario B.

11         5.     Estimated Recoveries

12         a.     Estimated Recoveries to Holders of Allowed Administrative, Priority, and

13             Secured Claims

14     Holders of Allowed Administrative Claims, Priority Tax Claims, Priority Non-Tax Claims

15    and Secured Claims will be paid in cash in full.

16         b.     Estimated Recoveries to Holders of Allowed General Unsecured Claims

17             i.     Scenario A.  If the Debtors receive a Successful Bid, then, based

18                 upon the definition of a Successful Bid, the Holders of all Allowed

19                 Claims will be paid in full.

20             ii.    Scenario B.  If the Debtors do not receive a Successful Bid, then

21                 distributions to Holders of Allowed Claims will be paid from the

22                 proceeds of the Exit Facility.  At a minimum, the proceeds of the

23                 Exit Facility will (a) be sufficient to pay all Allowed Secured Claims

24                 and Administrative Claims in full; and (b) make $1 million available

25                 for distribution to Holders of Allowed Priority Tax Clams, Allowed

26                 Priority Non-Tax Claims and Allowed General Unsecured Claims;

27                 which based upon the current assumptions regarding the amounts of

28                 Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims and

1    Allowed General Unsecured Claims, will provide for a sixty percent

2    (60%) distribution to Holders of Allowed General Unsecured

3    Claims.  Alternatively, the amount of the Exit Facility will be $3.6

4    million which, under certain assumptions could provide for payment

5    in full plus interest of all Allowed General Unsecured Claims.  The

6    Committee negotiated for 100% payment to Holders of Allowed

7    General Unsecured Claims consisting of eighty-five percent (85%)

8    payable on the Effective Date and fifteen percent (15%) payable on

9    the one year anniversary of the Effective Date plus interest at the

10   federal judgment rate (the "General Unsecured Creditor Recovery")

11   to maximize value for unsecured creditors in the event the

12   Investment Banking Process is unsuccessful.  The General

13   Unsecured Creditor Recovery will be paid from the proceeds of the

14   Exit Facility subject to the availability of sufficient proceeds. Fourth

15   Third and Investment Funding have agreed that the Exit Facility will

16   be the greater of (a) $3.6 million; or (b)(i) an amount sufficient to

17   pay the Allowed DIP Loan Claim, all Allowed Secured Claims and

18   Administrative Claims in full and (ii) an additional $1 million to be

19   made available for distribution to Holders of Allowed Priority Tax

20   Clams, Allowed Priority Non-Tax Claims and Allowed General

21   Unsecured Claims.  If the Exit Facility is insufficient to satisfy the

22   General Unsecured Creditor Recovery, the Plan provides the

23   Committee with the right to negotiate with Fourth Third and

24   Investment Funding to increase the amount of the Exit Facility,

25   thereby possibly increasing the distribution to Holders of Allowed

26   General Unsecured Claims above the $1 million guaranteed amount.

27   To the extent the distribution is not increased, and the Committee

28   elects to proceed with confirmation of the Plan, Holders of Allowed

General Unsecured Claims will receive at least their Pro Rata share of $1 million minus amounts sufficient to satisfy Allowed Priority Tax Claims and Allowed Priority Non-Tax Claims in full.  Under Scenario B, in lieu of a cash distribution, each Holder of an Allowed General Unsecured Claim may elect, in its discretion, to receive its Pro Rata share of the New Common Interests in Reorganized Technologies in accordance with the treatment of the Allowed General Unsecured Claims of Fourth Third and Investment Funding.

iii.    Estimated Recoveries to Fourth Third and Investment Funding. Under Scenario A, Fourth Third and Investment Funding will be paid the Fourth Third Discounted Payoff and the Investment Funding Discounted Payoff (i.e., $45.5 million and $8.5 million), respectively, in full satisfaction of their claims provided that such amounts are received on or before August 5, 2011.  Under Scenario B, each of Fourth Third and Investment Funding (and any other holder of an Allowed General Unsecured Claim electing equity in lieu of a cash distribution) shall receive its Pro Rata share of New Common Interests (i.e., newly issued common stock of Reorganized Technologies, representing 100% of the equity of Reorganized Technologies, subject to dilution).  Certain key terms and conditions of the New Common Interests will be set forth in the Plan Supplement.

iv.    Estimated Recoveries to Holders of Intercompany Claims.  All Intercompany Claims shall be either (i) reinstated, in full or in part, but which reinstatement shall not alter the treatment provided to Holders of Allowed General Unsecured Claims, or (ii) discharged and extinguished.  Under Scenario A, treatment of Intercompany Claims shall be decided by the Debtors in their sole discretion.

1    Under Scenario B, treatment of Intercompany Claims shall be

2    decided by Fourth Third in its sole discretion.

3    v.    Estimated Recoveries to Holders of Subordinated Claims. Under

4    Scenario A, Subordinated Claims shall receive the treatment set

5    forth under the Successful Bid (if any).  Under Scenario B,

6    Subordinated Claims shall be discharged and extinguished.

7    vi.    Estimated Recoveries to Holders of Interests. Under Scenario A, to

8    the extent provided by the Successful Bid, Holders of Interests may

9    receive no recovery or may retain or be paid (a) some or all of their

10    Interests, (b) cash, (c) any other consideration provided for in

11    connection with a Successful Bid (including new interests in the

12    reorganized Debtors), or (d) any combination of the following.

13    Under Scenario B, Holders of Interests shall receive no recovery.

14    6.    Summary of Classification of Treatment of Claims and Interests

15    The Plan designates a series of Classes of Claims and Interests for each Debtor.  These

16    Classes take into account the differing nature and priority under the Bankruptcy Code of the

17    various Claims and Interests.

18    The following table (the "Plan Summary Table") summarizes the classification and

19    treatment of the Claims and Interests under the Plan under Scenario A and Scenario B, as well as

20    an estimate of the percentage range of recovery for Holders of Claims and Interests in each Class.

21    THE TABLE IS INTENDED FOR ILLUSTRATIVE PURPOSES ONLY AND DOES NOT

22    ADDRESS ALL ISSUES REGARDING CLASSIFICATION, TREATMENT, AND ULTIMATE

23    RECOVERIES AND IS NOT A SUBSTITUTE FOR A FULL REVIEW OF THIS

24    DISCLOSURE STATEMENT AND THE PLAN (ATTACHED HERETO AS EXHIBIT "A") IN

25    THEIR ENTIRETY.

26

27

28

1        The Plan Summary Table lists a range of estimated percentages of recovery for each Class.

2    The estimated percentage range of recovery for each Class is based on a good faith estimate of the

3    amounts of the Claims that will ultimately be Allowed[1] and the cash that will be available for

4    distributions to Holders of Allowed Claims and Allowed Interests based on all currently known

5    information.  The actual amount of proceeds available for distribution from the liquidation of all of

6    the Debtors' Assets could vary materially from the estimates.[2]  The estimates of the percentage

7    range of recoveries may be adversely or favorably affected by the aggregate amount of Claims,

8    including Administrative and Priority Claims, Priority Tax Claims, Priority Non-Tax Claims, DIP

9    Loan Claim, Secured Claims, and General Unsecured Claims, and the recoveries from litigation,

10    sales or equity contributions.  Therefore, the actual recoveries also could vary materially from

11    those shown on the Plan Summary Table.

12        For all of the reasons stated above, no representation can be, or is being, made with respect

13    to whether the estimated percentage range of recoveries shown on the table below actually will be

14    realized by the holder of an Allowed Claim or Allowed Interest in any particular Class.  THERE

15    IS NO GUARANTEED RECOVERY AND THERE ARE NO GUARANTEED AMOUNTS OF

16    RECOVERY FOR ANY HOLDER OF A CLAIM OR INTEREST.  However, in order to confirm

17    the Plan, Holders of Allowed Administrative Claims, the DIP Claim, Allowed Priority Tax Claims

18    and Allowed Priority Non-Tax Claims must be paid in full.  Moreover, unless Holders of Allowed

19    General Unsecured Claims receive the General Unsecured Creditor Recovery, the Plan may not be

20    confirmed unless the Committee agrees on alternative treatment of Allowed General Unsecured

21    Claims with Fourth Third and Investment Funding.

22

23

---

24    [1] The estimated recoveries to Holders of Allowed Claims could vary materially from the estimates
      and do not constitute an admission by the Proponents or any party as to the validity or amount of
25    any particular Claim or Interest.  The Proponents, on behalf of themselves and the Reorganized
      Debtors (and Liquidating Trustees, if any), reserve the right to dispute the validity or amount of any
26    Claim or Interest that has not already been Allowed by the Bankruptcy Court or by agreement of
      the parties.

27    [2] The estimates in the Plan Summary Table exclude any recoveries that may be realized from the
      prosecution of affirmative claims.
28

1    In addition, the Plan provides for the establishment of the Disputed Claims Reserve with

2 respect to Disputed Claims.  Interim distributions on the Allowed Claims will be made with

3 appropriate amounts being held in the reserve to cover the Disputed Claims.  As a result, to the

4 extent there are material Disputed Claims, the process of distributing all of the Cash to be

5 distributed to Holders of Allowed Claims under the Plan may be completed over time.

6    **SUMMARY OF CLAIMS AND INTERESTS UNDER THE PLAN – SCENARIOS A AND B**

| CLASS | CLAIM INTEREST | TREATMENT | ESTIMATED RANGE OF THE AMOUNT OF ALLOWED CLAIMS [3] | ESTIMATED PERCENTAGE RECOVERY OF ALLOWED CLAIMS OR INTERESTS |
|---|---|---|---|---|
| n/a | DIP Loan | The DIP Loan will be indefeasibly repaid in full in cash from the Exit Facility (discussed below) on or before the Effective Date. | $1.6 million | 100% |
| n/a | Administrative Claims against Technologies, Fasteel, Steel Corp. and International | Except to the extent that any entity entitled to payment of an Allowed Administrative Claim agrees to a less favorable treatment or unless otherwise ordered by the Court, each Holder of an Allowed Administrative Claim will receive in full satisfaction, discharge, exchange and release thereof, Cash in an amount equal to such Allowed Administrative Claim on the later of (i) the Effective Date, and (ii) the fifteenth (15th) Business Day after such Administrative Claim becomes an Allowed Administrative Claim, or, in either case, as soon thereafter as is practicable.<br><br>Each Holder of a Professional Fee Claim seeking an award of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date will (i) file their respective interim (if applicable) and final fee applications by no later than the tenth (10th) day after the Effective Date or such other date as may be fixed by the Court or (ii) if granted such an award, be paid Cash in such amounts as are Allowed by the Court on the date such Professional Fee Claim becomes an Allowed Claim, or as soon thereafter as is practicable. | $500,000 | 100% |

---

[3]    The estimated amounts are the anticipated amounts due and owing on August 5, 2011, the anticipated Effective Date of the Plan.  The actual amount of the Allowed Claims may be materially different (including materially greater) than the ranges presented.

| CLASS | CLAIM INTEREST | TREATMENT | ESTIMATED RANGE OF THE AMOUNT OF ALLOWED CLAIMS [3] | ESTIMATED PERCENTAGE RECOVERY OF ALLOWED CLAIMS OR INTERESTS |
|---|---|---|---|---|
| n/a | Priority Tax Claims against Technologies, Fasteel, Steel Corp. and International | Except to the extent that a Holder of an Allowed Priority Tax Claim has been paid by the Debtors before the Effective Date or agrees to a less favorable treatment, each Holder of an Allowed Priority Tax Claim will receive in full satisfaction, discharge, exchange and release thereof, Cash in an amount equal to such Allowed Priority Tax Claim on the later of (i) the Effective Date or (ii) the fifteenth (15th) Business Day after such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as is practicable. | $0 | 100% |
| 1 | Priority Non-Tax Claims | Each Holder of an Allowed Class 1 Priority Non-Tax Claim, unless otherwise mutually agreed upon by the Holder of such Claim and the Debtors, will receive Cash in an amount equal to such Class 1 Allowed Priority Non-Tax Claim on the later of (a) the Effective Date, or as soon as practicable thereafter, or (b) the date such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim pursuant to a Final Order, or as soon thereafter as is practicable. | Technologies - $23,909.45; Fasteel - $0; Steel Corp. - $23,719.38; International - $0 | 100% |
| 2 | Secured Claims | Except to the extent that a holder of an allowed Secured Claim and Fourth Third and Investment Funding agree to a different treatment, each holder of an allowed Secured Claim shall, in full and final satisfaction of such claim, (i) be reinstated and rendered unimpaired in accordance with section 1124(2) of the Bankruptcy Code, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the holder of an allowed Secured Claim to demand to receive payment of such allowed Secured Claim prior to the stated maturity of such allowed Secured Claim from an after the occurrence of a default, or (ii) receive cash in an amount equal to such allowed Secured Claim in full and complete satisfaction of such allowed Secured Claim.  The Plan Proponents will file in the Plan Supplement a list of proposed treatments for each Holder of an Allowed Secured Claim. | Technologies - $22,500; Fasteel - $0; Steel Corp. - $458,579; International - $0 | 100% |

| CLASS | CLAIM INTEREST | TREATMENT | ESTIMATED RANGE OF THE AMOUNT OF ALLOWED CLAIMS [3] | ESTIMATED PERCENTAGE RECOVERY OF ALLOWED CLAIMS OR INTERESTS |
|---|---|---|---|---|
| 3 | General Unsecured Claims | Under Scenario A, each holder of an Allowed General Unsecured Claim shall be paid in full, with interest.  Under Scenario B, each holder of an allowed General Unsecured Claim, excluding Fourth Third on account of the Fourth Third Indebtedness and Investment Funding on account of the Investment Funding Indebtedness (who shall be deemed to receive equity in lieu of a cash distribution) or any holder electing to receive equity in lieu of a cash distribution, shall receive, in full and final satisfaction of its allowed General Unsecured Claim, the General Unsecured Creditor Recovery, subject to availability under the Exit Facility.  Fourth Third, Investment Funding, and any holder of an allowed General Unsecured Claim electing equity in lieu of a cash distribution shall, subject to funding its Pro Rata share of the Exit Facility and post-confirmation capital requirements, receive its Pro Rata share of New Common Interests.  The Allowed General Unsecured Claims against International and the Allowed Rejection Damages Claims arising from the rejection of contracts and leases under this Plan shall be funded from amounts in addition to the Exit Facility or the Exit Facility shall be increased to account for such claims; the Allowed General Unsecured Claims against International and the Allowed Rejection Damages Claims shall  not reduce the General Unsecured Creditor Recovery. | Technologies - $786,704 (plus Fourth Third, Investment Funding and Rejection Damages Claims); Fasteel - $4,668 (plus Fourth Third and Rejection Damages Claims); Steel Corp. - $640,417 (plus Fourth Third and Rejection Damages Claims); International $135.62 (plus Fourth Third and Rejection Damages Claims) | 60% to 100% |
| 4 | Intercompany Claims | All Intercompany Claims shall, at the Proponents' (or Successful Bidder's) option, be either (i) reinstated, in full or in part, or (ii) discharged and extinguished. | $Unknown | 0% - 100% |
| 5 | Subordinated Claims | Under Scenario A, Subordinated Claims shall receive the treatment set forth under the Successful Bid (if any).  Under Scenario B, Subordinated Claims shall be discharged and extinguished. | Technologies - $0; Fasteel - $0; Steel Corp. - $25,000 International -$0 | 0% |

| CLASS | CLAIM INTEREST | TREATMENT | ESTIMATED RANGE OF THE AMOUNT OF ALLOWED CLAIMS [3] | ESTIMATED PERCENTAGE RECOVERY OF ALLOWED CLAIMS OR INTERESTS |
|---|---|---|---|---|
| 6 | Interests | Under Scenario A, Class 6 Interests in shall receive the treatment set forth under the Successful Bid, if any.  The treatment under the Successful Bid may provide that Holders of Interests receive no recovery or may retain or be paid (a) some or all of their Interests, (b) cash, (c) any other consideration provided for in connection with a Successful Bid (including new interests in the Reorganized Debtors), or (d) any combination of the following. Under Scenario B, all existing Interests shall be cancelled on the Effective Date.  Existing warrants for equity interests shall also be canceled and holders thereof will receive no distribution. | n/a | See treatment |

**THE TREATMENT AND DISTRIBUTIONS PROVIDED TO HOLDERS OF ALLOWED CLAIMS AND INTERESTS PURSUANT TO THE PLAN ARE IN FULL AND COMPLETE SATISFACTION OF THE ALLOWED CLAIMS AND INTERESTS ON ACCOUNT OF WHICH SUCH TREATMENT IS GIVEN AND DISTRIBUTIONS ARE MADE.**

<div align="center">

**VI.**

**DEBTORS' CHAPTER 11 CASES**

</div>

    A.      **Events Leading Up To The Filing Of The Chapter 11 Petition**

          1.      Historical Background of the Debtors

The Debtors are part of an integrated corporate enterprise engaged in the manufacturing and sale of corrosion-resistant, high-strength nanotechnology steel products.  Technologies is the parent company of multiple subsidiaries and is headquartered in Irvine, California.

Technologies was formed on June 22, 1998 for the purpose of acquiring and holding valuable patents in the field of nanotechnology.  Its first acquisition was a patent from the University of California, Berkley.  These proprietary micro- and nano-technologies enable the manipulation of the microstructures of materials (primarily steel) to obtain optimum microstructural properties.  In short, as set forth in greater detail below, the technology allows Technologies to produce steel ("MMFX Steel") that is stronger, more ductile, corrosion resistant, ecologically sound, and economical than standard steel.

1    In its effort to commercialize the technology, Technologies formed the following

2  subsidiaries (all referenced hereinafter as the "MMFX"):

3    •    Fasteel was formed in August 2000 and currently performs the research,

4  development, application and testing of MMFX Steel and related materials under various

5  conditions to test stress, corrosion and the like;

6    •    Steel Corp was formed in September 2001 to handle the sales and Marketing of

7  MMFX concrete-reinforcing steel, and currently includes fabrication services;

8    •    International Holdings was formed in May 2008 to act as a holding company for

9  the foreign companies, Canadian Holdings and DMCC.

10    •    MMFX Steel DMCC ("DMCC") was formed under the laws of the United Arab

11  Emirates and is licensed to conduct business as a member of the Dubai Multi Commodities Center

12  to serve and supply the Middle East region with steel products and to provide support services to

13  engineers, contractors and sales personnel throughout the region.  DMCC is not in bankruptcy and

14  not among the Debtors.

15    •    Canadian Holdings was formed in March 2006 to hold 100% of the stock of the

16  following three Canadian subsidiaries: ST Welland Real Estate Inc. ("Welland Real Estate"), ST

17  Equipment Inc. ("STE"), and MMFX Steel of Canada Inc. ("Canada Steel") (collectively, the

18  "Canadian Subsidiaries"), each of which is organized under the laws of British Colombia.  The

19  Canadian Subsidiaries operated a steel mill in Canada and owned certain related real estate and

20  equipment in Canada.  Canadian Holdings is not being reorganized under the Plan.  Canadian

21  Holdings is a shell entity that no longer holds any assets of value (*see* section VI.A.5 below) and

22  the Debtors shall determine how to proceed with Canadian Holdings outside of this Plan.

23    MMFX has operated as a consolidated business and all decision making is centralized in

24  Irvine, California.  The following chart represents the MMFX corporate structure:

25

26

27

28

1
2
3
4
5
6
7
8
9
10



11    Technologies holds seven main U.S. patents and has filed for patent protection in

12 approximately 50 countries/regions for a total of approximately 350 patent applications relating to

13 MMFX's steel.  Until May 2008, Technologies successfully financed its operations with

14 $67 million in equity capital contributed by the current shareholders.

15    2.    Equity

16    Technologies is a privately held company whose equity interests are held by several

17 individual, family trusts and other entities.  There are 15 million authorized shares of

18 Technologies and 10,001,649 of those shares are outstanding. Technologies holds 100% of the

19 interest in Fasteel, Steel Corp. and International Holdings.  International Holdings holds 100% of

20 the interest in Canadian Holdings and DMCC.

21    3.    The MMFX Steel Product

22    MMFX Steel is five times as corrosion-resistant and up to three times as strong as

23 conventional, or as it is commonly called in the industry, "black" steel.  MMFX Steel has a

24 completely different structure at the nano, or atomic, scale than black steel.  MMFX Steel, as a

25 result of its composition and the processes it undergoes, creates a laminated lath structure

26 resembling "plywood" at the molecular level, thus creating the structural strength present in

27 plywood as compared to natural wood.  This "plywood " structure gives MMFX Steel its superior

28 strength, ductility, toughness and corrosion resistance.

1    Steel manufactured with Technologies' proprietary technology has the potential to change

2    the way the industrialized world uses steel.  MMFX Steel allows high-rise construction with less

3    steel and concrete than traditional steel, which reduces construction costs and the environmental

4    impacts associated with steel and concrete production.  Because MMFX Steel is extremely

5    corrosion resistant, it has the potential to greatly reduce future replacement costs.  The U.S.

6    Federal Highway Administration currently estimates that it will cost $429 billion to fix the

7    infrastructure corrosion problems currently facing the United States.  This amount represents

8    approximately 3.1% of the United States' GDP.  MMFX Steel has the potential to significantly

9    reduce future replacement costs, resulting in substantial savings for future generations.

10    MMFX is well positioned to gain the global market's acceptance for its proprietary

11    products from nearly all important market sectors.  The utility of MMFX Steel for the building of

12    infrastructure has been independently verified by several public agencies and universities.  MMFX

13    Steel's characteristics have been recognized by all 50 state Departments of Transportation (the

14    "DOTs") and, most notably, by the Virginia Department of Transportation, which now mandates

15    use of MMFX Steel for all of its bridge construction.  26 state DOTs have used MMFX Steel for

16    construction of bridges and highways.

17    MMFX Steel is also increasingly used in the high rise construction market.  Numerous

18    cities and counties in the U.S. have approved the use of MMFX Steel for high rise construction,

19    including San Diego, Long Beach, Los Angeles and Irvine, California, Seattle, Washington, Las

20    Vegas Clark County, and Miami, Orlando, and McDade counties in Florida.  MMFX steel is

21    increasingly gaining acceptance in international markets and has been used in construction

22    projects in the Middle East, a potentially lucrative market due to the region's highly corrosive

23    climate.

24    MMFX Steel is typically produced by third party mills under contract. Currently, MMFX

25    offers for sale to the market both traditional grades of black steel rebar and MMFX Steel, and is

26    increasing its market share over manufacturers of black steel on DOT projects.  MMFX also sells

27    its steel to DMCC for the Middle East projects, as well as to third party buyers.  In addition,

28

1    MMFX provides fabrication (cut and bend) services the third-parties through the Company's

2    fabrication service centers.

3                          4.       Incurrence of Debt for the Welland Facility

4          In an effort to improve MMFX's cost structure and better manage lead times, MMFX

5    acquired a steel mill in Welland, Ontario (the "Welland Facility"), along with real estate

6    (including office space) and equipment, in April, 2006.  MMFX created the Canadian Subsidiaries

7    to hold the Canadian assets.  The acquisition of the Welland Facility was financed in part by the

8    issuance by Technologies of a $5,000,000.00 convertible secured note, with an additional

9    $5,000,000 payable at maturity to Investment Funding (the "Investment Funding Note").  The

10   Investment Funding Note was secured by all of the equipment, machinery and trade fixtures at the

11   Welland Facility.

12         Following an outlay of approximately $30,000,000 in capital expenditures to achieve

13   commercial start-up, the Welland Facility became operational in January 2009.  The start up of the

14   Welland Facility was funded in part through a $55,000,000.00 credit facility extended by Fourth

15   Third, as lender, and Welland Security Holding Corporation, as collateral agent ("Welland"), to

16   the Canadian Subsidiaries pursuant to a credit agreement dated as of May 30, 2008 (the "Fourth

17   Third Loan").  Technologies, Steel Corp, Fasteel, Canadian Holdings and International Holdings

18   guaranteed the Canadian Subsidiaries' obligations under the Fourth Third Loan.

19                          5.       Market Downturn and the Canadian Bankruptcy Filing

20         The Welland Facility started producing steel in September 2008, just prior to the most

21   severe inflection point of the global financial crisis.  Many building and infrastructure projects

22   were subsequently halted during the global recession, directly resulting in a precipitous drop in

23   demand for steel and corresponding plummeted steel prices.  Unable to generate profits in the

24   difficult operating environment, the Welland Facility ceased production in June 2009 to decrease

25   overhead costs.  Upon ceasing the Welland mill's production, the Company and the Welland

26   Facility were unable to generate sufficient cash flow to service the related debts.  The Canadian

27   Subsidiaries defaulted on their monthly interest payments between July 2009 and January 2010

28   and, in September 2009, agreed with Fourth Third to stay default action until November 2009.

1  Ultimately, MMFX was unable to secure sufficient capital to meet the requirements under the

2  loans or restructure its debt.

3          As the applicable cure period was nearing to an end and the efforts to restructure the

4  Fourth Third Loan were unsuccessful, and with no other alternatives available, the Canadian

5  Subsidiaries determined to seek bankruptcy protection.  On January 6, 2010, the Canadian

6  Subsidiaries filed their insolvency proceedings in Canada under the Companies Creditors

7  Arrangement Act ("CCAA Proceedings").

8          At the time of the CCAA Proceedings, the total outstanding secured debt owed by MMFX

9  was approximately $60,000,000 in principal (including the acquisition and start-up financings),

10  plus accrued interest.

11          Shortly after the commencement of the CCAA Proceedings, the Canadian Subsidiaries

12  marketed the Canadian assets.  In March 2010, Fourth Third provided debtor-in-possession

13  financing in the CCAA Proceedings (the "Canadian DIP Loan") to run the sale process.  A sale

14  auction (the "Canadian Asset Sale") occurred on July 20, 2010 in the CCAA Proceedings, and

15  Fourth Third was the successful bidder after entering a bid of CAD $33.8 million, including a

16  credit bid of CAD $32.8 (~US $30.9) million.

17                  6.      The Initial Debtors' Bankruptcy Filing

18          On January 5, 2010, Canadian Holdings, Inc. ("Canadian Holdings"), and International

19  (together with Canadian Holdings, the "Initial Debtors"), each filed a voluntary petition for relief

20  under chapter 11 of the Bankruptcy Code in this Court under Case Nos. 10-10083 and 10-10085,

21  respectively.

22          Concurrently with the Canadian bankruptcy filing, the Initial Debtors determined that they

23  had a critical need for bankruptcy protection since the stock of Canadian Holdings was pledged by

24  International Holdings to secure the Fourth Third Loan, and commenced their bankruptcy

25  proceedings in this Court on January 5, 2010, under Case Nos. 10-10083 and 10-10085,

26  respectively, which were later jointly administered under Case No. 10-10083.  Thereafter, the

27  bankruptcy cases of the Initial Debtors remained in a holding pattern pending the resolution of the

28  CCAA Proceedings.

1    7.    The New Debtors' Bankruptcy Filing

2    Following the closing of the Canadian Asset Sale, Fourth Third asserted a deficiency claim

3    against the MMFX guarantors under the Fourth Third Loan in an amount in excess of $49 million.

4    In addition, on or about October 20, 2010, Fourth Third obtained a right to attach order in a

5    proceeding captioned *Fourth Third, LLC v. MMFX Technologies Corporation*, in the Superior

6    Court of California in and for the County of San Diego, Case No. 37-2010-00102068-CU-CO-

7    CTL.

8    Additionally, on or about August 25, 2010, Investment Funding obtained a Temporary

9    Protective Order in a proceeding captioned *Investment Funding Corporation v. MMFX*

10   *Technologies Corporation*, in the California Superior Court in and for the County of San Diego,

11   Case No. 37-2010-00098635-CU-BC-CTL.

12   Around this same time (late 2010), the Debtors received three proposals from interested

13   parties.  Each of the proposals contemplated a return for Holders of Interests.

14   Unable to reach a resolution of the claims of Fourth Third or Investment Funding, or

15   obtain a forbearance, and in order to provide time to consider alternatives and proposals, Fasteel

16   filed its voluntary petition for relief on December 13, 2010.  Steel Corp. and Technologies each

17   filed a voluntary petition for relief on December 14, 2010.  Fasteel, Steel Corp. and Technologies

18   are referred to as the "New Debtors."  On December 22, 2010, the Court entered its orders

19   approving the joint administration of the New Debtors' and the Initial Debtors' cases for

20   procedural purposes under Case No. 8:10-10083 and the caption of lead case MMFX Canadian

21   Holdings, Inc.

22   **B.    The Debtors' Management**

23   The following is a list of the officers and the members who served on the board of

24   directors of Technologies, the parent company of the other Debtors, as of the Petition Date:

25

26   Charles E. Gathers, Sr.            Chief Executive Officer
                                        and Chairman of the Board

     Michael W. Pompay                 President & Corporate Secretary

27   Mark Ashdown                       Chief Financial Officer

28

| | |
|---|---|
| Mary H. Macartney | Assistance Corporate Secretary |
| Art Lupia | Chief Operating Officer |
| Salem Faza | VP of Engineering & Specification |
| Amy Van Amburgh | VP of Marketing |
| Daniel Furlan | Member of Board of Directors |
| Chris Cano | Member of Board of Directors |
| Admiral Steve Abbot (Ret.) | Member of Board of Directors |
| Hal Long | Member of Board of Directors |

**C.    Significant Post-Petition Events**

Since the Petition Date, the Debtors have continued in possession of their property and the management of their affairs as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

1.    Significant Motions Filed

As noted above, the cases of the Initial Debtors were in a holding pattern pending the resolution of the CCAA Proceedings during the early months after they were initiated.  The majority of the motions were filed subsequent to the bankruptcy filing of the New Debtors.  What follows is a summary description of certain main motions made in those cases.

a.    Plan Exclusivity

The Initial Debtors obtained several extensions of the periods within which they have the exclusive right to file a chapter 11 plan and solicit acceptances thereto (the "Exclusive Periods").  Initially, the extensions were sought while the process in the Canadian Proceedings ran its course, and later in order to have their Exclusive Periods run parallel with the deadlines in the cases of the New Debtors.  The following were the extensions the Initial Debtors obtained of their Exclusive Periods:

i.    On May 13, 2010, the Court entered its *Order Granting the Debtors' Motion for Extension of Exclusive Periods to File a Plan and to Solicit Acceptances thereto*, approving the Initial Debtors' first motion to extend exclusivity and extending the Exclusive Periods

through and including September 30, 2010, and November 29, 2010,
respectively.

ii.    Pursuant to an order entered on September 8, 2010, the Court
extended the Initial Debtors' Exclusive Periods to October 31, 2010
and December 31, 2010, respectively.

iii.    Pursuant to an order entered on November 4, 2010, the Court
extended the Exclusive Periods to November 30, 2010 and
January 31, 2011.

iv.    Pursuant to an order on December 14, 2010, the Court extended the
Exclusive Periods to February 28, 2011 and March 31, 2011,
respectively.

v.    On February 15, 2011, the Debtors filed the *Debtors' Second
Motion for Extension of Exclusive Periods to File a Plan and to
Solicit Acceptances thereto* seeking further extension of their
Exclusivity Periods.  This motion has been resolved by agreement
and with the filing of the Plan and this Disclosure Statement.

Thereafter, the Debtors sought collectively an extension of the Exclusive Periods by filing
on April 1, 2011 the *Debtors' Motion for Extension of Exclusive Periods To File a Plan and To
Solicit Acceptances Thereto*.  The Debtors' motion was not supported by the Committee.  Indeed,
the Committee sought to terminate the Exclusive Periods and, on April 1, 2011, filed the *Motion of
Official Committee of Unsecured Creditors for Order (I) Terminating the Exclusive Periods in
Which Only the Debtors May File a Plan and Solicit Acceptances (II) Permitting the Committee
To File a Plan and Disclosure Statement, and (III) Approving Restructuring Support Agreement*.
On April 11, 2011, Lindsey Davidson as Trustee of the Lindsey Davidson Trust dated April 28,
2009 (the "DIP Lender") filed an opposition to the Committee's motion to terminate the Exclusive
Periods.  The Debtors and the Committee met and conferred extensively and eventually resolved
their disputes regarding the extension of the Exclusive Periods pursuant to a stipulated resolution
filed on April 20, 2011 (the "Exclusivity Stipulation").  Pursuant to that resolution, the Debtors

1    agreed to proceed with a joint chapter 11 plan with the Committee, Fourth Third and Investment

2    Funding in accordance with a Term Sheet and a Restructuring Support Agreement, which were

3    attached to the Stipulation.  On April 21, 2011, the DIP Lender filed an objection to the

4    Exclusivity Stipulation, which objection was later conditionally withdrawn on April 25, 2011 after

5    the Debtors agreed to the termination of their Exclusive Periods.  At a hearing on April 27, 2011,

6    the Court approved the Exclusivity Stipulation, the Term Sheet and the Restructuring Support

7    Agreement.

8                                b.        DIP Motion

9            On December 14, 2010, each of Fasteel, Steel Corp., and Technologies filed a Debtor's

10    Emergency Motion for Interim and Final Order (I) Authorizing Post-Petition Financing and

11    Granting Liens and Super-Priority Claims, and (II) Providing Related Relief (collectively, the

12    "DIP Motion") in each of their cases.  The DIP Motion came on for an initial hearing before the

13    Court on December 17, 2010, at which hearing the Court granted the Motion on an interim basis

14    pursuant to its order entered on that day.  A final hearing on the DIP Motion was subsequently

15    held on February 22, 2011, at which hearing the Court granted the DIP Motion, thereby allowing

16    the Debtors to borrow up to $1,600,000 in available DIP financing on a revolving basis, without

17    prejudice to the Debtors' rights to seek additional financing on appropriate notice.

18                                c.        Motions to Limit Scope of Notice

19            On December 14, 2010, each of the New Debtors filed a motion to provide notice of

20    certain matters in their cases to only a limited number of parties in interest.  The New Debtors

21    believed that requiring notice and service by the New Debtors on all the parties in interest would

22    increase the costs of administering the cases without conferring any meaningful benefit on the

23    Debtors' estates.  Hence, in order to avoid the costs that serving a notice of certain pleadings on all

24    the parties in interest would impose while assuring that these parties receive proper and sufficient

25    notice of certain key matters, the New Debtors proposed to limit the notice on certain matters.  By

26    order dated December 22, 2010 (entered in case no. 10-27570), the Court granted this motion.

27

28

d.    Joint Administration Motion

On January 13, 2010, each of the Initial Debtors filed a motion for the joint administration of their cases.  By an order dated January 26, 2010, the Court approved the joint administration of the Initial Debtors' cases under the lead case of Canadian Holdings, Case No. 10-10083.

Upon the bankruptcy filing of the New Debtors, they each filed a motion seeking the joint administration of all the five bankruptcy cases of the Debtors, which the Court granted pursuant to its orders dated December 22, 2010, making the case of Canadian Holdings as the lead case for all five cases.

e.    Motion to Approve Key Contract

In connection with its "first Day" motions, Steel Corp. sought authority from the Court to continue to perform under a key agreement (the "Assignment Agreement") with Adelphia Metals, LLC ("Adelphia").  The Assignment Agreement is critical to Steel Corp.'s operations as the Assignment Agreement provides Steel Corp. with the necessary working capital it needs to satisfy the customer orders for its steel products.  Under the Assignment Agreement, Steel Corp. assigns its sales orders to Adelphia, in exchange for Adelphia providing the working capital to fulfill the assigned sales orders and paying a service fee to Steel Corp.  The Court confirmed Steel Corp.'s authority to continue to perform under the pre-petition Assignment Agreement in its order entered on December 22, 2010.  Upon the expiration of the Assignment Agreement, Steel Corp. entered into a renewed Assignment agreement with Adelphia and sought further order from the Court confirming its authority to continue to perform under the renewed agreement, which order the Court entered on March 17, 2011.

f.    Stipulation to Approve Agreement with Cascade

As part of Steel Corp.'s value-added services, Steel Corp.'s business includes providing thermal treatment at its processing plant to steel products it receives from steel producers.  Thereafter, the treated products are shipped to the steel producers' customers, and Steel Corp. receives a fee for the thermal treatment of the products.  Cascade Steel Rolling Mills, Inc. ("Cascade"), who is in the business of manufacturing steel products and operates out of

1  McMinnville, Oregon, is such a steel producer that delivers certain concrete-reinforcing steel

2  products (the "Steel Products") to Steel Corp. for thermal treatment.

3      Steel Corp. and Cascade entered into an agreement dated March 1, 2011, (the "Cascade

4  Agreement") documenting their business relationship and providing that the Steel Products, the

5  treated Steel Products, and their proceeds remain the property of Cascade.  On or about February

6  25, 2011, the parties and the DIP Lender entered into a stipulation seeking the approval of the

7  Cascade Agreement.  On March 29, 2011, the Court entered its order approving the stipulation.

8              g.      Access Protocol Motion

9      The Bankruptcy Code provides that a creditors' committee appointed under section

10  1102(a) of the Bankruptcy Code shall "provide access to information for creditors who (i) hold

11  claims of the kind represented by that committee; and (ii) are not appointed to the committee."

12  11 U.S.C. § 1102(b)(3)(A).  However, the Bankruptcy Code does not indicate how a creditors'

13  committee should provide "access to information" and, more importantly, does not indicate the

14  nature, scope, or extent of the "information" that a creditors' committee must provide to creditors

15  that it represents.

16      Typically, a creditors' committee and the debtor share various confidential and other non-

17  public proprietary information that the creditors' committees use to assess, among other things, a

18  debtor's capital structure, opportunities for the restructuring of a debtor's business in chapter 11,

19  the results of any revised operations of debtors in the bankruptcy cases, and a debtor's overall

20  prospects for reorganization under a chapter 11 plan.  These cases are no different.  In addition,

21  creditors' committees typically operate pursuant written by-laws that include confidentiality

22  provisions or enter into other similar arrangements with debtors.  In these cases, the Committee's

23  confidentiality obligations are required under its bylaws, which is executed by each Committee

24  member, to ensure that its members will keep the Debtors' information confidential.

25      As such, on or about February 2, 2011, the Committee filed a motion seeking an order

26  from the Court clarifying the Committee's duty regarding the sharing of information and

27  approving a protocol for providing access to information for creditors as described in the motion.

28  Having no opposition filed to the motion, on or about February 22, 2011, the Committee filed a

1   declaration of no opposition to the motion.  On March 15, 2011, the Court entered its order

2   approving the motion and the access information protocol.  In addition, the bylaws specifically

3   provide that the Debtors (and not just the Committee) have standing to enforce certain

4   confidentiality breaches.

5             **h.**      <u>Motion for Interim Compensation Procedure</u>

6        The Debtors determined that establishing an interim compensation procedure for the

7   attorneys, advisors and other professionals representing the Debtors and the Committee would be

8   beneficial to their estates and the parties in interest.  Implementation of a procedure for paying and

9   monitoring interim compensation on a monthly basis would allow parties in interest – and in

10   particular the Debtors themselves – to obtain qualified assistance and guidance, as well as to

11   monitor and control the professional fees and costs for the benefit of their estates.  In addition,

12   requiring the professionals to wait an extended period of time would likely place an undue

13   hardship on the professionals in comparison to other creditors who are paid on a monthly basis.

14   Thus, the Debtors filed its *Motion for Order Establishing Interim Compensation and Expense*

15   *Reimbursement Procedures for Professionals and Official Committee Members* (the "Interim

16   Compensation Procedure Motion"), seeking the Court's approval of the interim compensation and

17   reimbursement procedures for the professionals described in the Interim Compensation Procedure

18   Motion.  Having no opposition filed with respect to the Interim Compensation Procedure Motion,

19   the Debtors filed on March 30, 2011, a *Declaration of Non-Opposition to Motion for Order*

20   *Establishing Interim Compensation and Expense Reimbursement Procedures for Professionals*

21   *and Official Committee Members*.  On April 15, 2011, the Court entered its order approving the

22   Interim Compensation Procedure Motion authorizing the professionals to receive interim

23   compensation of 85% of the monthly fees and 100% of the monthly expenses if no objections to

24   the monthly fee requests are filed (the "Knudsen Order").

25        To date, the following monthly fee requests have been filed by the professionals pursuant

26   to the Knudsen Order:

27

28

| Professional | Role | Period | 100% of Fees | 100% of Costs |
|---|---|---|---|---|
| Sheppard Mullin Richter & Hampton LLP | Debtors' counsel | 12/13/2010 – 3/31/2011 | $582,198.00 | $15,167.38 |
| | | 4/1/2011 – 4/30/2011 | $151,857.50 | $1,617.48 |
| Pachulski Stang Ziehl & Jones LLP | Committee counsel | 1/14/ 2011 – 1/31/2011 | $54,984.00 | $57.02 |
| | | 2/1/2011 – 2/28/2011 | $82,671.00 | $798.18 |
| | | 3/1/2011 – 3/31/2011 | $132,055.50 | $1,333.23 |
| | | 4/1/2011 – 4/30/2011 | $136,693.00 | $2,150.36 |
| BDO USA, LLP | Financial advisor for Committee | 01/25/11 – 03/31/11 | $122,419.35 | $0.00 |
| | | 4/1/2011 – 4/30/2011 | $55,000.00 | $0.00 |
| Pillsbury Winthrop Shaw Pittman LLP | Debtors' special counsel | 12/13/10-3/31/11 | $18,736.00 | $0.00 |
| | | 4/1/2011 – 4/30/2011 | $3,010.00 | $14.57 |

     i.     Stipulation to Perform Under Steel Pre-Petition Purchase Agreements

Pre-petition, certain parties ("Steel Parties") purchased steel products ("Products") which were delivered to Steel Corp. for thermal heat-treatment at Steel's facility, to ultimately be shipped to third-party customers.  In exchange, Steel Corp. would receive a handling fee.  Each such transaction is governed by a Steel Purchase Agreement (SPAs) entered into pre-petition.  Steel Corp. and Lindsey L. Davidson, individually and as trustee of the Lindsey Davidson Trust dated April 28, 2009 ("Davidson"), one of the Steel Parties, have entered into stipulation dated May 13, 2011 for Court approval to continue to sell the Products under the SPAs in accordance with the terms of that stipulation (the "SPA Stipulation") [Dckt # 334].  Under the SPA Stipulation,

1    Davidson, and each of the other Steel Parties singing off on the SPA Stipulation, shall be entitled

2    to receive a combined total of $252,648.00 (the "Total Amount"), rather than $277,648.00, which

3    reflects a price reduction of $25,000.00, to be shared among the Steel Parties in proportion to the

4    purchase price of the Products of each Steel Party to the total purchase price (i.e., $277,648.00)

5    (each Steel Party's pro rata share is referred to herein as the "Pro Rata Claim").  Davidson and

6    each of the Steel Parties shall also be allowed an unsecured claim in the amount of each Steel

7    Party's pro rata share of the balance of the amounts owed under the SPAs, comprised of the

8    $25,000.00 reduction amount and of the attorney's fees and costs associated with the negotiation

9    and documentation of the SPA Stipulation, provided, however, that such claim shall be a

10   Subordinated Claim, subordinate to all the other unsecured claims against the Debtors' estates and

11   may be paid, if at all, only after all other unsecured claims are paid in full plus interest and in cash.

12   Davidson shall receive her Pro Rata Claim, provided that Steel has received payment for such steel

13   from the customer making the purchase.  In the event of a sale of only a portion of Davidson's

14   steel, Davidson shall be entitled to payment of only a corresponding portion of the proceeds.  The

15   Debtors shall pay Davidson on account of her Pro Rata Claim within five (5) business days of its

16   receipt of the payment of such steel from the customer making the purchase.  Each of the other

17   Steel Parties shall be entitled to the benefits of the SPA Stipulation only upon such Steel Party's

18   acceptance of the stipulation within one month of the Court's approval of the stipulation.

19                    2.    Appointment of Creditors' Committee

20            On January 7, 2011, the United States Trustee appointed the Committee to represent the

21   interests of the unsecured creditors for the New Debtors pursuant to section 1102 of the

22   Bankruptcy Code.  The following members were initially appointed to the Committee: (i) Fourth

23   Third, LLC; (ii) Investment Funding, Inc.; (iii) Sherman Bros. Heavy Trucking; (iv) Hatch, Ltd.;

24   and (v) Henry B. Woo and Bessie K. Woo Foundation.  On January 21, 2011, the United States

25   Trustee filed a notice amending the appointment of the Committee to reflect the replacement of

26   Hatch, Ltd. with Michael Lassiter as a member of the Committee.  On March 29, 2011, the United

27   States trustee filed a notice adding Lex A. Corrales to the Committee.

28

3.    Filing of Schedules and Setting of Claims Bar Dates

a.    The Initial Debtors

On January 20, 2010, the Initial Debtors filed their Schedules and Statement of Financial Affairs (collectively, the "Schedules").  The Initial Debtors' Schedules have since not been amended.

Pursuant to an order dated June 9, 2010, which was entered following a status conference hearing held on April 7, 2010, the Court set June 15, 2010 as the last day for the Initial Debtors' creditors and holders of ownership interests in the Initial Debtors to file proofs of claim against or proofs of interests in the Initial Debtors' cases.

b.    The New Debtors

On December 27, 2010, the New Debtors filed a motion for an extension of time to file their Schedules.  On January 18, 2011, the Court approved that Motion.  The New Debtors filed their Schedules on January 17, 2011 and January 18, 2011.  Steel Corp. and Technologies each amended their Schedules by filing an *Amended Statement of Financial Affairs – Item 3(c)* on January 26, 2011.  Steel Corp. and Technologies filed amendments to their Schedule E and Schedule F in order to correct an error in the schedules as originally filed.  The amendments reflect a reduction in certain priority non-tax claims and an increase in certain general unsecured claims.

On February 2, 2011, the New Debtors filed a *Motion of Debtors for an Order Setting Bar Dates to File Proofs of Claim Against Certain Debtors*, seeking to establish certain deadlines by which those parties who wish to assert a claim against the New Debtors must file a proof of claim in the chapter 11 case of the applicable New Debtor.  The Court granted the motion in its order dated March 16, 2011, setting May 13, 2011 as the general bar date in the New Debtors' cases and June 13, 2011 as the deadline for the filing of claims of governmental units.

The Proponents have been reviewing various other proofs of Claim and will continue to review and evaluate each proof of Claim filed prior to the applicable bar date to determine whether grounds exist to object to the allowance of such Claims.  The Proponents believe that the Claims asserted against the Debtors will likely be resolved and/or reduced to aggregate amounts that

1   approximate the estimates for Allowed Claims set forth herein.  However, the actual aggregate

2   amounts of the Allowed Claims in any Class may differ significantly from the Proponents'

3   estimates thereof and any variance from such estimates may affect distributions in certain Classes.

4              4.     Meeting of Creditors

5        The New Debtors appeared and participated in a meeting of creditors administered by the

6   Office of the United States Trustee on January 26, 2011, consistent with section 341(a) of the

7   Bankruptcy Code.  The meeting of creditors was concluded on this date.

8              5.     KPMG's Retention as an Investment Banker

9        Shortly after the New Debtors' bankruptcy filing, they began exploring their options

10   regarding an exit strategy that is in the best interests of their estates and the creditors.  These

11   options have included a potential restructuring facilitated by a new financing, investment or

12   licensing deal, sale of assets, or licensing of technology, or combination thereof.

13        In connection with these efforts, the New Debtors sought to retain an investment banker to

14   assist them in the process of marketing the business and the technology to identify potential

15   interested investors, licensees or buyers.  The New Debtors followed a methodical and detailed

16   process in choosing their investment banker, which involved over a dozen screening or

17   preliminary interviews and several follow-up meetings.  In addition, the Committee was invited to

18   provide its input into the New Debtors' investment banker selection process.

19        Ultimately, the New Debtors determined that KPMG Corporate Finance, LLC ("KPMG")

20   was best suited to serve as their investment banker and well qualified to represent them in a cost-

21   effective, efficient and timely manner.  On February 11, 2011, after extensive negotiations of

22   KPMG's engagement agreement, the New Debtors filed their *Application for Order Authorizing*

23   *Employment of KPMG Corporate Finance LLC as Investment Banker for the Debtors Nunc Pro*

24   *Tunc to February 1, 2011* (the "KPMG Employment Application"), seeking the Court's approval

25   of KPMG's retention.  Informed that the KPMG Employment Application would be objected to by

26   Fourth Third and Investment Funding, the New Debtors sought to have the KPMG Employment

27   Application heard on a shortened notice and stipulated to a briefing schedule with these parties

28

1 and the Committee.  The hearing on the KPMG Employment Application was set for February 22,

2 2011.

3         On February 18, 2011, Fourth Third and Investment Funding each filed an objection to the

4 KPMG Employment Application, which objections took issue with the $500,000 "Transaction

5 Fee" contemplated under the KPMG's engagement agreement in the event a "Transaction" closes.

6 On February 21, 2011, the New Debtors filed their reply in support of the KPMG Employment

7 Application.

8         At the hearing on February 22, 2011, the court addressed the objections to and the

9 argument in favor of the KPMG Employment Application.  Ultimately, the Court approved the

10 KPMG Application.  The order approving the KPMG Employment Application was entered on the

11 docket on February 28, 2011.

12              6.    The Marketing Process

13        KPMG began the marketing process with meetings with management and review of

14 different materials regarding the company and the business.  KPMG reviewed the documents

15 available in a virtual data room where the due diligence materials are stored, and provided the

16 company's management with comments and requests to update the materials.  In addition, KPMG

17 conducted extensive research on the industry as part of its preparation of the materials associated

18 with the marketing process.

19        Thereafter, KPMG worked on preparing a draft of a summary of the transaction

20 opportunity, a "teaser," to send out to potential counterparties (e.g. licensees, investors, acquirers).

21 After receiving input from the Debtors, the Debtors' counsel, and the Committee, KPMG finalized

22 the "teaser" in the early part of March 2011.  Thereafter, KPMG began circulating the teaser

23 through its proprietary network of intermediaries, a list that includes over 340 potential

24 counterparties in the US and in markets overseas, and began to field numerous inquiries and

25 questions from interested parties.

26        In addition, a form of Non-Disclosure Agreement ("NDA") was prepared to be provided to

27 those potential counterparties who indicate an interest in the potential transaction in order to

28 protect the confidential and proprietary information related to the Debtors, their business and the

1    technology.  Several NDAs were distributed to potential counterparties in the month of March

2    2011 for their signature.

3    In March 2011, KPMG began preparing a Confidential Information Memorandum (the

4    "CIM"), which describes in detail the Debtors' business and its financial performance and

5    provides an overview of the company and a historical background of its development.  Once an

6    initial draft of the CIM was prepared, it was provided to the company's management for review

7    and comment.  Additionally, the draft of the CIM was shared with the Committee whose input and

8    comments were also solicited.  Eventually, a final draft of the CIM was agreed upon and was

9    ready to distribute to potential counterparties once they have signed a NDA.  On March 29, 2011,

10   a final version of the CIM was distributed to third parties who had signed an NDA.

11   At the same time, the Debtors, their counsel and KPMG held weekly status conference call

12   to discuss the status and the progress of the marketing process and the legal developments in the

13   bankruptcy cases.  Additionally, separate weekly conference calls have been held with the

14   Committee in order to keep the Committee apprised of the process and to keep it informed of the

15   marketing efforts.  The Committee and its members have provided the Debtors and KPMG with

16   input and suggestions during these weekly calls.

17                    7.    The Objection to Claims of Fourth Third

18   As noted above, the Initial Debtors filed their Claim Objection Motion on August 2, 2010,

19   objecting to the proofs of claim filed by Fourth Third and Welland in the Initial Debtors' cases.

20   After the New Debtors' bankruptcy filing, the Debtors and Fourth Third and Welland met and

21   conferred regarding Fourth Third's and Welland's claims filed in the Initial Debtors' cases and

22   their claims to be filed in the New Debtors' cases.

23   Since that time, the Debtors and Fourth Third have settled the Claim Objection Motion,

24   which settlement is reflected in the Plan.  Under the settlement, Fourth Third's claim will be

25   Allowed in the amount of $52,562,434.55 subject to Fourth Third's agreement to accept the

26   Fourth Third Discounted Payoff in the amount of $45.5 million under Scenario A provided such

27   claim must be paid in cash in full on or before August 5, 2011.  Fourth Third's claim will be

28

1   allowed in the full asserted amount of $52,562,434.55 under <u>Scenario B</u> under which Fourth

2   Third's claim will be converted to equity of Reorganized Technologies.

3       On May 10, 2011, Debtors filed the Motion for Order Approving Compromise of

4   Controversy Between the Debtors and Fourth Third LLC.  On May 17, 2011, Lindsey Davidson,

5   as Trustee of the Lindsey Davidson Trust dated April 28, 2009 ("Davidson") filed an objection to

6   the Debtors' Motion.  A hearing on the Debtors' Motion was held on May 31, 2011, and the Court

7   granted the Motion at that hearing.  An order approving the Motion was entered on June 2, 2011.

8                    8.    <u>Settlement of Claims of Investment Funding</u>

9       The Debtors have also agreed upon an Allowed Claim for Investment Funding.  Under the

10  settlement, Investment Funding's claim will be allowed in the amount of $11,199,782.34 subject

11  to Investment Funding's agreement to accept the Investment Funding Discounted Payoff in the

12  amount of $8.5 million under <u>Scenario A</u> provided such claim must be paid in cash in full on or

13  before August 5, 2011.  Investment Funding's claim will be allowed in the full asserted amount of

14  $11,199,782.34 under <u>Scenario B</u> under which Investment Funding's claim will be converted to

15  equity of Reorganized Technologies.

16      On May 10, 2011, Debtors filed the Motion for Order Approving Compromise of

17  Controversy Between the Debtor and Investment Funding, Inc.  On May 17, 2011, Davidson filed

18  an objection to the Motion.  A hearing was held on the Motion on May 31, 2011, and the Court

19  granted the Motion.  An order approving the Motion was entered on June 2, 2011.

20                   9.    <u>The Retention of Professionals</u>

21      In the cases of the Initial Debtors, Sheppard Mullin was retained as bankruptcy counsel for

22  the Initial Debtors, which retention was approved in the Court's order dated March 9, 2010.  The

23  Court also approved the employment of Sheppard Mullin as the bankruptcy counsel for the New

24  Debtors in its order dated February 11, 2011.

25      In addition, the following is a list of the other professionals retained in the New Debtors'

26  cases:

27

28

| Professional | Application Filed[4] | Date Order Entered | Role/Services |
|---|---|---|---|
| Kilpatrick Townsend & Stockton LLP | January 14, 2011 | February 14, 2011 | New Debtors' special IP counsel |
| KPMG Corporate Finance LLC | February 11, 2011 | February 28, 2011 | Debtors' Investment Banker |
| Bidna & Keys APLC | December 30, 2010 | April 15, 2011 | Conflicts and non-bankruptcy counsel for New Debtors |
| Pillsbury Winthrop Shaw Pittman LLP | February 17, 2011 | April 4, 2011 | Debtors' special corporate counsel |
| Pachulski Stang Ziehl & Jones LLP | February 2, 2011 | March 15, 2011 | Committee counsel |
| BDO USA, LLP | February 9, 2011 | March 31, 2011 | Financial advisor for Committee |

## VII.

## DESCRIPTION OF PLAN

### A.    Structure of the Plan

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of its creditors and other stakeholders. Upon the filing of a petition for relief under chapter 11, section 362 of the Bankruptcy Code provides for an automatic stay of substantially all acts and proceedings against the debtor and its property, including all attempts to collect claims or enforce liens that arose prior to the commencement of the chapter 11 case.

The consummation of a plan of reorganization is the principal objective of a chapter 11 case. A plan of reorganization sets forth the means for satisfying claims against and interests in a

---

[4] Many of the professionals were employed *nunc pro tunc* to a date prior to the Application Filed date.  For example, KPMG was employed effective February 1, 2011.

debtor. Confirmation of a plan of reorganization by the Bankruptcy Court makes the plan binding upon the debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor of or equity security holder in the debtor, whether or not such creditor or equity security holder: (a) is impaired under or has accepted the plan; or (b) receives or retains any property under the plan. Subject to certain limited exceptions, and other than as provided in the plan itself or the confirmation order, the confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes for such debt the obligations specified under the confirmed plan, and terminates all rights and interests of equity security holders.

If the Plan is confirmed by the Bankruptcy Court and consummated, (a) the Claims in certain Classes will be Reinstated or modified and receive distributions equal to the full amount of such Claims, (b) the Claims of certain other Classes may be modified and receive distributions constituting a partial recovery on such Claims, and (c) the Claims and Interests in certain other Classes will receive no recovery on such Claims or Interests under <u>Scenario B</u> or will receive some recovery, to be determined based upon the nature of the Successful Bid under <u>Scenario A</u>. On the Effective Date and at certain times thereafter, the Reorganized Debtors will distribute Cash and other property in respect of certain Classes of Claims as provided in the Plan. Under the Plan, Claims against and Interests in the Debtors are divided into Classes according to their relative seniority and other criteria. The Classes of Claims against and Interests in the Debtors created under the Plan, the treatment of those Classes under the Plan and other property to be distributed under the Plan are described below.

**B.**     **<u>Summary of the Plan</u>**

As discussed above in Section V.B, the Plan envisions two potential scenarios by which the Debtors will reorganize.  Each scenario will arise at the conclusion of the Debtors' Investment Banking Process.

1.     <u>Scenario A</u>.

In the event there is a Successful Bid at the conclusion of the Investment Banking Process, the Debtors will seek court approval of such Successful Bid on or before July 22, 2011.  Sections

1  V.B.6 above and F.2.f below set forth a summary of the Distributions that will be made to Holders

2  of Allowed Claims under Scenario A.  It is possible that multiple Qualified Bidders will submit

3  bids that are equal to or greater than the Minimum Bid.  Each such bid, by definition, will provide

4  some consideration to the Holders of Interests in Technologies (the "Technologies Shareholders").

5  Accordingly, if appropriate, the Debtors may hold a meeting (the "Shareholder Meeting") of the

6  Technologies Shareholders between July 15, 2011 and July 19, 2011 in order to solicit input from

7  the Technologies Shareholders regarding the selection of the Successful Bid.  Technologies may,

8  but need not, conduct a vote among the Technologies Shareholders at the time of the Shareholder

9  Meeting.  Similarly, Technologies reserves all rights to conduct (or not conduct) the Shareholder

10 Meeting, in its discretion.  The Shareholder Meeting shall be closed to the Committee, Fourth

11 Third, and Investment Funding.

12                              2.        Scenario B.

13            In the event the Debtors cannot secure and obtain Court approval of a Successful Bid on or

14 before July 22, 2011, the Debtors will restructure and provide recoveries to Creditors in

15 accordance with Scenario B.  Scenario B is premised upon Fourth Third and Investment Funding's

16 converting their Allowed General Unsecured Claims to New Common Interests and agreeing to

17 provide the Exit Facility to fund distributions to Holders of Allowed Claims.  The terms and

18 conditions of the Exit Facility are set forth in Exhibit B to this Disclosure Statement.  On or before

19 the Plan Supplement Filing Date the Proponents will file with the Court the definitive documents

20 governing the New Common Interests and Exit Facility.  Section V.B.6 above sets forth a

21 summary of the Distributions that will be made to Holders of Allowed Claims under Scenario B.

22 In summary, on the Effective Date Reorganized Technologies shall, without need for any further

23 corporate act or other action under any applicable law, regulation, order or rule, issue and

24 distribute the New Common Interests to Fourth Third and Investment Funding (or one or more of

25 their Affiliates or a third party designated by them) and any other Holder of a General Unsecured

26 Claim electing to receive equity in lieu of a cash distribution.  Such distributions shall be Pro Rata

27 based upon their Allowed General Unsecured Claims.  In addition, the proceeds of the Exit

28 Facility will be distributed to Holders of Allowed Claims as set forth in the Plan.

C. **Corporate Governance of the Reorganized Debtors.**

    1. Post-Confirmation Management and Operation

        a. Officers and Directors of Reorganized Debtors.

Under Scenario A, the names of the new directors (or managing members) and senior officers of the Reorganized Debtors shall be determined in connection with the bidders' Successful Bid. Under Scenario B, the names of the new managing members and senior officers for each of the Reorganized Debtors will be set forth in the Plan Supplement.

It is possible that certain employees of the Debtors may be approached regarding continued employment by the Reorganized Debtors. Certain employees may even receive offers of employment with the Reorganized Debtors prior to the Effective Date. However, the Debtors have requested that no binding agreements be entered into in connection with such offers prior to the Effective Date, and that any such discussions regarding employment be disclosed in the Plan Supplement so that they are made public prior to the Effective Date. If an officer or director of the Debtors is approached regarding employment or made an offer of employment, the Debtors may exclude such officer or director from participation in the decision-making process as appropriate.

        b. New Management Incentive Plan

Under Scenario A, there may be a Management Incentive Plan, the terms of which shall be determined by the Successful Bidder and shall be consistent with the terms of the Successful Bid. Under Scenario B, there may be a Management Incentive Plan, the terms of which shall be determined by the Managing Members of the Reorganized Debtors.

        c. Articles of Organization; Bylaws; and Continued Existence of Reorganized Debtors

Under either Scenario A or Scenario B, each of the Reorganized Debtors' articles of incorporation, or bylaws (as applicable), shall contain such provisions as are required to satisfy the provisions of the Plan and Bankruptcy Code and shall include, among other things, (a) provisions prohibiting the issuance of nonvoting equity securities to the extent, and only to the extent, required by section 1123(a)(6) of the Bankruptcy Code, (b) provisions for a board of directors or managing members (who will be identified in the Plan Supplement or in accordance with the

1   Successful Bid), and (c) other provisions customary in such situations so long as they are not

2   inconsistent with any of the provisions contained in the foregoing subsections (a) and (b).

3              2.      Interest Holder Rights

4       Under Scenario B, the New Common Interests will be subject to a shareholder's agreement

5   or similar terms, the terms of which shall be acceptable to Fourth Third and Investment Funding.

6   A term sheet of the key terms of such an agreement will be outlined in the Plan Supplement.

7       **D.    Substantive Consolidation**

8       The Debtors shall be treated as substantively consolidated for claims resolution and

9   distribution purposes.  On and after the Effective Date, each and every Claim filed or to be filed in

10  the Cases shall be deemed filed against all the Debtors and shall be a Claim against and obligation

11  of all the Debtors.  As a result of the consolidation, any guaranty by one or more of the Debtors of

12  the obligations of another Debtor shall be eliminated and any joint and/or several liability of any

13  Debtor with respect to any other Debtor shall be treated as one collective obligation of the

14  Debtors.  All duplicative Claims (identical in both amount and subject matter) filed against more

15  than one of the Debtors shall be automatically expunged so that only one Claim survives against

16  the consolidated Debtors (but in no way shall such surviving Claim be deemed Allowed by reason

17  of this section).

18      To the extent each Class of Claims votes to accept the Plan, this consolidation will be

19  treated as an approved settlement under Section 1123 of the Bankruptcy Code.  Further, the Plan

20  shall serve as a motion by the Proponents seeking entry of a Bankruptcy Court order substantively

21  consolidating all of the Estates into a single consolidated Estate for all purposes associated with

22  Confirmation and distributions to be made under the Plan.

23      Substantive consolidation shall not affect the legal and organizational structure of the

24  Reorganized Debtors or their separate corporate existences or any prepetition or postpetition

25  guarantees, Liens, or security interests that are required to be maintained under the Bankruptcy

26  Code, under the Plan, or in connection with contracts or leases that were assumed or entered into

27  during the Bankruptcy Cases.  Any alleged defaults under any applicable agreement with the

28

1    Debtors or the Reorganized Debtors arising from substantive consolidation shall be deemed Cured

2    as of the Effective Date.

3         **E.**      **Reorganized Capital Structure Created by the Plan**

4           Under <u>Scenario A</u>, current Holders of Interests may retain some or all of their Interests or

5    may receive cash or other consideration (including new interests in the Reorganized Debtors) in

6    connection with a Successful Bid.  In addition, the bidder with the Successful Bid may receive a

7    significant and a majority stake of the equity of Reorganized Technologies.

8           Under <u>Scenario B</u>, Fourth Third and Investment Funding will receive a substantial majority

9    and, depending upon whether any other Holder of an Allowed General Unsecured Claim elects to

10   receive equity, potentially up to 100% of the equity of Reorganized Technologies.  Reorganized

11   Technologies shall, in turn, receive 100% of the equity of Reorganized Fasteel, Steel Corp. and

12   International on account of Fourth Third's and Investment Funding's converting their Claims to

13   equity.

14        **F.**      **Classification and Treatment of Claims and Interests under the Plan**

15         In the event a Successful Bid is accepted and approved by the Court, the Plan shall provide

16   for treatment of claims and interests and such other terms as are described in Plan <u>Scenario A</u>

17   below.  In the event no Successful Bid is accepted and approved by the Court, the Plan shall

18   provide for treatment of claims and interests and such other terms as are described in Plan

19   <u>Scenario B</u> below.

20             1.     <u>Treatment of Unclassified Claims Against All Debtors under Scenario A</u>

21                     <u>and Scenario B</u>

22         Unclassified Claims shall be treated identically for all Debtors under <u>Scenario A</u> and

23   <u>Scenario B</u>.  The treatment shall be as follows:

24             a.     <u>Administrative Claims</u>

25                 i.     <u>Administrative Claim Bar Date</u>.  All requests for payment of

26                       Administrative Claims (except with respect to Professional Fees,

27                       which shall instead be subject to the Professional Fees Bar Date,

28                       which are subject to the procedures and deadlines set forth therein)

1    must be filed by the Administrative Claim Bar Date or the holders

2    thereof shall be forever barred from asserting such Administrative

3    Claims against the Debtors or from sharing in any distribution under

4    the Plan.  The Debtors anticipate establishing an Administrative

5    Claims Bar Date prior to the Confirmation Hearing.

6        ii.    Treatment

7            (A)    Generally.  Unless any entity entitled to payment of an

8                Allowed Administrative Claim agrees to a less favorable

9                treatment or unless otherwise ordered by the Court, each

10               Holder of an Allowed Administrative Claim (except for

11               Professional Fees, which shall be treated as set forth in

12               Section III.D of the Plan) will receive in full satisfaction,

13               discharge, exchange and release thereof, Cash in an amount

14               equal to such Allowed Administrative Claim on the later of

15               (i) the Effective Date, and (ii) the fifteenth (15th) Business

16               Day after such Administrative Claim becomes an Allowed

17               Administrative Claim, or, in either case, as soon thereafter as

18               is practicable.

19           (B)    Ordinary Course.  Notwithstanding anything in Section

20               VII(F)(1)(a)(i) above to the contrary, holders of

21               Administrative Claims based on liabilities incurred in the

22               ordinary course of the Debtors' businesses following the

23               Petition Date shall not be required to comply with the

24               Administrative Claim Bar Date.

25           (C)    U.S. Trustee Fees.  Quarterly fees owed to the Office of the

26               U.S. Trustee that accrue prior to the Effective Date will be

27               paid by the Debtors and U.S. Trustee Fees that accrue after

28               the Effective Date will be paid for each Reorganized Debtor

1        when due in accordance with applicable law.  The Debtors

2        will continue to file the Post-Confirmation Quarterly Reports

3        as required until the Effective Date and the Reorganized

4        Debtors will file the reports after the Effective Date until

5        each Case is closed under Bankruptcy Code section 350.

6    b.    <u>Priority Tax Claims</u>. Priority Tax Claims are Claims entitled to priority

7        against the Estates under Bankruptcy Code section 507(a)(8).  Except to the

8        extent that a Holder of an Allowed Priority Tax Claim has been paid by the

9        Debtors before the Effective Date or agrees to a less favorable treatment,

10        each Holder of an Allowed Priority Tax Claim will receive in full

11        satisfaction, discharge, exchange and release thereof, Cash in an amount

12        equal to such Allowed Priority Tax Claim on the later of (i) the Effective

13        Date or (ii) the fifteenth (15th) Business Day after such Priority Tax Claim

14        becomes an Allowed Priority Tax Claim, or as soon thereafter as is

15        practicable.

16    c.    <u>DIP Loan Claim</u>. The DIP Loan will be indefeasibly repaid in full in cash

17        from the Exit Facility on or before the Effective Date.

18    d.    <u>Claims for Professional Fees</u>.  Each Holder of a Professional Fee Claim

19        seeking an award of compensation for services rendered or reimbursement

20        of expenses incurred through and including the Effective Date will (i) file

21        their respective interim (if applicable) and final fee applications by no later

22        than the tenth (10th) day after the Effective Date or such other date as may

23        be fixed by the Court or (ii) if granted such an award, be paid Cash in such

24        amounts as are Allowed by the Court on the date such Professional Fee

25        Claim becomes an Allowed Claim, or as soon thereafter as is practicable.

26    2.    <u>Treatment of Classified Claims Against and Interests in All Debtors Under</u>

27        <u>Scenario A and Scenario B</u>

28    a.    <u>Priority Non-Tax Claims (Class 1) - Unimpaired</u>

i.    <u>Classification</u>

Class 1 consists of all Priority Non-Tax Claims, if any, against Technologies, Fasteel, Steel Corp. and International, respectively.  Priority Non-Tax Claims are Unsecured Claims which are entitled to priority in payment pursuant to section 507(a) of the Bankruptcy Code other than Priority Tax Claims.

ii.    <u>Treatment</u>

Each Holder of an Allowed Class 1 Priority Non-Tax Claim, unless otherwise mutually agreed upon by the Holder of such Claim and the applicable Debtor, will receive Cash in an amount equal to such Class 1 Allowed Priority Non-Tax Claim on the later of (a) the Effective Date, or as soon as practicable thereafter, or (b) the date such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim pursuant to a Final Order, or as soon thereafter as is practicable.

b.    <u>Secured Claims (Class 2) - Unimpaired</u>

i.    <u>Classification</u>

Class 2 consists of all Secured Claims, if any, against Technologies, Fasteel, Steel Corp. and International, respectively.  Secured Claims are those Claims that are secured by liens against certain assets of the Debtors, including Cash Collateral.

ii.    <u>Treatment</u>

Except to the extent that a holder of an allowed Secured Claim and Fourth Third and Investment Funding agree to a different treatment, each holder of an allowed Secured Claim shall, in full an final satisfaction of such claim,  (aa) be reinstated and rendered unimpaired in accordance with section 1124(2) of the Bankruptcy Code, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the holder of an allowed Secured Claim to demand to receive payment of such allowed Secured Claim prior to the stated maturity of such allowed Secured Claim from an after the occurrence of a default, or (bb) receive cash in an amount equal to such allowed Secured Claim in full and complete satisfaction of such allowed Secured Claim.  The Plan Proponents will include in the Plan Supplement a list of proposed treatments for each Holder of an Allowed Secured Claim, which list shall specify treatment in accordance with section b.ii(aa) or b.ii(bb) above.

1          c.      <u>General Unsecured Claims (Class 3) - Impaired</u>

2          i.      <u>Classification</u>

3      Class 3 consists of all General Unsecured Claims against Technologies, Fasteel, Steel

4 Corp. and International, respectively.

5          ii.      <u>Treatment</u>

6      On, or as soon as practicable after the later of (a) the Effective Date; and (b) the date the

7 Holder of a General Unsecured Claim becomes an Allowed Claim, under <u>Scenario A</u>, Holders of

8 General Unsecured Claims will be paid in cash in full plus interest accruing after the Effective

9 Date at the federal judgment rate, <u>provided</u>, <u>however</u>, the payment of the Fourth Third Discounted

10 Payoff and the Investment Funding Discounted Payoff (i.e., the payment of $45.5 million to

11 Fourth Third and $8.5 million to Investment Funding) prior to August 5, 2011 shall be deemed to

12 satisfy such Claims in full.

13      On, or as soon as practicable after the later of (a) the Effective Date; and (b) the date the

14 Holder of a General Unsecured Claim becomes an Allowed Claim, under <u>Scenario B</u>, Holders of

15 General Unsecured Claims, excluding Fourth Third on account of the Fourth Third Indebtedness

16 and Investment Funding on account of the Investment Funding Indebtedness (who shall be

17 deemed to receive New Common Interests in lieu of a cash distribution) and excluding any other

18 Holder of an Allowed General Unsecured Claim electing to receive New Common Interests in lieu

19 of a cash distribution, shall receive a distribution equal to eighty five percent (85%) of their

20 Allowed General Unsecured Claim.  In addition, on, or as soon as practicable after the later of (a)

21 the one year anniversary of the Effective Date; and (b) the date the Holder of a General Unsecured

22 Claim becomes an Allowed Claim, Holders of General Unsecured Claims will receive a

23 distribution equal to fifteen percent (15%) of their General Unsecured Claim plus accrued and

24 unpaid interest, accrued after the Petition Date,  on their entire General Unsecured Claim at the

25 federal judgment rate, subject to availability under the Exit Facility.  Notwithstanding the

26 foregoing, if the proceeds of the Exit Facility are insufficient to make the foregoing distributions

27 to Holders of General Unsecured Claims after payment of Allowed Secured Claims,

28 Administrative Claims, Priority Tax Claims and Priority Non-Tax Claims, then, Holders of

1    General Unsecured Claims (other than Holders of General Unsecured Rejection Damages Claims)

2    shall receive their Pro Rata share of $1,000,000 minus the amounts necessary to pay Holders of

3    Priority Tax Claims and Priority Non-Tax Claims (and Holders of Allowed General Unsecured

4    Rejection Damages Claims shall receive an equivalent distribution), provided, however, that in

5    lieu of such treatment the Committee may negotiate for enhanced treatment of Holders of General

6    Unsecured Claims.  It is thus the intent of the parties thereto that nothing in this Plan shall impair

7    or discharge the obligation of any party other than these Debtors, including, without limitation,

8    any Affiliate of the Debtors, owed to Fourth Third or Investment Funding against any such party.

9    The Plan Proponents do not request that the Court determine at this time the effect, if any, of the

10    Plan on Fourth Third or Investment Funding's claims against any other party.  However, the

11    recovery to them under this Class shall constitute all of the claims of any type or nature, direct or

12    indirect, by Fourth Third or Investment Funding against the Debtors that are Plan Proponents.

13            d.    <u>Intercompany Claims (Class 4) - Impaired</u>

14                i.    <u>Classification</u>

15    Classes 4 consists of all Intercompany Claims against Technologies, Fasteel, Steel Corp.

16    and International, respectively.

17                ii.    <u>Treatment</u>

18    Under <u>Scenario A</u>, all Intercompany Claims against Technologies, Fasteel, Steel Corp. and

19    International shall, at the Successful Bidder's option, be either (i) reinstated in full or in part, or

20    (ii) discharged and extinguished.  Under <u>Scenario B</u>, all Intercompany Claims against

21    Technologies, Fasteel, Steel Corp. and International shall, at Fourth Third's option, be either (i)

22    reinstated, in full or in part, or (ii) discharged and extinguished.

23            e.    <u>Subordinated Claims (Class 5) - Impaired</u>

24                i.    <u>Classification</u>

25    Class 5 consists of all Subordinated Claims against Technologies, Fasteel, Steel Corp. and

26    International, respectively.

27

28

1            ii.     Treatment

2      Under Scenario A, Subordinated Claims shall receive the treatment set forth under the

3 Successful Bid (if any). Under Scenario B, Subordinated Claims shall be discharged and

4 extinguished.

5          f.     Interests (Class 6) - Impaired

6            i.     Classification

7      Class 6 consists of all Interests against Technologies, Fasteel, Steel Corp. and

8 International, respectively.

9            ii.     Treatment

10      Under Scenario A, Class 6 Interests shall receive the treatment set forth under the

11 Successful Bid, if any. The treatment under the Successful Bid may provide that Holders of

12 Interests retain or be paid (a) some or all of their Interests, (b) cash, (c) any other consideration

13 provided for in connection with a Successful Bid (including new interests in the Reorganized

14 Debtors, or (d) any combination of the following. Under Scenario B, all existing Interests shall be

15 cancelled on the Effective Date. Existing warrants for equity interests shall also be canceled and

16 holders thereof will receive no distribution. Interests in Reorganized Technologies shall be

17 cancelled and replaced by the New Common Interests. Interests in Fasteel, Steel Corp., and

18 International shall be cancelled to be replaced by new Interests to be held by Reorganized

19 Technologies.

20      **G.**     **Executory Contracts and Unexpired Leases**

21         1.     Assumption.

22      On the Effective Date, pursuant to section 1123(b)(2) of the Bankruptcy Code, the

23 Reorganized Debtors will assume the executory contracts and unexpired leases of the Debtors that

24 have been expressly identified in the Plan Supplement for assumption. Each executory contract

25 and unexpired lease listed in the Plan Supplement shall include any modifications, amendments

26 and supplements to such agreement, whether or not listed in the Plan Supplement. The costs of

27 distributions under the Plan shall be the responsibility of the Reorganized Debtors.

28

1          2.      Rejection.

2        Except as set forth in Section VII of the Plan or the Plan Supplement, on the Effective

3 Date, pursuant to section 1123(b)(2) of the Bankruptcy Code, the Debtors will be deemed to reject

4 any and all executory contracts and unexpired leases of the Debtors not otherwise identified in the

5 Plan Supplement for assumption. Any Person asserting any Claim for damages arising from the

6 rejection of an executory contract or unexpired lease of the Debtors under the Plan shall file such

7 Claim on or before the Rejection Claim Bar Date, or be forever barred from: (a) asserting such

8 Claim against the Debtors, the Reorganized Debtors, or the Estate Assets, and (b) sharing in any

9 distribution under the Plan. For the avoidance of doubt, any costs relating to the rejection of any

10 executory contracts shall be the responsibility of the Reorganized Debtors or Successful Bidder, as

11 the case may be, and shall not reduce the General Unsecured Creditor Recovery.

12          3.      Assumption Obligations.

13        The Reorganized Debtors shall satisfy all Assumption Obligations, if any, by making a

14 Cash payment in the manner provided in Section V.D of the Plan or as otherwise permitted by

15 section 365(b)(1)(B) of the Bankruptcy Code, equal to the amount specified in the Plan

16 Supplement, unless an objection to such proposed amount is filed with the Bankruptcy Court and

17 served on counsel to the Proponents on or prior to the date set by the Bankruptcy Court for filing

18 objections to Confirmation of the Plan and the Bankruptcy Court, after notice and hearing,

19 determines that the applicable Debtor is obligated to pay a different amount under section 365 of

20 the Bankruptcy Code, in which case, the Proponents shall have the right to remove such executory

21 contract or lease from the list of assumed contracts pursuant to Section V.F of the Plan, or, if

22 following the Effective Date, file a motion within ten (10) days after such determination to seek an

23 order of the Bankruptcy Court rejecting such executory contract or unexpired lease. Any Person

24 that fails to object to the Assumption Obligation specified in the Plan Supplement on or prior to

25 the date set by the Bankruptcy Court for filing objections to Confirmation of the Plan and/or other

26 subsequent date(s) set by the Bankruptcy Court, as applicable, shall be forever barred from: (a)

27 asserting any other, additional or different amount on account of such obligation against the

28 Debtors, the Reorganized Debtors, or the Estate Assets, and (b) sharing in any other, additional or

different distribution under the Plan on account of such obligation. Any cure payments made pursuant to this paragraph shall not reduce the General Unsecured Creditor Recovery. For the avoidance of doubt, any costs relating to the assumption of any executory contracts shall be the responsibility of the Reorganized Debtors or Successful Bidder, as the case may be, and shall not reduce the General Unsecured Creditor Recovery.

4.    Effect of Confirmation Order.

The Confirmation Order shall constitute an order of the Bankruptcy Court: (i) approving, as of the Effective Date, the assumption or rejection by the Reorganized Debtors pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of all executory contracts and unexpired leases identified under this Article VII of the Plan and/or the Plan Supplement. The contracts and leases identified in the Plan will be assumed or rejected, respectively, only to the extent that such contracts or leases constitute pre-petition executory contracts or unexpired leases of the Debtors, and the identification of such agreements under the Plan does not constitute an admission with respect to the characterization of such agreements or the existence of any unperformed obligations, defaults, or damages thereunder. The Plan will not affect any executory contracts or unexpired leases that: (a) have been assumed, rejected or terminated prior to the Confirmation Date, or (b) are the subject of a pending motion to assume, reject or terminate as of the Confirmation Date.

5.    Post-Petition Agreements.

Unless inconsistent with the provisions of the Plan, all contracts, leases and other agreements entered into or restated by the Debtors on or after the Petition Date, or previously assumed by any of the Debtors prior to the Confirmation Date (or the subject of a pending motion to assume by either of the Debtors as of the Confirmation Date that is granted by the Bankruptcy Court), which have not expired or been terminated in accordance with their terms, shall be performed by the Reorganized Debtors in the ordinary course of business and shall survive and remain in full force and effect following the Effective Date.

6.    Modifications to Plan Supplement.

The Proponents shall have the right, any time prior to the Effective Date, to make additions, deletions, modifications and/or other revisions to the identification of executory

1   contracts and leases to be assumed or rejected by the Debtors; provided, however, that any party to

2   such contract or lease or affected by such action shall be provided notice of such action and an

3   opportunity to object, and if any objection is filed, such action will not be effective until such

4   objection is resolved by the parties or by order of the Bankruptcy Court.

5            **H.**      **Provisions Governing Distributions**

6                 1.      Distributions by the Debtors.

7         The Reorganized Debtors shall administer Claims and make distributions in respect of

8   Allowed Claims; provided, however, the Reorganized Debtors may elect to designate and/or retain

9   a third party to serve as disbursing agent without the need for any further order of the Bankruptcy

10   Court.

11                 2.      Estimation.

12         In order to establish reserves under the Plan and avoid undue delay in the administration of

13   these Cases, the Debtors, the Reorganized Debtors, or the Proponents, shall have the right to seek

14   an order of the Bankruptcy Court pursuant to section 502(c) of the Bankruptcy Code, estimating

15   the amount of any Claim.

16                 3.      Distributions on Account of Claims Allowed After the Effective Date.

17                 a.      Distributions on Account of Disputed Claims and Estimated Claims.

18                           Except as otherwise provided herein, a Final Order, or as agreed by the

19                           relevant parties, distributions on account of Disputed Claims and Estimated

20                           Claims that become Allowed after the Effective Date shall be made by the

21                           Reorganized Debtors within fifteen (15) business days after the Claims

22                           becomes an Allowed Claim.

23                 b.      Distributions of New Common Interests.  Reorganized Technologies will

24                           distribute (i) New Common Interests to the holders of Allowed Class 3

25                           General Unsecured Claims Held by Fourth Third and Investment Funding

26                           and (ii) New Common Interests to the Holders of Allowed Class 3 General

27                           Unsecured Claims that elect the equity option.

28

c.  <u>No Distributions Pending Allowance</u>.  Notwithstanding anything in the Plan to the contrary no distribution shall be made with respect to any Disputed Claim or Estimated Claim until such Claim becomes an Allowed Claim. Notwithstanding the above, to the extent that the Reorganized Debtors dispute the amount owed pursuant to a Claim, but do not dispute some portion of the Claim, the undisputed portion of the Claim shall be treated as an Allowed Claim and only the disputed portion shall be treated as a Disputed Claim.

d.  <u>Objection Deadline</u>.  The Reorganized Debtors shall file all objections to Disputed Claims, and shall file all motions to estimate Claims under section 502(c) of the Bankruptcy Code, on or before the Claims Objection Deadline.

e.  <u>Disputed and Estimated Claims Reserve</u>.

   i.  <u>Cash Reserve</u>.  On and after the Effective Date, the Reorganized Debtors shall maintain in reserve such Cash as necessary to satisfy any Cash distributions required to be made to Holders of Disputed Claims and Estimated Claims against the Debtors in full.

   ii.  <u>Professional Fee Reserve</u>.  Fees incurred by Professionals prior to the Effective Date shall be estimated and placed into a trust account for all Professionals to be paid upon entry of an order approving the final fee applications with any remaining amount to be returned to be Reorganized Debtors to be distributed in accordance with the Plan.

f.  <u>Settling Disputed Claims</u>.  The Post-Effective Debtors shall be authorized to settle, or withdraw any objections to any Disputed Claims following the Effective Date without further order of the Court.

4.      Distributions in Cash.

The Reorganized Debtors shall make any required Cash payments to the holders of Allowed Claims in U.S. dollars by check and by first-class mail (or by other equivalent or superior means as determined by the Reorganized Debtors).

5.      Undeliverable Distributions.

Distributions shall be made to the name and address on the Claimant's proof of claim, if applicable, or if no Claim was filed, to the name and address in the Debtors' records.  If any distribution under the Plan is returned as undeliverable, no further distributions to such Person shall be made unless and until the Reorganized Debtors or other appropriate disbursing agent is notified in writing of such holder's then-current address, at which time the undelivered distributions shall be made to such holder without interest or dividends.  Undeliverable distributions shall be returned to the Reorganized Debtors until such distributions are claimed.

6.      Unclaimed Distributions.

Any entity that fails to claim any Cash within ninety (90) days from the date upon which a distribution of Cash is first made to such entity shall forfeit all rights to any distribution under the Plan, and the Reorganized Debtors shall be authorized to cancel any distribution that is not timely claimed.  Pursuant to section 347(b) of the Bankruptcy Code, upon forfeiture, such Cash (including interest thereon, if any) shall revert to the Reorganized Debtors free of any restrictions under the Plan, the Bankruptcy Code or the Bankruptcy Rules, provided, however, that until Holders of Allowed General Unsecured Claims have received payment in full plus interest at the federal judgment rate, any unclaimed distributions, after forfeiture, shall be distributed, Pro Rata, to the Holders of General Unsecured Claims.  Upon forfeiture, the Claim of a Person with respect to such funds shall be discharged and forever barred notwithstanding any federal or state escheat laws to the contrary, and Holders of such Claims shall have no claim whatsoever against the Debtors or the Reorganized Debtors.

7.      Setoff.

Nothing contained in the Plan shall constitute a waiver or release by the Debtors of any right of setoff or recoupment the Debtors may have against any Person.  To the extent permitted

1    by applicable law, the Reorganized Debtors may setoff or recoup against any Claim and the

2    payments or other distributions to be made under the Plan in respect of such Claim, claims of any

3    nature whatsoever that arose before the Petition Date that the Debtors may have against the holder

4    of such Claim or Interest.  Notwithstanding the foregoing or anything to the contrary elsewhere in

5    the Plan, nothing in the Plan or the Confirmation Order shall prejudice or affect (1) any rights of

6    any Person to assert Claims, including Administrative Claims, against the Debtors, the

7    Reorganized Debtors, the Estates, or any transferee thereof, by way of offset, recoupment, or

8    counterclaim to the extent permitted by applicable law; and/or (2) any defense to any Causes of

9    Action and Defenses or any other claims asserted by the Debtors, the Reorganized Debtors, the

10    Estates, or any transferee thereof.

11                    8.    <u>Taxes</u>.

12            Pursuant to section 346(f) of the Bankruptcy Code, the Reorganized Debtors shall be

13    entitled to deduct any federal, state or local withholding taxes from any Cash payments made with

14    respect to Allowed Claims, as appropriate.  The Reorganized Debtors shall be authorized to take

15    all actions necessary to comply with applicable withholding and recording requirements.

16    Notwithstanding any other provision of the Plan, each holder of an Allowed Claim that has

17    received a distribution of Cash shall have sole and exclusive responsibility for the satisfaction or

18    payment of any tax obligation imposed by any governmental unit, including income, withholding

19    and other tax obligation, on account of such distribution.  For tax purposes, distributions received

20    in respect of Allowed Claims will be allocated first to the principal amount of such Claims, with

21    any excess allocated to unpaid accrued interest, if any.

22                    9.    <u>De Minimis Distributions</u>.

23            If any interim distribution under the Plan to the holder of an Allowed Claim would be less

24    than $50.00 or a fractional number of New Common Interests, the Reorganized Debtors may

25    withhold such distribution.  If any final distribution under the Plan to the holder of an Allowed

26    Claim would be less than $25.00, the Reorganized Debtors may cancel such distribution.  Any

27    unclaimed distributions pursuant to this section shall be treated as unclaimed property under the

28    Plan.

1            10.     <u>Preservation of Causes of Action</u>.

2        As of the Effective Date, all Causes of Action (other than Avoidance Actions, which shall

3 be released) shall vest in the Reorganized Debtor.  Any Person with respect to whom any Debtor

4 has incurred an obligation (whether on account of services, purchase or sale of property, or

5 otherwise), or who has received services from any of the Debtors or a transfer of money or

6 property of any of the Debtors, or who has transacted business with any of the Debtors, or leased

7 equipment or property from any of the Debtors should assume that such obligation, transfer, or

8 transaction may be reviewed by the Reorganized Debtors subsequent to the Effective Date, and

9 may, if appropriate, be the subject of an action after the Effective Date, whether or not (i) such

10 Person has filed a proof of Claim against any of the Debtors; (ii) such Person's proof of Claim has

11 been objected to; (iii) such Person's Claim was included in the Schedules; (iv) such Person's

12 scheduled Claims have been objected to or has been identified by the Debtors as disputed,

13 contingent, or unliquidated; or (v) such Person has previously been notified that the Debtors

14 believe the estate holds Causes of Action against such Person.

15     **I.**      **<u>Conditions Precedent</u>**

16            1.     <u>Conditions to Confirmation</u>.

17        The following, unless waived by the Plan Proponents in writing, are conditions precedent

18 to confirmation of the Plan and funding of the Exit Facility:

19                a.      No Agreement Termination Event under the Restructuring Support

20                        Agreement has occurred;

21                b.      The Bankruptcy Court shall have entered a Final Order approving a

22                        Disclosure Statement with respect to the Plan in form and substance

23                        satisfactory to the Proponents on or before July 22, 2011;

24                c.      The Plan has not been modified to provide for any terms that are materially

25                        adverse from the Proponents Plan Term Sheet, including, but not limited to

26                        modifications that would prevent or delay payment in full under <u>Scenario A</u>

27                        of the Fourth Third Discounted Payoff and/or the Investment Funding

28                        Discounted Payoff on or before August 5, 2011;

d.      The Confirmation Order shall be in a form and substance acceptable to the Proponents;

e.      No order(s) is entered by the Bankruptcy Court have the practical effect of rendering unachievable compliance with any of the deadlines set forth in the Plan unless such effect is waived by each of the Parties in writing or cured within five (5) business days after the date on which such order(s) is/are entered;

f.      The Cases shall not have been converted to cases under chapter 7 of the Bankruptcy Code or to liquidating chapter 11 cases;

g.      Neither a trustee under chapter 7 or 11 of the Bankruptcy Code, a responsible officer with enlarged powers, nor an examiner with enlarged powers (i.e., powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code) relating to operation of the business under section 1106(b) of the Bankruptcy Code shall have been appointed for the Debtors;

Absent agreement of Fourth Third and Investment Funding to the contrary, in their sole and absolute discretion, the Exit Facility shall not exceed the greater of (1) $3.6 million, or (ii) an amount sufficient to satisfy the DIP Loan, Allowed Secured Claims and Allowed Administrative Claims and provide a minimum of $1,000,000 to be made available to fund payments to Holders of Allowed General Unsecured Claims, Allowed Priority Tax Claims and Allowed Non-Tax Priority Claims; and

If the Exit Facility is not sufficient to pay the General Unsecured Creditor Recovery the Committee shall have consented to such other treatment.

2.      <u>Conditions to Effectiveness</u>.

The following are conditions precedent to the occurrence of the Effective Date:

a.      Under <u>Scenario A</u>, Fourth Third and Investment Funding shall have been paid $45.5 million and $8.5 million, in cash, on or before August 5, 2011.

b.      The Confirmation Date shall have occurred;

c.      The Confirmation Order shall be a Final order;

1          d.     No request for revocation of the Confirmation Order under section 1144 of

2                the Bankruptcy Code has been made, or, if made, remains pending;

3          e.     The Professional Fee Reserve shall have been funded;

4          f.     The Proponents shall have determined that all Disputed Claims have been

5                sufficiently resolved or estimated so as to establish the Distribution

6                Reserve; and

7          g.     All actions, documents and agreements necessary to implement the Plan

8                shall have been effected or executed as determined by the Proponents in

9                their sole and absolute discretion, provided, however, that if under Scenario

10                A all of the other conditions set forth above have been met, then the Debtors

11                in their sole discretion shall determine whether all actions, documents and

12                agreements necessary to implement the Plan have been effected or

13                executed.

14          3.     Waiver of Conditions.

15 Conditions to Confirmation and the Effective Date may be waived, in whole or in part, by

16 the Proponents adversely affected by such waiver at any time without notice, an order of the

17 Bankruptcy Court, or any further action other than proceeding to Confirmation and consummation

18 of the Plan.

19     **J.**     **Effects of Confirmation**

20          1.     Binding Effect.

21 The rights afforded under the Plan and the treatment of all Claims and Interests under the

22 Plan shall be the sole and exclusive remedy on account of such Claims against, and Interests in the

23 Debtors, the Reorganized Debtors, and the Estate Assets.  The distributions made pursuant to the

24 Plan shall be in full and final satisfaction, settlement, release and discharge of the Allowed Claims

25 on account of which such distributions are made.  Confirmation of the Plan shall bind and govern

26 the acts of the Reorganized Debtors and all holders of all Claims against, and Interests in the

27 Debtors, whether or not: (i) a proof of Claim or proof of Interest is filed or deemed filed pursuant

28

1    to section 501 of the Bankruptcy Code; (ii) a Claim or Interest is allowed pursuant to section 502

2    of the Bankruptcy Code, or (iii) the holder of a Claim or Interest has accepted the Plan.

3              2.    <u>Property Revests Free and Clear.</u>

4              Upon the Effective Date, title to all remaining Estate Assets of the Debtors shall vest in the

5    Reorganized Debtors for the purposes contemplated under the Plan and shall no longer constitute

6    property of the Debtors' Estates.  Except as otherwise provided in the Plan, upon the Effective

7    Date, all Estate Assets shall be free and clear of all Claims and Interests, including Liens, charges

8    or other encumbrances of Creditors of the Debtors.

9              3.    <u>Releases by the Debtors.</u>

10             a.    *As of the Effective Date, for good and valuable consideration, the Debtors,*

11                   *their Estates, and the Reorganized Debtors release the Released Parties*

12                   *from any and all Causes of Action and Defenses (other than the rights, if*

13                   *any, of the Debtors or the Reorganized Debtors to enforce applicable post-*

14                   *petition agreements (including, without limitation, any settlement*

15                   *agreements), any order entered in the Cases, the Plan and any agreements,*

16                   *instruments or other documents delivered thereunder, and the Plan*

17                   *Supplement) held, assertable on behalf of or derivative from the Debtors,*

18                   *whether known or unknown, foreseen or unforeseen, existing or hereafter*

19                   *arising, in law, equity or otherwise, based on or relating to or in any*

20                   *manner arising from, in whole or in part, the Debtors, the Debtors'*

21                   *restructuring, the conduct of the Debtors' businesses, the Cases, the*

22                   *purchase, sale or rescission of the purchase or sale of any security of the*

23                   *Debtors, the subject matter of, or the transactions or events giving rise to,*

24                   *any Claim or Interest that is treated in the Plan, and/or the business or*

25                   *contractual arrangements between any Debtor and any Agent thereof,*

26                   *and/or the restructuring of Claims and Interests prior to or in the Cases,*

27                   *which Causes of Action and Defenses are based in whole or in part on any*

28                   *act, omission, transaction, event or other occurrence (except for willful*

*misconduct, ultra vires acts, or gross negligence) taking place before the*

*Effective Date; provided, however, that no Released Party shall be release*

*or discharged from any obligations under the Plan.  Notwithstanding the*

*foregoing, if a Released Party directly or indirectly brings or asserts any*

*Claim or Cause of Action and Defense in any way arising out of or related*

*to any document or transaction that was in existence prior to the Effective*

*Date against the Debtors, the Reorganized Debtors, or any of their Agents,*

*then the release set forth in this section (but not any release or exoneration*

*or any other rights or claims granted under any other section of the Plan or*

*under any other document or agreement) shall automatically and*

*retroactively be null and void ab initio with respect to such Released Party;*

*provided, however, the immediately preceding clause shall not apply to the*

*prosecution in this Court (or any appeal therefrom) of the amount, priority*

*or secured status of any pre-petition Claim or ordinary course*

*Administrative Claim against the Debtors.  As of the Effective Date, the*

*Debtors release holders of General Unsecured Creditors Claims from any*

*and all Avoidance Actions.*

b.    *Certain Waivers.  In an abundance of caution, each Debtor shall waive the*

*effect of section 1542 of the California Civil Code to the extent that such*

*section is applicable to the Debtors.  Section 1542 of the California Civil*

*Code provides:*

*§1542. A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH*

*THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR*

*HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF*

*KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS*

*OR HER SETTLEMENT WITH THE DEBTOR.*

*EACH DEBTOR AGREES TO ASSUME THE RISK OF ANY AND ALL UNKNOWN*

*UNANTICIPATED OR MISUNDERSTOOD DEFENSES, CLAIMS, CAUSES OF ACTION,*

*CONTRACTS, LIABILITIES, INDEBTEDNESS AND OBLIGATIONS WHICH ARE RELEASED*

*BY THE PLAN AND EACH DEBTOR HEREBY WAIVES AND RELEASES ALL RIGHTS AND*

*BENEFITS WHICH IT MIGHT OTHERWISE HAVE UNDER THE AFOREMENTIONED*

*SECTION 1542 OF THE CALIFORNIA CIVIL CODE WITH REGARD TO THE RELEASE OF*

*SUCH UNKNOWN UNANTICIPATED OR MISUNDERSTOOD DEFENSES, CLAIMS, CAUSES*

*OF ACTION, CONTRACTS, LIABILITIES, INDEBTEDNESS AND OBLIGATIONS.  TO THE*

*EXTENT (IF ANY) ANY OTHER LAWS SIMILAR TO SECTION 1542 OF THE CALIFORNIA*

*CIVIL CODE MAY BE APPLICABLE EACH DEBTOR WAIVES AND RELEASES ANY BENEFIT*

*RIGHT OR DEFENSE WHICH IT MIGHT OTHERWISE HAVE UNDER ANY SUCH LAW WITH*

*REGARD TO THE RELEASE OF UNKNOWN UNANTICIPATED OR MISUNDERSTOOD*

*DEFENSES, CLAIMS, CAUSES OF ACTION, CONTRACTS, LIABILITIES, INDEBTEDNESS*

*AND OBLIGATIONS.*

4.    *Discharge and Permanent Injunction.*

*Except as otherwise set forth in the Plan, Confirmation of the Plan shall discharge the Debtors and the Reorganized Debtors from all Claims or other debts that arose at any time before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not: (a) a proof of claim based on such debt is filed or deemed filed under section 501 of the Bankruptcy Code; (b) a Claim based on such debt is Allowed under section 502 of the Bankruptcy Code; or (c) the holder of a Claim has accepted the Plan.  As of the Effective Date, all entities that have held, currently hold or may hold a Claim or other debt or liability that is discharged or any other right that is terminated under the Bankruptcy Code or the Plan are permanently enjoined, to the full extent provided under section 524(a) of the Bankruptcy Code, from "the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability" of the Debtors or the Reorganized Debtors, except as otherwise set forth in the Plan.  Nothing contained in the foregoing discharge shall affect the liability of any other entity on, or the property of any other entity for, any debt of the Debtors that is discharged under the Plan.*

5.    *Limitation of Liability*.

The Debtors, the Reorganized Debtors, the Proponents and each of their respective Agents shall have all of the benefits and protections afforded under section 1125(e) of the Bankruptcy Code and applicable law.

6.    *Exoneration and Reliance*.

The Debtors, the Reorganized Debtors, their Estates, the Proponents and each of their respective Agents, shall not be liable, other than for gross negligence, willful misconduct, acts taken in violation of an Order of the Bankruptcy Court entered in the Cases, or under section 549 of the Bankruptcy Code, to any holder of a Claim or Interest or any other entity with respect to any action, omission, forbearance from action, decision, or exercise of discretion taken at any time after the Petition Date in connection with the Cases or the negotiation, formulation, development, proposal, disclosure, Confirmation or implementation of the Plan.  The Debtors, the Reorganized Debtors, their Estates, the Proponents, and each of their respective Agents may reasonably rely upon the opinions of their respective counsel, accountants, and other experts and professionals and such reliance, if reasonable, shall conclusively establish good faith and the absence of gross negligence or willful misconduct; provided, however, that a determination that such reliance is unreasonable shall not, by itself, constitute a determination or finding of bad faith, gross negligence or willful misconduct.

**K.    Retention of Jurisdiction**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Cases after the Effective Date to the extent legally permissible, including, without limitation, jurisdiction to:

1.    Allow, disallow, determine, liquidate, classify, estimate, or establish the priority or secured or unsecured status of any Claim, including the resolution of any request for payment of any Administrative Claim and the resolution of any objections to the allowance or priority of Claims;

2.    Grant or deny any applications for allowance of compensation or reimbursement of expenses authorized under the Bankruptcy Code or the Plan;

3.    Resolve any matters related to the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which any Debtor is a party and to hear, determine and, if necessary, liquidate, any Claims arising from, or cure amounts related to, such assumption or rejection;

4.    Ensure that distributions to holders of Allowed Claims are accomplished in accordance with the Plan;

5.    Decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters and grant or deny any applications or motions involving any Debtor that may be pending on the Effective Date;

6.    Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

7.    Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or any Person's obligations incurred in connection with the Plan;

8.    Modify the Plan before or after the Effective Date under section 1127 of the Bankruptcy Code or modify the Disclosure Statement or any contract, instrument, release, or other agreement or document created in connection with the Plan or the Disclosure Statement; or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, or any contract, instrument, release, or other agreement or document created in connection with the Plan and the Disclosure Statement, in such manner as may be necessary or appropriate to consummate the Plan, to the extent authorized by the Bankruptcy Code;

9.    Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

10.    Determine any other matters that may arise in connection with or related to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, or

1   other agreement or document created in connection with the Plan, the Disclosure Statement or the

2   Confirmation Order, except as otherwise provided in the Plan;

3          11.     Hear and determine Causes of Action and Defenses commenced by the

4   Debtors or the Reorganized Debtors to the extent the Bankruptcy Court otherwise has jurisdiction

5   over such claims;

6          12.     Hear and determine any and all retained Claims commenced by the Debtors

7   to the extent the Bankruptcy Court otherwise has jurisdiction over such claims;

8          13.     Enter and implement other orders, or take such other actions as may be

9   necessary or appropriate to restrain interference by any entity with consummation or enforcement

10  of the Plan, except as otherwise provided in the Plan; and

11          14.     Enter an order closing the Chapter 11 Cases at the appropriate time.

12  **L.     Amendment and Withdrawal of Plan**

13          1.     Amendment of the Plan.  At any time before the Confirmation Date, the

14  Proponents, acting unanimously, may alter, amend, or modify the Plan, subject only to the

15  restrictions on modifications set forth in section 1127 of the Bankruptcy Code and Bankruptcy

16  Rule 3019, provided, however, that the Plan may be altered, amended or modified without the

17  unanimous approval of all of the Proponents provided that such alteration, amendment or

18  modification does not adversely affect the interests of any Proponent that does not consent to such

19  alteration, amendment or modification.  Specifically, the Proponents shall be entitled to amend the

20  Plan to reflect the results of the Auction and given that the modifications or amendments to the

21  Plan will be an enhancement to the proposed treatment of Claims under the Plan or no worse

22  treatment than currently proposed under the Plan, any such modification or amendments are

23  approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional

24  disclosure or resolicitation under Bankruptcy Code 3019.  After the Confirmation Date, the

25  Proponents may, under section 1127(b) of the Bankruptcy Code, institute proceedings in the

26  Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan,

27  the Disclosure Statement, or the Confirmation Order, or as otherwise may be necessary to carry

28  out the purposes and effects of the Plan so long as such proceedings do not materially and

1  adversely affect the treatment of holders of Claims under the Plan; provided, however, that prior

2  notice of such proceedings shall be served in accordance with the Bankruptcy Rules or applicable

3  order of the Bankruptcy Court.

4          2.      <u>Revocation or Withdrawal of the Plan</u>.  Acting unanimously, the Proponents

5  reserve the right to revoke or withdraw the Plan.  If the Plan is withdrawn or revoked, then the

6  Plan shall be deemed null and void, and nothing contained in the Plan shall be deemed a waiver of

7  any Claims by or against the Proponents or any other Person in any further proceedings involving

8  the Proponents or an admission of any sort, and the Plan and any transaction contemplated by the

9  Plan shall not be admitted into evidence in any proceeding.  To the extent that any Proponent

10  withdraws as a Proponent, the remaining Proponents shall have the right to take all actions

11  necessary to confirm, and consummate, the Plan.

12      **M.      <u>Miscellaneous</u>**

13          1.      <u>Effectuating Documents; Further Transactions; Timing</u>.  The Debtors, the

14  Reorganized Debtors, and the Plan Proponents shall be authorized and directed to execute, deliver,

15  file, or record such contracts, instruments, releases, and other agreements or documents, and to

16  take such actions as may be necessary or appropriate to effectuate and further evidence the terms

17  and conditions of the Plan.  All transactions required to occur on the Effective Date under the

18  terms of the Plan shall be deemed to have occurred simultaneously.

19          2.      <u>Exemption From Transfer Taxes</u>.  In accordance with section 1146(c) of the

20  Bankruptcy Code, the making, delivery, or recording of a deed or other instrument of transfer

21  under the Plan shall not be subject to any stamp tax or similar tax, fee or assessment, and the

22  appropriate state or local government officials or agents, shall be directed to forego the collection

23  of any such tax, fee or assessment and to accept for filing or recordation any of the foregoing

24  instruments or other documents without the payment of any such tax, fee or assessment.

25          3.      <u>Governing Law</u>.  Except to the extent that the Bankruptcy Code or other

26  federal law is controlling, the rights, duties and obligations of the Debtors, the Reorganized

27  Debtors, and any other Person arising only under the Plan shall be governed by, and construed and

28

1  enforced in accordance with, the internal laws of the State of California, without giving effect to

2  California's choice of law provisions.

3        4.     Modification of Payment Terms. The Reorganized Debtors may modify the

4  treatment of any Allowed Claim or Interest in any manner adverse only to the holder of such

5  Claim or Interest at any time after the Effective Date upon the prior written consent of the Person

6  whose Allowed Claim or Interest treatment is being adversely affected.

7        5.     Provisions Enforceable. The Confirmation Order shall constitute a judicial

8  determination that each term and provision of the Plan is valid and enforceable in accordance with

9  its terms.

10        6.     Timing of Payment. Whenever any payment or distribution to be made

11  under the Plan is due on a day other than a Business Day, such payment or distribution may

12  instead be made, without interest, on the immediately following Business Day.

13        7.     Notice of Confirmation. As soon as practicable following the Effective

14  Date of the Plan, the Reorganized Debtors shall file and serve a notice of the entry of the

15  Confirmation Order in the manner required under Bankruptcy Rule 2002(f). The notice shall

16  further identify the Effective Date and shall set forth the Professional Fees Bar Date and Rejection

17  Claims Bar Date and any other deadlines that may be established under the Plan or the

18  Confirmation Order. To the extent the Debtors have not separately established an Administrative

19  Claim Bar Date prior to the Confirmation Hearing, the Confirmation Order shall also set forth the

20  Administrative Claim Bar Date.

21        8.     Successors and Assigns. The Plan is binding upon and will inure to the

22  benefit of the Debtors, the Reorganized Debtors, and each of their respective Agents, successors,

23  and assigns, including, without limitation, any bankruptcy trustees or estate representatives.

24        9.     Notices. Except as otherwise provided in the Plan, any notice or other

25  communication required or permitted under the Plan will be in writing and deemed to have been

26  validly served, given, delivered, and received upon the earlier of: (a) the third (3rd) calendar day

27  after transmission by facsimile or hand delivery or deposit with an overnight express service or

28  overnight mail delivery service; or (b) the third (3rd) calendar day after deposit in the United

1  States mail, with proper first class postage prepaid.  If such notice is made to the Debtors, it shall

2  be addressed as follows:

3          If such notice is made to the Plan Proponents, it shall be addressed as follows:

4          **Debtors**
           Ori Katz

5          Sheppard, Mullin, Richter & Hampton LLP
           A Limited Liability Partnership

6          Including Professional Corporations
           Four Embarcadero Center, Suite 1700

7          San Francisco, California  94111
           Tel:     415.434.9100

8          Fax:     415.434.3947

9          **Fourth Third**
           John D. Fredericks

10         Winston & Strawn LLP
           101 California Street

11         San Francisco, CA 94111-5802
           Tel: 415.591.1000

12         Fax: 415.591.1400

13         **Investment Funding**
           Donald A. English, Esq.

14         English & Gloven, A Professional Corporation
           550 West C Street, Suite 1800

15         San Diego, CA 92101
           Tel: 619-338-6610

16         Fax: 619-338-6657

17         **Committee**
           Jeff Pomerantz

18         Pachulski Stang Ziehl & Jones LLP
           10100 Santa Monica Blvd., 11th Floor

19         Los Angeles, California 90067-4100
           Tel: 310.277.6910

20         Fax: 310.201.0760

21         a.      <u>Notice to Claim and Interest Holders</u>.  Notices to Persons holding a Claim

22  or Interest will be sent to the addresses set forth in such Person's proof of Claim or Interest or, if

23  none was filed, at the address set forth in the Schedules.

24         b.      <u>Post-Effective Date Notices.</u>  Following the Effective Date, notices will

25  only be served on the Reorganized Debtors, the Office of the United States Trustee and those

26  Persons who file with the Court and serve upon the Reorganized Debtors a request, which includes

27  such Person's name, contact person, address, telephone number and facsimile number, that such

28  Person receive notice of post-Effective Date matters.  Persons who had previously filed with the

1   Court requests for special notice of the proceedings and other filings in the Cases will not receive

2   notice of post-Effective Date matters unless such Persons file a new request for notice.

3           10.    Incorporation by Reference.  All exhibits, schedules and supplements to the

4   Plan are incorporated and are made a part of the Plan as if set forth in full in the Plan.

5           11.    Computation of Time.  In computing any period of time prescribed or

6   allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.  Any reference to

7   "day" or "days" shall mean calendar days, unless otherwise specified herein.

8           12.    Conflict of Terms.  In the event of a conflict between the terms of the Plan

9   and the Disclosure Statement, the terms of the Plan will control.

10          13.    Severability of Plan Provisions.  If, prior to Confirmation, any non-material

11  term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable,

12  the Bankruptcy Court will have the power to alter and interpret such term or provision to make it

13  valid or enforceable to the maximum extent practicable, consistent with the original purpose of the

14  term or provision held to be invalid, void or unenforceable, and such term or provision will then

15  be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or

16  interpretation, the remainder of the terms and provisions of the Plan will remain in full force and

17  effect and will in no way be affected, Impaired or invalidated by such holding, alteration or

18  interpretation.  The Confirmation Order will constitute a judicial determination that each term and

19  provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing,

20  is valid and enforceable pursuant to its terms.  In addition, in the event that certain Debtors are

21  excluded from the scope of the Plan or the Plan is determine to be invalid, void or unenforceable

22  as to such Debtors, the remaining provisions of the Plan shall remain valid and enforceable against

23  the remaining Debtors to the Plan.

**VIII.**

**CERTAIN RISK FACTORS TO BE CONSIDERED**

26          The Holders of Claims and Interests should read and carefully consider the following

27  factors, as well as the other information set forth in this Disclosure Statement (and the documents

28  delivered together herewith and/or incorporated by reference herein), before deciding whether to

1   vote to accept or reject the Plan.  These risk factors should not, however, be regarded as

2   constituting the only risks associated with the Plan and its implementation.

3       **A.**       **General Considerations**

4       The Plan sets forth the means for satisfying the Claims against each of the Debtors. Certain

5   Claims and Interests may receive no distributions pursuant to the Plan.  Nevertheless,

6   reorganization of certain of the Debtors' businesses and operations under the proposed Plan avoids

7   the potentially adverse impact of a liquidation on the Debtors' customers, suppliers, employees,

8   communities and other stakeholders.

9       **B.**       **Certain Bankruptcy Considerations**

10      Even if all voting Impaired Classes vote in favor of the Plan, and if with respect to any

11  Impaired Class deemed to have rejected the Plan the requirements for "cramdown" are met, the

12  Bankruptcy Court may choose not to confirm the Plan. section 1129 of the Bankruptcy Code

13  requires, among other things, a showing that confirmation of the Plan will not be followed by

14  liquidation or the need for further financial reorganization of the Debtors, and that the value of

15  distributions to dissenting Holders of Claims and Interests will not be less than the value such

16  Holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

17  Although the Proponents believe that the Plan will meet such tests, there can be no assurance that

18  the Bankruptcy Court will reach the same conclusion.  If a liquidation or protracted reorganization

19  were to occur, there is a significant risk that the value of the Debtors' enterprise would be

20  substantially eroded to the detriment of all stakeholders.

21      The Debtors' future results are dependent upon the successful confirmation and

22  implementation of a plan of reorganization.  Failure to obtain this approval in a timely manner

23  could adversely affect the Debtors' operating results, as the Debtors' relations with their customers

24  and suppliers may be harmed by protracted bankruptcy proceedings.  Furthermore, the Debtors

25  cannot predict the ultimate amount of all their liabilities that will be subject to a plan of

26  reorganization.  Once a plan of reorganization is approved and implemented, the Debtors'

27  operating results may be adversely affected by the possible reluctance of prospective lenders,

28

1  customers and suppliers to do business with a company that recently emerged from bankruptcy

2  proceedings.

3      **C.**       **Claims Estimations**

4         There can be no assurance that any estimated Claim amounts set forth in this Disclosure

5  Statement are correct.  The actual Allowed amount of Claims likely will differ in some respect

6  from the estimates.  The estimated amounts are subject to certain risks, uncertainties, and

7  assumptions.  Should one or more of these risks or uncertainties materialize, or should any

8  underlying assumptions prove incorrect, the actual Allowed amount of Claims may vary from

9  those estimated herein.

10      **D.**       **Conditions Precedent to Consummation**

11         The Plan provides for certain conditions that must be satisfied (or waived) prior to

12  confirmation of the Plan and for certain other conditions that must be satisfied (or waived) prior to

13  the Effective Date.  As of the date of this Disclosure Statement, there can be no assurance that any

14  or all of the conditions in the Plan will be satisfied (or waived).  Accordingly, even if the Plan is

15  confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated

16  and the restructuring completed.

17      **E.**       **Disclosure Regarding Potentially Illiquid Securities and Funding Obligations**

18         The New Common Interests issued under the Plan will not be registered with the SEC, will

19  not be traded on any exchange, and are subject to restrictions under various securities laws and

20  will be subject to certain restrictions under a shareholders agreement or similar agreement, the key

21  terms of which will be described in the Plan Supplement.

22      **F.**       **Competition**

23         The high degree of competition in the Debtors' businesses and the potential for new

24  competitors could cause actual results to differ from those expected by the Debtors.

25      **G.**       **Cyclicality**

26         There can be no assurance that the general market conditions relating to the Debtors'

27  services will not impair the Debtors' future financial performance.

28

**H.**     **Reliance on Key Personnel**

The Debtors operate a business that is dependent in part on skilled employees and business relationships.  A loss of a significant number of key management or sales employees or a key business partner could have a material adverse effect on the Reorganized Debtors.  The Debtors' successful transition through the restructuring process is dependent in part on their ability to retain relationship and motivate their officers and key employees.  There can be no assurance that the Reorganized Debtors will be able to retain and employ qualified management and sales personnel or continue their relationships.

**I.**     **Litigation**

The Reorganized Debtors will be subject to various claims and legal actions arising in the ordinary course of their businesses.  The Debtors are not able to predict the nature and extent of any such claims and actions and cannot guarantee that the ultimate resolution of such claims and actions will not have a material adverse effect on the Reorganized Debtors.

**J.**     **Certain Tax Considerations**

There are a number of income tax considerations, risks and uncertainties associated with consummation of the Plan.  Interested parties should read carefully the discussions set forth in Article X regarding certain U.S. federal income tax consequences of the transactions proposed by the Plan to the Debtors and the Reorganized Debtors and to Holders of Claims who are entitled to vote to accept or reject the Plan.

**IX.**

**APPLICABILITY OF FEDERAL AND OTHER SECURITIES LAWS**

It is not currently expected that any registration statement will be filed under the Securities Act or any state securities laws with respect to the transfer of New Common Interests under the Plan.

The exemption from the requirements of section 5 of the Securities Act of 1933, 15 U.S.C. § 77e, and any state or local law requiring registration or qualification for the offer or sale of a security provided under Bankruptcy Code section 1145 shall apply to all new Interests issued and distributed under or in accordance with the Plan to Fourth Third, Investment Funding or any

1  Holder of an Allowed General Unsecured Claim electing to receive equity in lieu of a cash

2  distribution.  The Debtors will seek to obtain, as part of the Confirmation Order, a provision

3  confirming such exemption.

4      To the extent Bankruptcy Code section 1145 does not apply, the Proponents will also rely

5  on section 4(2) and Regulation D of the Securities Act, and similar provisions of the applicable

6  state securities and "blue sky" laws, to exempt the exchange, issuance and distribution of

7  securities to be issued by the Reorganized Debtors under the Plan from the registration

8  requirements of the Securities Act of 1933 and applicable state securities and "blue sky" laws.

9      THE FOREGOING SUMMARY DISCUSSION IS GENERAL IN NATURE AND HAS

10  BEEN INCLUDED IN THIS DISCLOSURE STATEMENT SOLELY FOR INFORMATIONAL

11  PURPOSES.  THE PROPONENTS MAKE NO REPRESENTATIONS CONCERNING, AND

12  DO NOT HEREBY PROVIDE, ANY OPINIONS OR ADVICE WITH RESPECT TO THE

13  SECURITIES ISSUED, OR THE BANKRUPTCY MATTERS DESCRIBED HEREIN.  IN

14  LIGHT OF THE UNCERTAINTY CONCERNING THE AVAILABILITY OF EXEMPTIONS

15  FROM THE RELEVANT PROVISIONS OF FEDERAL AND STATE SECURITIES LAWS,

16  THE PROPONENTS ENCOURAGE EACH CREDITOR AND PARTY-IN-INTEREST TO

17  CONSIDER CAREFULLY AND CONSULT WITH ITS OWN LEGAL ADVISORS WITH

18  RESPECT TO ALL SUCH MATTERS.  BECAUSE OF THE COMPLEX, SUBJECTIVE

19  NATURE OF THE QUESTION OF WHETHER A PARTICULAR HOLDER MAY BE AN

20  UNDERWRITER, THE PROPONENTS MAKE NO REPRESENTATION CONCERNING THE

21  ABILITY OF A PERSON TO DISPOSE OF SECURITIES ISSUED UNDER THE PLAN.

22                                    X.

23      **CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**

24      THE FOLLOWING DISCUSSION SUMMARIZES CERTAIN ANTICIPATED U.S.

25  FEDERAL INCOME TAX CONSEQUENCES OF THE TRANSACTIONS PROPOSED BY

26  THE PLAN TO THE DEBTORS AND U.S. HOLDERS OF CLAIMS THAT ARE ENTITLED

27  TO VOTE TO ACCEPT OR REJECT THE PLAN.  THIS SUMMARY IS PROVIDED FOR

28  INFORMATION PURPOSES ONLY AND IS BASED ON THE INTERNAL REVENUE CODE

1  OF 1986, AS AMENDED (THE "<u>CODE</u>"), TREASURY REGULATIONS PROMULGATED

2  THEREUNDER, JUDICIAL AUTHORITIES, AND CURRENT ADMINISTRATIVE RULINGS

3  AND PRACTICE, ALL AS IN EFFECT AS OF THE DATE HEREOF AND ALL OF WHICH

4  ARE SUBJECT TO CHANGE OR DIFFERING INTERPRETATION, POSSIBLY WITH

5  RETROACTIVE EFFECTS THAT COULD ADVERSELY AFFECT THE U.S. FEDERAL

6  INCOME TAX CONSEQUENCES DESCRIBED BELOW.

7      THIS SUMMARY DOES NOT ADDRESS ALL ASPECTS OF U.S. FEDERAL

8  INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR U.S. HOLDER OF

9  A CLAIM IN LIGHT OF ITS PARTICULAR FACTS AND CIRCUMSTANCES OR TO

10  CERTAIN TYPES OF HOLDERS OF CLAIMS SUBJECT TO SPECIAL TREATMENT

11  UNDER THE CODE (FOR EXAMPLE, NON-U.S. TAXPAYERS, FINANCIAL

12  INSTITUTIONS, BROKER-DEALERS, INSURANCE COMPANIES, TAX-EXEMPT

13  ORGANIZATIONS, AND THOSE HOLDING CLAIMS THROUGH A PARTNERSHIP OR

14  OTHER PASS-THROUGH ENTITY).  IN ADDITION, THIS SUMMARY DOES NOT

15  DISCUSS ANY ASPECTS OF STATE, LOCAL, OR NON-U.S. TAXATION AND DOES NOT

16  ADDRESS THE U.S. FEDERAL INCOME TAX CONSEQUENCES TO U.S. HOLDERS OF

17  CLAIMS THAT ARE UNIMPAIRED UNDER THE PLAN, U.S. HOLDERS OF CLAIMS

18  THAT ARE NOT ENTITLED TO VOTE UNDER THE PLAN, AND U.S. HOLDERS OF

19  CLAIMS THAT ARE NOT ENTITLED TO RECEIVE OR RETAIN ANY PROPERTY UNDER

20  THE PLAN.

21      THE TAX RULES DESCRIBED HEREIN ARE COMPLEX AND THEIR

22  APPLICATION IS UNCERTAIN IN CERTAIN RESPECTS.  EACH U.S. HOLDER OF A

23  CLAIM IS STRONGLY URGED TO CONSULT WITH ITS OWN TAX ADVISOR

24  REGARDING THE TAX CONSEQUENCES (INCLUDING STATE, LOCAL AND NON-U.S.)

25  OF THE PLAN TO SUCH U.S. HOLDER.

26      A SUBSTANTIAL AMOUNT OF TIME MAY ELAPSE BETWEEN THE DATE OF

27  THIS DISCLOSURE STATEMENT AND THE RECEIPT OF A FINAL DISTRIBUTION

28  UNDER THE PLAN.  EVENTS SUBSEQUENT TO THE DATE OF THIS DISCLOSURE

1    STATEMENT, SUCH AS ADDITIONAL TAX LEGISLATION, COURT DECISIONS, OR

2    ADMINISTRATIVE CHANGES, COULD AFFECT THE U.S. FEDERAL INCOME TAX

3    CONSEQUENCES OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED

4    THEREUNDER.  NO RULING HAS BEEN OR IS EXPECTED TO BE SOUGHT FROM THE

5    INTERNAL REVENUE SERVICE (THE "IRS") WITH RESPECT TO ANY OF THE TAX

6    ASPECTS OF THE PLAN AND NO OPINION OF COUNSEL HAS BEEN OR IS EXPECTED

7    TO BE OBTAINED BY THE DEBTORS WITH RESPECT THERETO.

8    **To ensure compliance with United States Internal Revenue Service Circular 230,**

9    **(a) any discussion of U.S. federal tax issues in this Disclosure Statement is not intended or**

10    **written to be relied upon, and cannot be relied upon by, U.S. Holders for purposes of**

11    **avoiding penalties that may be imposed on such U.S. Holders under the Code; (b) such**

12    **discussion is written to support the promotion of the Plan; and (c) each U.S. Holder of a**

13    **claim should seek advice based on such U.S. Holder's particular circumstances from an**

14    **independent tax advisor.**

15        A.    **U.S. Federal Income Tax Consequences to the Debtors**

16        1.    Cancellation of Debt

17    Generally, income from the cancellation of indebtedness ("COD income") is includable in

18    a taxpayer's gross income. However, section 108(a) of the Tax Code provides that gross income

19    does not include any COD income if the cancellation of indebtedness occurs in a bankruptcy case

20    and the cancellation is granted by a court with proper jurisdiction under the Bankruptcy Code or

21    pursuant to a plan approved by such a court.

22    The debtor in a bankruptcy case must reduce certain of its tax attributes-such as its current-

23    year "net operating loss" ("NOL"), NOL carryforwards, tax credits and the tax basis in its assets-

24    by the amount of any COD income that is excluded from gross income under section 108(a) of the

25    Tax Code. The reduction of these tax attributes is made after the federal income tax liability for

26    the year of the debt cancellation has been determined.

27    COD income realized by a debtor equals the amount by which the indebtedness discharged

28    exceeds any consideration given in exchange therefor, subject to certain statutory or judicial

exceptions that can apply to limit the amount of COD realized (such as where the payment of the cancelled debt would have given rise to a tax deduction). To the extent that the amount of COD income excluded from gross income pursuant to section 108(a) of the Tax Code exceeds the tax attributes available for reduction, the excess COD income is simply excluded from gross income without any further tax consequences.

As a result of the Plan's treatment of the various claims of its creditors, the Reorganized Debtors may realize a significant amount of COD income. The extent of such COD income and the resulting tax attribute reduction will depend, in part, on the fair market value of the consideration paid in satisfaction of Claims and Interests, including the Units issued by the Reorganized Debtors, pursuant to the Plan.

<center>2.    <u>Limitation on NOL Carryforwards</u></center>

The utilization of part of Technologies' NOL carryforwards may be subject to limitation under section 382 of the Tax Code and Treasury Regulations promulgated thereunder, which limitation, if applicable, could effectively prevent Technologies from offsetting some portions (or potentially all) of such NOL carryforwards against its taxable income in future years. Section 383 imposes similar limitations on capital loss carryforwards and tax credits.

Under section 382, if a corporation undergoes an "ownership change" and the corporation does not qualify for (or elects out of) the special bankruptcy exception discussed below, the amount of its pre-change losses that may be utilized to offset future taxable income is, in general, subject to an annual limitation. Such limitation also may apply to certain losses or deductions that are "built-in" (i.e., economically accrued but unrecognized for tax purposes) as of the date of the ownership change and subsequently recognized. In general, a corporation undergoes an "ownership change" whenever, immediately after the close of any "testing date," the percentage of the corporation's stock owned by any one or more "5% shareholders" is more than fifty percentage points higher than the lowest percentage of the corporation's stock that such shareholders owned at any time during a specified "testing period" (generally the three-year period preceding the testing date).

a.     <u>General Section 382 Limitation</u>. The amount of the annual limitation to which a loss corporation may be subject depends, in part, on whether the corporation is in bankruptcy and the ownership change occurs pursuant to a plan of reorganization confirmed by the Bankruptcy Court. As discussed below, under a special bankruptcy exception, a corporation in bankruptcy may also be able to avoid any annual limitation.

In general, the amount of the annual limitation to which a corporation would be subject would be equal to the product of (i) the fair market value of the stock of the corporation immediately before the ownership change (with certain adjustments) multiplied by (ii) the "long-term tax-exempt rate" in effect for the month in which the ownership change occurs. If a corporation is in bankruptcy, and the corporation undergoes the ownership change pursuant to a confirmed plan, the fair market value of the corporation's stock generally is determined immediately after (rather than before) the ownership change. The Tax Code provides for the reduction of such value in certain circumstances, including, for example, where the corporation has substantial non-business assets.

Any unused limitation in a taxable year may be carried forward for 20 years, thereby increasing the annual limitation in the subsequent taxable year. However, if the corporation does not continue its historic business or use a significant portion of its historic assets in a new business for two years after the ownership change, it will not be able to utilize the NOLs at all.

b.     <u>Special Bankruptcy Exception</u>. An exception to the general annual limitation described above applies where the stockholders and/or certain qualified creditors of a debtor retain or receive (other than for new value) at least 50% of the vote and value of the stock pursuant to a confirmed bankruptcy plan. Under this exception, the use of a debtor's pre-change losses is not limited on an annual basis, although the pre-change losses which may be carried to a post-change year must be reduced by the amount of interest paid or accrued by the debtor on indebtedness that is converted to stock pursuant to a bankruptcy case during (i) any taxable year ending during the three-year period preceding the taxable year in which the ownership change occurs, and (ii) the portion of the taxable year in which the ownership change occurs on or before the change date.  In addition, if the bankruptcy exception to the application of section 382 applies,

1 any further ownership change of the debtor within a two-year period will preclude the debtor's

2 utilization of any pre-change losses at the time of the subsequent ownership change against future

3 taxable income.

4         3.       <u>Alternative Minimum Tax</u>

5       In general, an alternative minimum tax ("<u>AMT</u>") is imposed on a corporation's alternative

6 minimum taxable income at a 20% rate to the extent that such tax exceeds the corporation's

7 regular federal income tax. For purposes of computing taxable income for AMT purposes, certain

8 tax deductions and other beneficial allowances are modified or eliminated, including NOL

9 carryforwards. Only 90% of a corporation's taxable income for AMT purposes may be offset by

10 available NOL carryforwards (as computed for AMT purposes).

11         4.       <u>Abandonment of Collateral</u>

12       To the extent any Debtor satisfies a Claim by abandoning the collateral securing the Claim,

13 that Debtor will be deemed to have sold such collateral at its fair market value and will recognize

14 taxable income in an amount equal to the difference between the fair market value of the collateral

15 and its adjusted basis in the collateral. The Debtors would also realize COD income to the extent

16 the Allowed Claim exceeds the fair market value of the abandoned collateral.

17       **B.**      **<u>U.S. Federal Income Tax Consequences to Claim Holders</u>**

18       Pursuant to the Plan, the holders of certain Allowed Claims will be entitled to cash

19 distributions. Each of the holders of such Allowed Claims will recognize gain or loss in an

20 amount equal to the difference between (x) the amount received by such holder in satisfaction of

21 its Claim and (y) the holder's adjusted tax basis in its Allowed Claim.

22       Where gain or loss is recognized by the holder of an Allowed Claim, the character of such

23 gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be

24 determined by a number of factors, including the tax status of the holder, whether the Allowed

25 Claim constitutes a capital asset in the hands of the holder, how long it has been owned by the

26 holder, whether the Allowed Claim was acquired at a market discount, and whether and to what

27 extent the holder of the Allowed Claim previously had claimed a bad debt deduction on the

28 Allowed Claim.

1    If an Allowed Claim that is paid in full exceeds $250,000, a portion of each installment

2    paid may be deemed to be interest under the "original issue discount" principles of section 1274 of

3    the Tax Code and taxable as ordinary income.

4        1.    Withholding/Reporting Requirements.

5        All distributions to holders of Claims under the Plan are subject to any applicable

6    withholding (including employment tax withholding). Under federal income tax law, interest,

7    dividends, and other reportable payments may, under certain circumstances, be subject to "backup

8    withholding." Backup withholding generally applies if the holder (a) fails to furnish its social

9    security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN,

10   (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide

11   a certified statement, signed under penalty of perjury, that the TIN provided is its correct number

12   and that it is not subject to backup withholding. Backup withholding is not an additional tax, but

13   merely an advance payment, which may be refunded to the extent such advance payment results in

14   an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain

15   circumstances, corporations and financial institutions.

16       THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL

17   PURPOSES ONLY. ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO

18   CONSULT THEIR TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL AND

19   OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

20                **XI.**

21   **FEASIBILITY OF THE PLAN AND THE BEST INTERESTS OF CREDITORS**

22   **A.    Feasibility of the Plan**

23       In connection with confirmation of the Plan, the Bankruptcy Court will be required to

24   determine that the Plan is feasible pursuant to section 1129(a)(11) of the Bankruptcy Code, which

25   means that the confirmation of the Plan is not likely to be followed by the liquidation or the need

26   for further financial reorganization of the Debtors.  Because the consummation of the transactions

27   envisioned under either Scenario A or Scenario B will generate sufficient funds to satisfy a

28   substantial portion the Debtors' obligations under the Plan, and the Plan will enable the Debtors to

1   emerge from the Cases with little debt, the Proponents believe that the Plan is feasible pursuant to

2   section 1129(a)(11) of the Bankruptcy Code.

3       **B.       Acceptance of the Plan**

4           As a condition to Confirmation, the Bankruptcy Code requires that each Class of Impaired

5   Claims vote to accept the Plan, except under certain circumstances.

6           Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of

7   impaired claims as acceptance by holders of at least two-thirds (2/3) in dollar amount and more

8   than one-half (1/2) in number of Allowed claims in that class, but for that purpose counts only

9   those who actually vote to accept or to reject the Plan.  Thus, Holders of Claims in each of Class 3

10  (and 5 and 6, if applicable) will have voted to accept the Plan only if two-thirds (2/3) in amount

11  and a majority in number of the Claims actually voting in each Class cast their ballots in favor of

12  acceptance.  Holders of Claims who fail to vote are not counted as either accepting or rejecting the

13  Plan.

14      **C.       Best Interests Test**

15          As noted above, even if a plan is accepted by each class of claims and interests, the

16  Bankruptcy Code requires a bankruptcy court to determine that the plan is in the best interests of

17  all holders of claims or interests that are impaired by the plan and that have not accepted the plan.

18  The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a

19  bankruptcy court to find either that all members of an impaired class of claims or interests have

20  accepted the plan or that the plan will provide a member who has not accepted the plan with a

21  recovery of property of a value, as of the effective date of the plan, that is not less than the amount

22  that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy

23  Code.

24          To calculate the probable distribution to Holders of each Impaired Class of Claims and

25  Interests if the Debtors were liquidated under chapter 7, a bankruptcy court must first determine

26  the aggregate dollar amount that would be generated from the Debtors' assets if their chapter 11

27  cases were converted to a chapter 7 case under the Bankruptcy Code.  This "liquidation value"

28

1   would consist primarily of the proceeds from a forced sale of the Debtor's Assets by a chapter 7

2   trustee.

3        The amount of liquidation value available to Holders of General Unsecured Claims would

4   be reduced by, first, the Secured Claims to the extent of the value of their collateral and, second,

5   by the costs and expenses of liquidation, as well as by other Administrative Claims and costs of

6   both the chapter 7 cases and the chapter 11 cases.  Costs of liquidation under chapter 7 of the

7   Bankruptcy Code would include the compensation of a trustee, as well as of counsel and other

8   professionals retained by the trustee, asset disposition expenses, all unpaid administrative

9   expenses incurred by the Debtors in their chapter 11 cases that are allowed in the chapter 7 cases,

10  litigation costs and claims arising from the operations of the Debtors during the pendency of the

11  chapter 11 cases.  The liquidation itself would trigger certain priority payments that otherwise

12  would be due in the ordinary course of business.  Those priority claims would be paid in full from

13  the liquidation proceeds before the balance would be made available to pay Holder of General

14  Unsecured Claims or to make any distribution in respect of Interests.  The liquidation would also

15  prompt the rejection of executory contracts and unexpired leases and thereby enlarge the total pool

16  of General Unsecured Claims by reason of resulting rejection damages claims.  Further, if Fourth

17  Third and Investment Funding did not receive equity, their Claims would greatly enlarge the total

18  pool of General Unsecured Claims, greatly diminishing distributions.

19       Once the Bankruptcy Court ascertains the recoveries in liquidation of Holders of Secured

20  Claims and Priority Claims, it must determine the probable distribution to Holders of General

21  Unsecured Claims and Interests from the remaining available proceeds in liquidation.  If such

22  probable distribution has a value greater than the distributions to be received by Holders of

23  General Unsecured Claims and Interests under the Plan, then the Plan is not in the best interests of

24  creditors and equity security holders.

25       **D.**    **Liquidation Analysis**

26            1.    Scenario A.

27       Under Scenario A, Holders of Secured Claims, Administrative Claims, Priority Tax

28  Claims, Priority Tax Claims will receive full payment on account of their Allowed Claims.  In

1    addition, Holders of General Unsecured Claims will receive full payment on account of their

2    Allowed Claims plus interest at the federal judgment rate.  Accordingly, as to the Holders of

3    Claims, the Plan clearly meets the best interests of creditors test as Holders of Claims will receive

4    the maximum they are entitled to receive under the Plan.  As to Holders of Interests, under

5    Scenario A they will receive value as determined by the Successful Bid.  Holders of Interests will

6    not receive any distribution if the Debtors' assets were liquidated in chapter 7 as the proceeds of

7    the Debtors' assets would be insufficient to satisfy Holders of Claims in full.  Accordingly, as to

8    the Holders of Interests, the best interests of creditors test is satisfied under Scenario A.

9            2.    Scenario B.

10           Scenario B will only proceed if the fulsome Investment Banking Process is not successful.

11   Thus Scenario B would, to the extent the Investment Banking Process is unsuccessful, represent

12   the best potential recovery to unsecured creditors.  Under Scenario B, Holders of Secured Claims,

13   Administrative Claims, Priority Tax Claims, Priority Non-Tax Claims will receive full payment on

14   account of their Allowed Claims.  In addition, Holders of General Unsecured Claims may receive

15   full payment on account of their Allowed Claims plus interest at the federal judgment rate based

16   upon proceeds of the Exit Facility being sufficient to satisfy such Claims.  The Proponents project

17   that Holders of General Unsecured Claims will receive no less than sixty percent (60%) on

18   account of their Allowed Claims.  The Plan Proponents believe that Holders of General Unsecured

19   Claims will receive less than 60% on account of their Allowed Claims in a liquidation scenario for

20   at least one primary reason:  a Chapter 7 liquidation scenario will not fare better than the

21   Investment Banking Process.  Thus, if the Investment Banking Process is not successful, Scenario

22   B will be superior to a Chapter 7 liquidation scenario.  As to Holders of Interests, under Scenario

23   B they will not receive any distribution.  As discussed in Scenario A above, Holders of Interests

24   would also receive no distribution under a Chapter 7.  Accordingly, as to the Holders of Interests,

25   the best interests of creditors test is also satisfied under Scenario B.

26

27

28

**E.**    **Confirmation Without Acceptance of All Impaired Classes: The "Cramdown" Alternative**

In the event any Class of Impaired Claims rejects the Plan, the Debtors may seek confirmation of the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code.

Section 1129(b) of the Bankruptcy Code provides that a plan can be confirmed even if the plan is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted it.  The Bankruptcy Court may confirm a plan at the request of a debtor if the plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired class that has not accepted the plan.  A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank.  The Debtors believe the Plan does not discriminate unfairly with respect to the Claims and Interests in Classes.

A plan is "fair and equitable" as to holders of unsecured claims that reject the plan if the plan provides either that: (a) each holder of a claim of such class receives or retains on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (b) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

A plan is fair and equitable as to a class of equity interests that rejects a plan if the plan provides: (a) that each holder of an interest included in the rejecting class receive or retain on account of that interest property that has a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled or the value of such interest; or (b) that the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property at all.

The Debtors believe that they could, if necessary, meet the "fair and equitable" requirements of section 1129(b) of the Bankruptcy Code with respect to Holders of Claims and Interests in Impaired Classes.

# XII.

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Proponents believe that the Plan affords all Holders of Claims and Interests the potential for the greatest realization on the Debtors' assets and, therefore, is in the best interests of such Holders.  If, however, the requisite acceptances are not received, or the Plan is not confirmed and consummated, the theoretical alternatives include: (a) formulation of an alternative plan or plans of reorganization; or (b) liquidation of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code.

### A.    Alternative Plan(s) of Reorganization

If the requisite acceptances are not received or if the Plan is not confirmed, the Proponents or any other party in interest could attempt to formulate and propose a different plan or plans of reorganization.  Such a plan or plans might involve either a reorganization and continuation of the Debtors' businesses or an orderly liquidation of assets.

The Proponents believe that the Plan enables Holders of Claims to realize the greatest possible value under the circumstances and has the greatest chance to be confirmed and consummated.

### B.    Liquidation under Chapter 7 or Chapter 11

If no plan is confirmed, the Debtors' cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.  It is impossible to predict with certainty how the proceeds of the liquidation would be distributed to the respective Holders of Claims against or Interests in the Debtors.  It is, however, possible to predict that the cessation in operations would likely further diminish the value of the Debtors' assets, resulting in reduced returns to all Holders of Allowed Claims.

The Proponents believe that a liquidation under chapter 7 would not likely result in distributions to Holders of Claims in excess of those provided under the Plan.  That is because the Plan contemplates the continuation of the Investment Banking Process which essentially seeks to monetize the Debtors' assets for the most value.  Further, Fourth Third and Investment Funding

1    have agreed to compromise their Claims by more than $9 million to incentive potential bidders by

2    lowering the amount necessary to pay Holders of Allowed General Unsecured Claims in full.  If

3    the Investment Banking Process fails, the floor of recovery provided by <u>Scenario B</u>, which is the

4    conversion of Fourth Third's and Investment Funding's Allowed General Unsecured Claims to

5    equity and the funding of remaining Allowed Claims through the Exit Facility, should be far

6    superior to a liquidation.  There is no reason to believe that a conversion of the Debtors' cases to

7    chapter 7 and the forced liquidation of the Debtors' assets by a chapter 7 trustee will generate a

8    superior recovery.  Moreover, any proceeds of the Debtors' assets generated in a chapter 7

9    liquidation would be reduced by such additional expenses and by Claims, some of which would be

10    entitled to priority, arising by reason of the liquidation and from the rejection of leases and other

11    executory contracts in connection with the cessation of operations.

12                                   **XIII.**

13                    **<u>SOLICITATION; VOTING PROCEDURES</u>**

14        **A.        <u>Parties in Interest Entitled to Vote</u>**

15            In general, a holder of a claim or interest may vote to accept or to reject a plan if (i) the

16    claim or interest is "allowed," which means generally that no party in interest has objected to such

17    claim or interest, and (ii) the claim or interest is "impaired" by the plan but entitled to receive or

18    retain property under the plan.

19            Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be

20    "impaired" under a plan unless (i) the plan leaves unaltered the legal, equitable and contractual

21    rights to which such claim or interest entitles the holder thereof; or (ii) notwithstanding any legal

22    right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other

23    than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of

24    such claim or interest as it existed before the default.

25            If, however, the holder of an impaired claim or interest will not receive or retain any

26    distribution under the plan on account of such claim or interest, the Bankruptcy Code deems such

27    holder to have rejected the plan and, accordingly, holders of such claims and interests do not

28    actually vote to accept or reject the Plan. If a claim or interest is not impaired by the plan, the

1   Bankruptcy Code deems the holder of such claim or interest to have accepted the plan and,

2   accordingly, holders of such claims and interests are not entitled to vote to accept or reject the

3   Plan.

4           **B.      Classes Entitled to Vote to Accept or Reject the Plan**

5           Holders of Claims in Classes 3 (and 5 and 6 in certain circumstances) are entitled to vote to

6   accept or reject the Plan.  By operation of law, each Unimpaired Class of Claims is deemed to

7   have accepted the Plan and each Impaired Class of Claims or Interests that will receive nothing

8   under the Plan is deemed to have rejected the Plan and, therefore, the Holders of Claims or

9   Interests in such Classes are not entitled to vote to accept or reject the Plan.  Consequently, under

10  Scenario B, Classes 1 and 2 are deemed to have accepted the Plan and Classes 4, 5, and 6 are

11  deemed to have rejected the Plan and, therefore, none of the Holders of Claims or Interests in such

12  Classes are entitled to vote to accept or reject the Plan.  Under Scenario A, only Class 6 is entitled

13  to vote.

14          At the time the Proponents solicit votes from Holders of Claims and Holders of Interests, it

15  will be unclear whether the Plan under Scenario A or Scenario B will ultimately prevail.  As a

16  result, certain Holders of Claims and Holders of Interests will be asked to vote, even though some

17  of those votes may ultimately be deemed to be acceptances or rejections of the Plan.

18          **C.      Solicitation Order**

19          Upon approval of this Disclosure Statement, the Bankruptcy Court entered an order that,

20  among other things, determined the dates, procedures and forms applicable to the process of

21  soliciting votes on the Plan and established certain procedures with respect to the tabulation of

22  such votes (the "Solicitation Order").  Parties in interest may obtain a copy of the Solicitation

23  Order through the Bankruptcy Court's electronic case filing system, or by making written request

24  upon the Debtors' counsel or the Voting Agent.

25          **D.      Waivers of Defects, Irregularities, Etc.**

26          All questions with respect to the validity, form, eligibility (including time of receipt),

27  acceptance and revocation or withdrawal of ballots will be determined by the Bankruptcy Court.

28  As indicated below under "Withdrawal of Ballots; Revocation," effective withdrawals of ballots

1   must be delivered to the Voting Agent prior to the Voting Deadline.  The Proponents reserve the

2   absolute right to contest the validity of any such withdrawal.  The Proponents also reserve the

3   right to seek rejection of any and all ballots not in proper form.  The Proponents further reserve the

4   right to seek waiver of any defects or irregularities or conditions of delivery as to any particular

5   ballot.  Neither the Debtors nor any other Person will be under any duty to provide notification of

6   defects or irregularities with respect to deliveries of ballots nor will any of them incur any

7   liabilities for failure to provide such notification.  Ballots previously furnished (and as to which

8   any irregularities have not theretofore been cured or waived) may be invalidated by the

9   Bankruptcy Court.

10      **E.      <u>Withdrawal of Ballots; Revocation</u>**

11      Any party who has delivered a valid ballot for the acceptance or rejection of the Plan may

12  withdraw such acceptance or rejection by delivering a written notice of withdrawal to the Voting

13  Agent at any time prior to the Voting Deadline.  A notice of withdrawal, to be valid, must:

14  (i) contain the description of the Claim(s) to which it relates and the aggregate principal amount

15  represented by such Claim(s); (ii) be signed by the withdrawing party in the same manner as the

16  ballot being withdrawn; (iii) contain a certification that the withdrawing party owns the Claim(s)

17  and possesses the right to withdraw the vote sought to be withdrawn; and (iv) be received by the

18  Voting Agent in a timely manner via regular mail at Sheppard, Mullin, Richter & Hampton LLP,

19  Four Embarcadero Center, Suite 1700, San Francisco, California  94111, Attn: Robert Sahyan,

20  Esq.  The Proponents intend to consult with the Voting Agent to determine whether any

21  withdrawals of ballots were received and whether the requisite acceptances of the Plan have been

22  received.  As stated above, the Proponents expressly reserve the absolute right to contest the

23  validity of any such withdrawals of ballots.

24      Unless otherwise directed by the Bankruptcy Court, a purported notice of withdrawal of

25  ballots which is not received in a timely manner by the Voting Agent will not be effective to

26  withdraw a previously cast ballot.

27      Any party who has previously submitted to the Voting Agent prior to the Voting Deadline

28  a properly completed ballot may revoke such ballot and change its vote by submitting to the

1  Voting Agent prior to the Voting Deadline a subsequent properly completed ballot for acceptance

2  or rejection of the Plan.  In the case where more than one timely, properly completed ballot is

3  received, only the ballot which bears the latest date will be counted for purposes of determining

4  whether the requisite acceptances have been received.

5          **F.    <u>Voting Rights of Disputed Claimants</u>**

6          Holders of Disputed Claims or Interests in Classes 3 (and 5 and 6 in certain circumstances)

7  whose Claims or Interests are: (a) asserted as wholly unliquidated or wholly contingent in Proofs

8  of Claim or Interest filed prior to the Distribution Record Date; or (b) whose Claims or Interests

9  are asserted in Proofs of Claim as to which an objection to the entirety of the Claim or Interest is

10  pending as of the Balloting Deadline (collectively, the "<u>Disputed Claimants</u>") are not permitted to

11  vote to accept or reject the Plan except as provided in the Solicitation Order.  Pursuant to the

12  procedures outlined in the Solicitation Order, Disputed Claimants may obtain a ballot for voting

13  on the Plan only by filing a motion under Bankruptcy Rule 3018(a) seeking to have their Claims

14  temporarily Allowed for voting purposes (a "<u>Rule 3018 Motion</u>").  Any such Rule 3018 Motion

15  must be filed and served upon the Debtors' counsel and the Voting Agent no later than 5:00 p.m.

16  (Pacific time) on the fourteenth (14th) day after the later of: (i) the Solicitation Date; and (ii) the

17  date of service of an objection, if any, to such claim.  The ballot of any creditor filing such a

18  motion will not be counted unless temporarily allowed by the Bankruptcy Court for voting

19  purposes, after notice and a hearing.  Any party timely filing and serving a Rule 3018 Motion will

20  be provided a ballot and be permitted to cast a provisional vote to accept or reject the Plan.  If and

21  to the extent that the Proponents and such party are unable to resolve the issues raised by the Rule

22  3018 Motion prior to the Voting Deadline established by the Bankruptcy Court, then at the

23  Confirmation Hearing the Bankruptcy Court will determine whether the provisional ballot should

24  be counted as a vote to accept or reject the Plan. Nothing herein affects the Proponents' right to

25  object to any Proof of Claim after the Balloting Deadline. With respect to any such objection, the

26  Proponents may request that any vote cast by the Holder of the Claim subject to the objection be

27  disallowed and not counted in determining whether the requirements of section 1126(c) of the

28  Bankruptcy Code have been met.

1

### G.    Further Information; Additional Copies

If you have any questions or require further information about the voting procedures for

voting your Claim or about the package of materials you received, or if you wish to obtain an

additional copy of the Plan or this Disclosure Statement, or any exhibits or appendices to such

documents (at your own expense, unless otherwise specifically required by Bankruptcy Rule

3017(d) or the Solicitation Order), please contact the Voting Agent at:

> Robert Sahyan, Esq.
> Sheppard, Mullin, Richter & Hampton LLP
> A Limited Liability Partnership
> Including Professional Corporations
> Four Embarcadero Center, Suite 1700
> San Francisco, California  94111
> Tel:    415.434.9100
> Fax:    415.434.3947

# XIV.

## RECOMMENDATION AND CONCLUSION

For all of the reasons set forth in this Disclosure Statement, the Proponents believe that confirmation and consummation of the Plan is preferable to all other alternatives. Consequently, the Proponents urge all Holders of Claims and Holders of Interests to vote to ACCEPT the Plan, and to complete and return their ballots so that they will be RECEIVED on or before July 8, 2011, at 5:00 p.m. prevailing Pacific time.

Dated:  June 7, 2011                    MMFX TECHNOLOGIES CORPORATION,
                                        FASTEEL CORPORATION, MMFX STEEL
                                        CORPORATION OF AMERICA, AND MMFX
                                        INTERNATIONAL HOLDINGS, INC.


                                        By: _____
                                        Name: Michael W. Pompay
                                        Title:   President & Corporate Secretary


Dated:  June 7, 2011                    FOURTH THIRD LLC


                                        By: _____
                                        Name: _____
                                        Title: _____


Dated:  June 7, 2011                    INVESTMENT FUNDING, INC.
                                        :

                                        By: _____
                                        Name: _____
                                        Title: _____


Dated:  June 7, 2011                    OFFICIAL COMMITTEE OF UNSECURED
                                        CREDITORS


                                        By: _____
                                        Name: _____
                                        Title: _____

# XIV.

## RECOMMENDATION AND CONCLUSION

For all of the reasons set forth in this Disclosure Statement, the Proponents believe that confirmation and consummation of the Plan is preferable to all other alternatives. Consequently, the Proponents urge all Holders of Claims and Holders of Interests to vote to ACCEPT the Plan, and to complete and return their ballots so that they will be RECEIVED on or before July 8, 2011, at 5:00 p.m. prevailing Pacific time.

Dated: June 7, 2011

MMFX TECHNOLOGIES CORPORATION, FASTEEL CORPORATION, MMFX STEEL CORPORATION OF AMERICA, AND MMFX INTERNATIONAL HOLDINGS, INC.

By: _____
Name: Michael W. Pompay
Title:  President & Corporate Secretary

Dated: June 7, 2011

FOURTH THIRD LLC

By: _____
Name: _____
Title: _____

Dated: June 7, 2011

INVESTMENT FUNDING, INC.
:

By: _____
Name: _____
Title: _____

Dated: June 7, 2011

OFFICIAL COMMITTEE OF UNSECURED CREDITORS

By: Munnia VanDenheuvel
Name: Munnia VanDenheuvel
Title: Chair | AIR Credit Manager

# **<u>EXHIBIT A</u>**

COUNSEL TO DEBTORS

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
Ori Katz (SBN: 209561)
Aaron J. Malo (SBN: 179985)
Robert K. Sahyan (SBN: 253763)
650 Town Center Drive, 4th Floor
Costa Mesa, California  92626-1993
Telephone:      (714) 513-5100
Facsimile:      (714) 513-5130
Email: okatz@sheppardmullin.com
          amalo@sheppardmullin.com
          rsahyan@sheppardmullin.com

COUNSEL TO OFFICIAL COMMITTEE OF UNSECURED CREDITORS

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (SBN: 143717)
Shirley S. Cho (SBN: 192616)
10100 Santa Monica Blvd., 11th Floor
Los Angeles, California  90067-4100
Telephone:      (310) 277-6910
Facsimile:      (310) 201-0760
Email: jpomerantz@pszjlaw.com
          scho@pszjlaw.com

COUNSEL TO FOURTH THIRD LLC

WINSTON & STRAWN LLP
John D. Fredericks (SBN:  168309)
Justin E. Rawlins (SBN:  209915)
101 California Street, 39th Floor
San Francisco, CA  94111-5802
Telephone:      (415) 591-1000
Facsimile:      (415) 591-1400
Email: jfredericks@winston.com
          jrawlins@winston.com

COUNSEL TO INVESTMENT FUNDING, INC.

ENGLISH & GLOVEN
A PROFESSIONAL CORPORATION
Donald A. English, Esq. (SBN: 115569)
550 West C Street, Suite 1800
San Diego, CA  92101
Telephone:      (619) 338-6610
Facsimile:      (619) 338-6657
Email: dae@englishapc.com

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SANTA ANA DIVISION

| | |
|---|---|
| In re:<br><br>MMFX CANADIAN HOLDINGS, INC., *et al.*,<br><br>        Debtors.<br><br>---<br><br>☐  Affects MMFX Canadian Holdings, Inc.<br><br>☒  Affects MMFX International Holdings, Inc.<br><br>☒  Affects Fasteel Corporation<br><br>☒  Affects MMFX Steel Corporation of America<br><br>☒  Affects MMFX Technologies Corporation<br><br>☐  Affects all Debtors | **Case No. 8:10-bk-10083-RK**<br>Chapter 11<br><br>**(Jointly Administered with Case Nos.: 10-bk-10085; 10-bk-27570; 10-bk-27571; and 10-bk-27572**<br><br>**FIRST AMENDED JOINT PLAN OF REORGANIZATION OF AFFILIATED DEBTORS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**<br><br>Date:  July 22, 2011<br>Time:  9:00 a.m.<br>Place:  United States Bankruptcy Court<br>       411 West Fourth Street<br>       Santa Ana, CA 92701<br>       Courtroom 5D |

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ................................................................................................... 1

II.     CLASSIFICATION OF CLAIMS AND INTERESTS ........................................... 2

        A.      Unclassified Claims ................................................................................... 2

        B.      Summary of Classification ......................................................................... 2

III.    TREATMENT OF UNCLASSIFIED CLAIMS AGAINST ALL DEBTORS
        UNDER SCENARIO A AND SCENARIO B ......................................................... 3

        A.      Administrative Claims ................................................................................ 3

        B.      Priority Tax Claims .................................................................................... 4

        C.      DIP Loan Claim .......................................................................................... 5

        D.      Claims for Professional Fees ...................................................................... 5

IV.     TREATMENT OF CLASSIFIED CLAIMS AGAINST AND INTERESTS ................... 5

        A.      Class 1 – Priority Non-Tax Claims. ........................................................... 5

        B.      Class 2 – Secured Claims. .......................................................................... 5

        C.      Class 3 – General Unsecured Claims. ........................................................ 6

        D.      Class 4 – Intercompany Claims. ................................................................ 8

        E.      Class 5 – Subordinated Claims. ................................................................. 8

        F.      Class 6 – Equity Interests. ......................................................................... 9

        G.      Nonconsensual Confirmation .................................................................. 10

V.      IMPLEMENTATION OF THE PLAN ................................................................... 10

        A.      Corporate Action ...................................................................................... 10

        B.      Sources of Consideration for Plan. .......................................................... 11

        C.      Continued Corporate Existence; Ongoing Operations of Reorganized
                Debtors. .................................................................................................... 12

        D.      Management and Corporate Governance. ................................................ 12

        E.      Substantive Consolidation. ...................................................................... 13

F.    Revesting of Estate Assets. .................................................................. 14

G.    Retained Claims and/or Defenses. ....................................................... 14

H.    Miscellaneous. ...................................................................................... 15

VI.    PROVISIONS GOVERNING DISTRIBUTIONS ........................................... 16

A.    Distributions by the Debtors ................................................................ 16

B.    Estimation ............................................................................................. 16

C.    Distributions on Account of Claims Allowed After the Effective Date ........ 16

D.    Distributions in Cash ........................................................................... 17

E.    Undeliverable Distributions ................................................................. 17

F.    Unclaimed Distributions ...................................................................... 18

G.    Setoff .................................................................................................... 18

H.    Taxes .................................................................................................... 18

I.    De Minimis Distributions ..................................................................... 19

J.    Preservation of Causes of Action ........................................................ 19

VII.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES ........................... 20

A.    Assumption ........................................................................................... 20

B.    Rejection ............................................................................................... 20

C.    Assumption Obligations ....................................................................... 20

D.    Effect of Confirmation Order ............................................................... 21

E.    Post-Petition Agreements ..................................................................... 21

F.    Modifications to Plan Supplement ....................................................... 22

VIII.    CONDITIONS PRECEDENT ............................................................................ 22

A.    Conditions to Confirmation .................................................................. 22

B.    Conditions to Effectiveness .................................................................. 23

C.    Waiver of Conditions ........................................................................... 24

IX.     EFFECTS OF CONFIRMATION ................................................................. 24

        A.      Release by Debtors ................................................................. 25

        B.      Discharge and Permanent Injunction ................................................ 26

        C.      Limitation of Liability ................................................................. 27

        D.      Exoneration and Reliance ................................................................. 27

X.      RETENTION OF JURISDICTION ................................................................. 28

XI.     AMENDMENT AND WITHDRAWAL OF PLAN ............................................... 29

        A.      Amendment of the Plan ................................................................. 29

        B.      Revocation or Withdrawal of the Plan ................................................ 30

XII.    MISCELLANEOUS ................................................................................. 30

        A.      Effectuating Documents; Further Transactions; Timing ........................... 30

        B.      Exemption From Transfer Taxes ..................................................... 31

        C.      Governing Law ................................................................................. 31

        D.      Modification of Payment Terms ..................................................... 31

        E.      Provisions Enforceable ................................................................. 31

        F.      Quarterly Fees to the United States Trustee ..................................... 31

        G.      Timing of Payment ................................................................. 31

        H.      Notice of Confirmation ................................................................. 32

        I.      Successors and Assigns ................................................................. 32

        J.      Notices ................................................................................. 32

        K.      Notice to Claim and Interest Holders ................................................ 33

        L.      Post-Effective Date Notices ..................................................... 33

        M.      Incorporation by Reference ..................................................... 33

        N.      Computation of Time ................................................................. 33

        O.      Conflict of Terms ................................................................. 33

        P.      Severability of Plan Provisions ..................................................... 33

XIII.    DEFINITIONS AND RULES OF INTERPRETATION........................................................ 34

# I.

## **INTRODUCTION**

This document is the First Amended Joint Plan of Reorganization for MMFX Steel Corporation of America ("Steel Corp."), MMFX Technologies Corporation ("Technologies"), Fasteel Corporation ("Fasteel") and MMFX International Holdings, Inc. ("International" and, together with Steel Corp, Technologies, and Fasteel, the "Debtors"), jointly proposed by the Debtors, the Official Committee of Unsecured Creditors (the "Committee"), Fourth Third LLC ("Fourth Third"), and Investment Funding, Inc. ("Investment Funding").  Also enclosed in the same envelope as this Plan is the Disclosure Statement that has been approved by the Bankruptcy Court, which provides you with background information necessary to vote on the Plan, including a discussion of the Debtors' history, business, properties, results of operations, and events leading up to the contemplated restructuring and a summary and analysis of the Plan and certain related matters.  ***All holders of Claims against, and Interests in, any of the Debtors are encouraged to read the Plan, the Disclosure Statement and the related solicitation materials in their entirety before voting to accept or reject the Plan.***

This is a reorganizing Plan. The Plan envisions the Debtors will reorganize under one of two alternative scenarios described as Scenario A and Scenario B.  The Plan envisions the continuance of the Debtors' current investment banking process seeking solicitation of bids to invest in, license or acquire some or all of the Debtors' assets (the "Investment Banking Process"). Scenario A takes place if the Investment Banking Process results in a Successful Bid, under which event the Debtors will restructure and recoveries to Holders of Allowed Claims and Holders of Interests will be made in accordance with Scenario A.  Scenario A provides that all Allowed Claims will be paid in full (provided, however, Fourth Third and Investment Funding shall receive discounted payoffs, reducing their asserted claims by over $9 million, if Fourth Third and Investment Funding are paid on or before August 5, 2011).

Scenario B takes place in the event the Investment Banking Process does not lead to a Successful Bid on or before July 20, 2011, or if it does, the Court does not approve Successful Bid on or before July 22, 2011.  In such event, the Debtors will restructure and recoveries to Holders

1   of Allowed Claims will be made in accordance with Scenario B.  Under Scenario B, Fourth Third

2   and Investment Funding will convert their Allowed General Unsecured Claims to equity and

3   provide the Reorganized Debtors with the Exit Facility.  The Exit Facility is currently estimated to

4   be sufficient to pay Holders of Allowed Unsecured Claims in full, with interest.[1]  The Exit Facility

5   will provide a minimum of $1,000,000 to be made available to fund payments to Holders of

6   Allowed General Unsecured Claims, Allowed Priority Tax Claims and Allowed Non-Tax Priority

7   Claims, which the Proponents currently estimate should be sufficient to make a minimum of a

8   sixty percent (60%) distribution to Holders of Allowed General Unsecured Claims.  Further, if the

9   proceeds of the Exit Facility are not sufficient to pay the Holders of Allowed General Unsecured

10  Claims in full plus interest, the Committee, Fourth Third and Investment Funding will engage in

11  further negotiations, the outcome of which will be to provide Holders of General Unsecured

12  Claims with a recovery under the Plan equal to or greater than what would be achieved based upon

13  the funds available to pay Holders of General Unsecured Claims from the Exit Facility as

14  presently committed.

15                                              **II.**

16                        **CLASSIFICATION OF CLAIMS AND INTERESTS**

17          **A.**        **Unclassified Claims**.  As provided in section 1123(a)(1) of the Bankruptcy Code,

18  Administrative Claims and Priority Tax Claims against the Debtors are not classified for purposes

19  of voting on, or receiving distributions under, the Plan.  Holders of such Claims are not entitled to

20  vote on the Plan.  All such Claims are instead treated separately in accordance with Article III and

21  in accordance with the requirements set forth in section 1129(a)(9) of the Bankruptcy Code.

22          **B.**        **Summary of Classification**.  In accordance with section 1123(a)(1) of the

23  Bankruptcy Code, all Claims of Creditors (except those Claims receiving treatment as set forth in

24  

---

25  [1] Depending upon the results of the Debtors' operations and ability to meet budget forecasts
    through the Effective Date, and the accuracy of the Proponents assumptions regarding  the total

26  amount of the DIP Loan, Allowed Secured Claims and Allowed Administrative Claims against the
    Debtors' Estates, and the amount of Allowed Priority Tax Claims, Allowed Non-Tax Priority

27  Claims and Allowed General Unsecured Claims, the Proponents currently estimate that the
    proceeds of the Exit Facility should be sufficient to pay all Allowed General Unsecured Claims in

28  full plus interest.

Article III) and holders of Interests are placed in the Classes described below and treated in

accordance with Article IV below for all purposes, including voting on, confirmation of, and

distribution under, the Plan.

| Class | Summary | Voting Status |
|---|---|---|
| N/A | Administrative Claims | Not Entitled To Vote |
| N/A | Priority Tax Claims | Not Entitled To Vote |
| N/A | DIP Loan Claim | Not Entitled to Vote |
| N/A | Professional Fee Claims | Not Entitled to Vote |
| 1 | Priority Non-Tax Claims | Unimpaired – Deemed to Accept; Not Entitled to Vote |
| 2 | Secured Claims | Unimpaired – Deemed to Accept; Not Entitled to Vote |
| 3 | General Unsecured Claims | Impaired – Entitled to Vote |
| 4 | Intercompany Claims | Impaired – Not Entitled to Vote |
| 5 | Subordinated Claims | <u>Scenario A</u> – Impaired – Entitled to Vote<br><u>Scenario B</u> – Impaired – Deemed to Reject; Not Entitled to Vote |
| 6 | Equity Interests | <u>Scenario A (Class 6A)</u> – Impaired – Entitled to Vote; <u>Scenario A (Classes 6B-6D)</u> <u>and Scenario B</u> – Impaired – Deemed to Reject; Not Entitled to Vote |

**III.**

**TREATMENT OF UNCLASSIFIED CLAIMS AGAINST ALL DEBTORS UNDER**

**SCENARIO A AND SCENARIO B**

Unclassified Claims shall be treated identically for all Debtors under <u>Scenario A</u> and

<u>Scenario B</u>.  The treatment shall be as follows:

A.    **Administrative Claims.**

1.    <u>Administrative Claim Bar Date</u>.  All requests for payment of Administrative

Claims (except with respect to Professional Fees, which shall instead be subject to the Professional

Fees Bar Date and the separate procedures and deadlines set forth therein) must be filed by the

1    Administrative Claim Bar Date or the holders thereof shall be forever barred from asserting such

2    Administrative Claims against the Debtors or from sharing in any distribution under the Plan.

3            2.    Treatment.

4            a.    Generally.  Unless any entity entitled to payment of an Allowed

5    Administrative Claim agrees to a less favorable treatment or unless otherwise ordered by the

6    Court, each Holder of an Allowed Administrative Claim (except for Professional Fees, which shall

7    be treated as set forth in Section III(D)) will receive in full satisfaction, discharge, exchange and

8    release thereof, Cash in an amount equal to such Allowed Administrative Claim on the later of (i)

9    the Effective Date, and (ii) the fifteenth (15th) Business Day after such Administrative Claim

10   becomes an Allowed Administrative Claim, or, in either case, as soon thereafter as is practicable.

11           b.    Ordinary Course.  Notwithstanding anything III.A.1 above to the

12   contrary, holders of Administrative Claims based on liabilities incurred in the ordinary course of

13   the Debtors' businesses following the Petition Date shall not be required to comply with the

14   Administrative Claim Bar Date.

15           c.    U.S. Trustee Fees.  Quarterly fees owed to the Office of the U.S.

16   Trustee that accrue prior to the Effective Date will be paid by the Debtors and U.S. Trustee Fees

17   that accrue after the Effective Date will be paid for each Reorganized Debtor when due in

18   accordance with applicable law.  The Debtors will continue to file the Post-Confirmation

19   Quarterly Reports as required until the Effective Date and the Reorganized Debtors will file the

20   reports after the Effective Date until each Bankruptcy Case is closed under Bankruptcy Code

21   section 350.

22       **B.    Priority Tax Claims**.  Except to the extent that a Holder of an Allowed Priority

23   Tax Claim has been paid by the Debtors before the Effective Date or agrees to a less favorable

24   treatment, each Holder of an Allowed Priority Tax Claim will receive in full satisfaction,

25   discharge, exchange and release thereof, Cash in an amount equal to such Allowed Priority Tax

26   Claim on the later of (i) the Effective Date or (ii) the fifteenth (15th) Business Day after such

27   Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as is practicable.

28

**C.** **DIP Loan Claim.** The DIP Loan Claim will be indefeasibly repaid in full in on or before the Effective Date.

**D.** **Claims for Professional Fees.** Each Holder of a Professional Fee Claim seeking an award of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date will (i) file their respective interim (if applicable) and final fee applications by no later than the tenth (10th) day after the Effective Date or such other date as may be fixed by the Court and (ii) if granted such an award, be paid Cash in such amounts as are Allowed by the Court on the date such Professional Fee Claim becomes an Allowed Claim, or as soon thereafter as is practicable.

## IV.

## TREATMENT OF CLASSIFIED CLAIMS AGAINST AND INTERESTS
## SCENARIO A AND SCENARIO B

**A.** **Class 1 – Priority Non-Tax Claims.**

1. **Classification.** Class 1 consists of all Priority Non-Tax Claims, if any, against Technologies, Fasteel, Steel Corp. and International, respectively.

2. **Impairment and Voting.** Class 1 is unimpaired. Holders of Priority Non-Tax Claims are deemed to have accepted this Plan under section 1126(f) of the Bankruptcy Code and are not entitled to vote on the Plan.

3. **Treatment.** Each Holder of an Allowed Class 1 Priority Non-Tax Claim, unless otherwise mutually agreed upon by the Holder of such Claim and the applicable Debtor, will receive Cash in an amount equal to such Class 1 Allowed Priority Non-Tax Claim on the later of (a) the Effective Date, or as soon as practicable thereafter, or (b) the date such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim pursuant to a Final Order, or as soon thereafter as is practicable.

**B.** **Class 2 – Secured Claims.**

1. **Classification.** Class 2 consists of all Secured Claims, if any, against Technologies, Fasteel, Steel Corp. and International, respectively.

2.    **Impairment and Voting.**  Class 2 is unimpaired.  Holders of Secured Claims are deemed to have accepted the Plan under section 1126(f) of the Bankruptcy Code and are not entitled to vote on the Plan.

3.    **Treatment.**  Except to the extent that a holder of an allowed Secured Claim and, under Scenario A the party who submits a Successful Bid that is consummated, and under Scenario B, Fourth Third and Investment Funding, agree to a different treatment, each holder of an allowed Secured Claim shall, in full an final satisfaction of such claim, (i) be reinstated and rendered unimpaired in accordance with section 1124(2) of the Bankruptcy Code, notwithstanding any contractual provision or applicable nonbankruptcy law that entitles the holder of an allowed Secured Claim to demand to receive payment of such allowed Secured Claim prior to the stated maturity of such allowed Secured Claim from an after the occurrence of a default, or (ii) receive cash in an amount equal to such allowed Secured Claim in full and complete satisfaction of such allowed Secured Claim.  The Plan Proponents will file in the Plan Supplement a list of proposed treatments for each Holder of an Allowed Secured Claim.  The Plan Proponents will include in the Plan Supplement a list of proposed treatments for each Holder of an Allowed Secured Claim, which list shall specify treatment in accordance with section B.3(i) or B.3(ii) above.

C.    **Class 3 – General Unsecured Claims.**

1.    **Classification**.  Class 3 consists of all General Unsecured Claims against Technologies, Fasteel, Steel Corp. and International, respectively.

2.    **Impairment and Voting.**  Class 3 is impaired.  Holders of General Unsecured Claims are entitled to vote on the Plan.

3.    **Treatment**.

a.    Scenario A.  On, within fifteen (15) business after the later of (a) the Effective Date; and (b) the date the Holder of a General Unsecured Claim becomes an Allowed Claim, under Scenario A, Holders of General Unsecured Claims will be paid in cash in full plus interest accruing after the Effective Date at the federal judgment rate, provided, however, the payment of the Fourth Third Discounted Payoff and the Investment Funding Discounted Payoff (i.e., the payment of $45.5 million to Fourth Third and $8.5 million to Investment Funding) prior

1    to August 5, 2011 shall be deemed to satisfy Fourth Third's and Investment Funding's Claims in

2    full.

3                    b.        Scenario B.  On, within fifteen (15) business after the later of (a) the

4    Effective Date; and (b) the date the Holder of a General Unsecured Claim becomes an Allowed

5    Claim, under Scenario B, Holders of General Unsecured Claims, excluding Fourth Third on

6    account of the Fourth Third Indebtedness and Investment Funding on account of the Investment

7    Funding Indebtedness (who shall be deemed to receive New Common Interests in lieu of a cash

8    distribution) and excluding any other Holder of an Allowed General Unsecured Claim electing to

9    receive New Common Interests in lieu of a cash distribution, shall receive a distribution equal to

10   eighty five percent (85%) of their Allowed General Unsecured Claim.  In addition, on, or as soon

11   as practicable after the later of (a) the one year anniversary of the Effective Date; and (b) the date

12   the Holder of a General Unsecured Claim becomes an Allowed Claim, Holders of General

13   Unsecured Claims will receive a distribution equal to fifteen percent (15%) of their General

14   Unsecured Claim plus accrued and unpaid interest, accrued after the Petition Date, on their entire

15   General Unsecured Claim at the federal judgment rate, subject to availability under the Exit

16   Facility.  Alternatively, Holders of General Unsecured Claims may elect on the Ballot to receive

17   New Common Interests in lieu of the Distributions of Cash provided for under Scenario B in

18   which case they will receive a Pro Rata share of New Common Interests based upon the total

19   amount of General Unsecured Claims converted to New Common Interests (with the conversion

20   of the Fourth Third and Investment Funding General Unsecured Claims being made based on their

21   Allowed General Unsecured Claims of 52,562,434.55 and $11,199,782.34, respectively).

22   Notwithstanding the foregoing, if the proceeds of the Exit Facility, plus an additional amount to be

23   funded by Fourth Third and Investment Funding sufficient to satisfy all General Unsecured Claims

24   against International, are insufficient to make the foregoing distributions to Holders of General

25   Unsecured Claims after payment of Allowed Secured Claims, Administrative Claims, Priority Tax

26   Claims and Priority Non-Tax Claims, then, Holders of General Unsecured Claims (other than

27   Holders of General Unsecured Rejection Damages Claims) shall receive their Pro Rata share of

28   $1,000,000 minus the amounts necessary to pay Holders of Priority Tax Claims and Priority Non-

1  Tax Claims (and Holders of Allowed General Unsecured Rejection Damages Claims and Allowed

2  General Unsecured Claims with respect to International shall receive an equivalent distribution),

3  provided, however, that in lieu of such treatment the Committee may negotiate for enhanced

4  treatment of Holders of General Unsecured Claims.  It is thus the intent of the parties that nothing

5  in this Plan shall impair or discharge the obligation of any party other than these Debtors,

6  including, without limitation, any Affiliate of the Debtors, owed to Fourth Third or Investment

7  Funding against any such party.  The Proponents do not request that the Court determine at this

8  time the effect, if any, of the Plan on Fourth Third or Investment Funding's claims against any

9  other party.  However, the recovery to them under these Classes shall constitute all of the claims

10  of any type or nature, direct or indirect, by Fourth Third or Investment Funding against the

11  Debtors that are Proponents.

12    **D.**    Class 4 – Intercompany Claims.

13        1.    **Classification.**  Class 4 consists of all Intercompany Claims against

14  Technologies, Fasteel, Steel Corp. and International, respectively.

15        2.    **Impairment and Voting.**  Class 4 are Insiders, as that term is defined under

16  the Bankruptcy Code, and, regardless of their treatment, are not entitled to vote on the Plan.

17        3.    **Treatment**.

18        a.    Scenario A.  Under Scenario A, all Intercompany Claims against

19  Technologies, Fasteel, Steel Corp. and International shall, at the Successful Bidder's option and

20  depending upon consolidation of the Debtors, be either (i) reinstated, in full or in part, or

21  (ii) discharged and extinguished.

22        b.    Scenario B.  Under Scenario B, all Intercompany Claims against

23  Technologies, Fasteel, Steel Corp. and International shall, at Fourth Third's option, be either

24  (i) reinstated, in full or in part, or (ii) discharged and extinguished.

25    **E.    Class 5 – Subordinated Claims.**

26        1.    **Classification.**  Class 5 consists of all Subordinated Claims against

27  Technologies, Fasteel, Steel Corp. and International, respectively.

28

2.      **Impairment and Voting.**  Class 5 is impaired under the Plan.  Such Claims shall receive the treatment set forth under the Successful Bid (if any) under Scenario A and are thus entitled to vote under <u>Scenario A</u>.  Holders of Class 5 Claims will not receive any recovery under <u>Scenario B</u>, are not entitled to vote, and are deemed to reject the Plan.

3.      **Treatment**.

a.      <u>Scenario A</u>.  Under Scenario A, Subordinated Claims shall receive the treatment set forth under the Successful Bid (if any).  The treatment under the Successful Bid may provide that Holders of Subordinated Claims may (a) receive no recovery, or (b) be paid some or all of their claims in: (i) cash, (ii) any other consideration provided for in connection with a Successful Bid (including new interests in the Reorganized Debtors, or (iii) any combination of the foregoing.

b.      <u>Scenario B</u>.  Under Scenario B, Subordinated Claims shall be discharged and extinguished.

F.      <u>**Class 6 – Equity Interests.**</u>

1.      **Classification.**  Class 6 consists of all Interests in Technologies, Fasteel, Steel Corp. and International, respectively.

2.      **Impairment and Voting.**  Class 6 is impaired under the Plan.  Holders of Interests in Class 6 may receive some recovery under <u>Scenario A</u> and are entitled to vote.  Holders of Interests in Class 6 shall receive the treatment under the Successful Bid under <u>Scenario A</u>. Holders of Interests will not receive any recovery under <u>Scenario B</u>, are not entitled to vote, and are deemed to reject the Plan.

3.      **Treatment**.

a.      <u>Scenario A</u>.  Under <u>Scenario A</u>, Class 6 Interests shall receive the treatment set forth under the Successful Bid, if any.  The treatment under the Successful Bid may provide that Holders of Interests retain or be paid (a) some or all of their Interests, (b) cash, (c) any other consideration provided for in connection with a Successful Bid (including new interests in the Reorganized Debtors, or (d) any combination of the foregoing.

1                  b.       <u>Scenario B</u>.  Under <u>Scenario B</u>, all existing Interests shall be

2    cancelled on the Effective Date.  Existing warrants for equity interests shall also be canceled and

3    holders thereof will receive no distribution.  Interests in Reorganized Technologies shall be

4    cancelled and replaced with the New Common Interests.  Interests in Fasteel, Steel Corp., and

5    International shall be cancelled to be replaced by new Interests to be held by Reorganized

6    Technologies.

7           **G.**       **Nonconsensual Confirmation.**  To the extent necessary, the Proponents hereby

8    request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code.

9    <div align="center">**V.**</div>

10   <div align="center">**IMPLEMENTATION OF THE PLAN**</div>

11         The Plan shall be implemented on the Effective Date.  In addition to the provisions set

12   forth elsewhere in this Plan regarding means of execution, the following shall constitute the

13   principal means for the implementation of the Plan.

14         **A.**       **Corporate Action.**  On the Effective Date, the adoption, filing, approval and

15   ratification, as necessary, of all corporate or related actions contemplated under the Plan with

16   respect to each of the Reorganized Debtors shall be deemed authorized and approved in all

17   respects.  Without limiting the foregoing, such actions may include: (i) the adoption and filing of

18   the Reorganized Debtor Documents; (ii) the election or appointment, as the case may be, of

19   directors and officers (or managing members, as the case may be) for the Reorganized Debtors;

20   and (iii) the issuance of Interests (including the New Common Interests) under Scenario A or

21   Scenario B.

22         All matters provided for herein involving the corporate structure of any Debtor or

23   Reorganized Debtor, or any corporate action required by any Debtor or Reorganized Debtor in

24   connection with the Plan, shall be deemed to have occurred and shall be in effect, without any

25   requirement of further action by the equity holders, directors or officers of such Debtor,

26   Reorganized Debtor, or by any other stakeholder.

27         On or after the Effective Date, the appropriate officers of each Debtor and/or Reorganized

28   Debtors and members of the board of directors (or equivalent body) of each Debtor and/or

1   Reorganized Debtors are authorized and directed to issue, execute, deliver, file and record any and

2   all agreements, documents, securities, deeds, bills of sale, conveyances, releases and instruments

3   contemplated by the Plan in the name of and on behalf of such Reorganized Debtor and take such

4   actions as may be necessary or appropriate to effectuate and further evidence the terms and

5   conditions of the Plan.

6           With regard to issuance of any new Interests (including the New Common Interests), the

7   Reorganized Debtors shall be authorized and directed on the Effective Date to take any and all

8   necessary and appropriate actions to issue and deliver the Interests.  The terms of the Interests will

9   be subject to a Shareholder Agreement (or equivalent agreement) and related documents, a

10  summary of the key terms of which will be submitted as part of the Plan Supplement.  The

11  Interests, when issued or distributed as provided in the Plan, will be duly authorized, validly

12  issued and, if applicable, fully paid and nonassessable.  The Proponents (and each of their

13  respective affiliates, agents, directors, officers, members, managers, employees, advisors, and

14  attorneys) have, and upon Confirmation of the Plan shall be deemed to have, participated in good

15  faith and in compliance with the applicable provisions of the Bankruptcy Code and applicable law

16  with regard to the distribution of the Interests, and therefore are not, and on account of such

17  distributions will not be, liable at any time for the violation of any applicable law, rule, or

18  regulation governing the solicitation of acceptances or rejections of the Plan or such distributions

19  made pursuant to the Plan.  Upon entry of the Confirmation Order, all provisions of the Plan

20  addressing distribution of any Interests shall be deemed necessary and proper.  A summary of key

21  terms expected to be included in such an agreement will be outlined in the Plan Supplement.

22          **B.**      <u>**Sources of Consideration for Plan.**</u>

23          Under <u>Scenario A</u>, the funds to be utilized to make Cash payments under this Plan will be

24  generated from the Successful Bid.  Under <u>Scenario B</u>, the funds to be utilized to make Cash

25  payments under this Plan will be generated from the Exit Facility, existing assets, and Cash

26  generated from operations (if any) and additional amounts to be funded by Fourth Third and

27  Investment Funding to insure that Holders of Allowed General Unsecured Rejection Claims and

28

1    Allowed General Unsecured Claims against International receive the same treatment as Holders of

2    General Unsecured Claims against Fasteel, Steel Corp. and Technologies.

3    **C.    Continued Corporate Existence; Ongoing Operations of Reorganized Debtors.**

4    As of the Effective Date, each Debtor shall, as a Reorganized Debtor, continue to maintain

5    its separate legal existence for all purposes under the Plan, with each Reorganized Debtor

6    retaining all the powers of a legal entity under applicable law.  From and after the Effective Date,

7    the Reorganized Debtors shall continue to engage in business under this Plan.

8    **D.    Management and Corporate Governance.**

9    1.    Officers and Directors of Reorganized Debtors.

10   On the Effective Date, the Reorganized Debtors shall retain directors (or managing

11   members) or senior officers of the Reorganized Debtors.  Under Scenario A, the new directors (or

12   managing members) and senior officers of the Reorganized Debtors shall be determined in

13   connection with the bidders' Successful Bid.  Under Scenario B, the new managing members and

14   senior officers for each of the Reorganized Debtors will be set forth in the Plan Supplement.

15   It is possible that certain employees of the Debtors may be approached regarding continued

16   employment by the Reorganized Debtors.  Certain employees may even receive offers of

17   employment with the Reorganized Debtors prior to the Effective Date.  However, the Debtors

18   have requested that no binding agreements be entered into in connection with such offers prior to

19   the Effective Date, and that any such discussions regarding employment be disclosed in the Plan

20   Supplement so that they are made public prior to the Effective Date.  If an officer or director of the

21   Debtors is approached regarding employment or made an offer of employment, the Debtors may

22   exclude such officer or director from participation in the decision-making process as appropriate.

23   2.    Adoption or Assumption of Senior Management Contracts.

24   On the Effective Date, the Reorganized Debtors may assume existing management

25   contracts.  Notice of such assumption shall be included in the Plan Supplement.

26   3.    Adoption of New Management Incentive Plan.

27   On the Effective Date, the Reorganized Debtors may adopt a new management incentive

28   plan (the "Management Incentive Plan").  Under Scenario A, the terms of the Management

Incentive Plan shall be determined by the Successful Bidder and shall be consistent with the terms of the Successful Bid.  Under Scenario B, the terms of the Management Incentive Plan shall be determined by the Managing Members of the Reorganized Debtors.

4.    Corporate Structure.

Following the Effective Date, under either Scenario A or Scenario B, the Reorganized Debtors shall have the same corporate structure as existed prior the Effective Date, as may be modified in a manner acceptable to the Successful Bidder or Fourth Third and Investment Funding, as applicable.

5.    Articles of Organization, Bylaws.

Each of the Reorganized Debtors' articles of incorporation or bylaws (as applicable), shall contain such provisions as are required to satisfy the provisions of the Plan and Bankruptcy Code and shall include, among other things, (i) provisions prohibiting the issuance of nonvoting equity securities to the extent, and only to the extent, required by section 1123(a)(6) of the Bankruptcy Code, (ii) provisions for a board of directors or managing members (who will be identified in the Plan Supplement or in accordance with the Successful Bid), and (iii) other provisions customary in such situations so long as they are not inconsistent with any of the provisions contained in the foregoing subsections (i) and (ii).

E.    **Substantive Consolidation.**

The Debtors shall be treated as substantively consolidated for claims resolution and distribution purposes.  On and after the Effective Date, each and every Claim filed or to be filed in the Cases shall be deemed filed against all the Debtors and shall be a Claim against and obligation of all the Debtors.  As a result of the consolidation, any guaranty by one or more of the Debtors of the obligations of another Debtor shall be eliminated.  All duplicative Claims (identical in both amount and subject matter) filed against more than one of the Debtors shall be automatically expunged so that only one Claim survives against the consolidated Debtors (but in no way shall such surviving Claim be deemed Allowed by reason of this section).  Any claim filed against more than one Debtor for the same underlying debt, whether based on joint and/or several liability or otherwise, shall be treated as one collective obligation of the Debtors.

1    To the extent each Class of Claims votes to accept the Plan, this consolidation will be

2    treated as an approved settlement under Section 1123 of the Bankruptcy Code.  Further, this Plan

3    shall serve as a motion by the Proponents seeking entry of a Bankruptcy Court order substantively

4    consolidating all of the Estates into a single consolidated Estate for all purposes associated with

5    Confirmation and distributions to be made under the Plan.

6    Substantive consolidation shall not affect the legal and organizational structure of the

7    Reorganized Debtors or their separate corporate existences or any prepetition or postpetition

8    guarantees, Liens, or security interests that are required to be maintained under the Bankruptcy

9    Code, under the Plan, or in connection with contracts or leases that were assumed or entered into

10   during the Bankruptcy Cases.  Any alleged defaults under any applicable agreement with the

11   Debtors or the Reorganized Debtors arising from substantive consolidation shall be deemed cured

12   as of the Effective Date.

13   **F.    Revesting of Estate Assets.**

14   Upon the Effective Date, the Reorganized Debtors shall be vested with all right, title and

15   interest in the applicable respective Estate Assets of the Debtors, and such property shall become

16   the property of the Reorganized Debtors free and clear of all Claims, Liens, charges, other

17   encumbrances and Interests, except as set forth in this Plan.

18   **G.    Retained Claims and/or Defenses.**

19   As additional consideration to Class 3 General Unsecured Creditors, the Debtors will

20   waive the right to pursue Avoidance Actions pursuant to section 547 of the Bankruptcy Code on

21   the Effective Date.  Unless any Causes of Action and Defenses are expressly waived, relinquished,

22   released, compromised, or settled in the Plan or any Final Order (including, without limitation, the

23   Confirmation Order), the Debtors, and the Reorganized Debtors, expressly reserve all such Causes

24   of Action and Defenses for later adjudication by the Reorganized Debtors.  The reservation set

25   forth in this section shall include, without limitation, a reservation by the Debtors and the

26   Reorganized Debtors of any Causes of Action and Defenses not specifically identified in the Plan

27   or Disclosure Statement, or of which the Debtors and/or the Proponents may presently be

28   unaware, or which may arise or exist by reason of additional facts or circumstances unknown to

the Debtors and/or the Proponents at this time or facts or circumstances that may change or be different from those that the Debtors and/or the Proponents now believe to exist and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise), or laches will apply to such Causes of Action and Defenses upon or after the Confirmation of the Plan based on the Disclosure Statement, the Plan or the Confirmation Order, except where such Causes of Action and Defenses have been expressly waived, relinquished, released, compromised, or settled in the Plan or a Final Order.  Following the Effective Date, the Reorganized Debtors may assert, compromise or dispose of any Causes of Action and Defenses without further notice to Creditors or authorization of the Bankruptcy Court.  Notwithstanding the foregoing or anything to the contrary elsewhere in this Plan, nothing in this Plan or the Confirmation Order shall prejudice or affect (1) any rights of any Person to assert Claims, including Administrative Claims, against the Debtors, the Reorganized Debtors, the Estates, or any transferee thereof, by way of offset, recoupment, or counterclaim to the extent permitted by applicable law; and/or (2) any defense to any Causes of Action and Defenses or any other claims asserted by the Debtors, the Reorganized Debtors, the Estates, or any transferee thereof.

**H.    Miscellaneous.**

1.    <u>Tax Identification Numbers</u>.  The Reorganized Debtors may require any Creditors to furnish their social security number, employer or taxpayer identification number, and the Reorganized Debtors may condition any distribution upon receipt of such identification number and supporting documentation (including, without limitation, an IRS Form W-9 in the case of a U.S. Person or other appropriate form in the case of a Foreign Person).

2.    <u>Committee</u>.  On the Effective Date, the Committee shall be dissolved and the members of the Committee shall be released and discharged from any further authority, duties, responsibilities, liabilities and obligations related to, or arising from, the Bankruptcy Cases, except that the Committee shall continue in existence and have standing and capacity to prepare and prosecute (i) applications or objections for the payment of fees and reimbursement of expenses incurred by the Committee or any of the estates' Professionals, and (ii) any motions or other

1  actions seeking enforcement or implementation of the provisions of this Plan or the Confirmation

2  Order or pending appeals of Orders entered in the Bankruptcy Cases.

3          3.    <u>Final Decree</u>.  At any time following the Effective Date, the Reorganized

4  Debtors shall be authorized to file a motion for the entry of a final decree closing the Bankruptcy

5  Cases pursuant to section 350 of the Bankruptcy Code.

6                          **VI.**

7              **<u>PROVISIONS GOVERNING DISTRIBUTIONS</u>**

8      **A.    <u>Distributions by the Debtors</u>.**  The Reorganized Debtors shall administer Claims

9  and make distributions in respect of Allowed Claims; provided, however, the Reorganized Debtors

10  may elect to designate and/or retain a third party to serve as disbursing agent without the need for

11  any further order of the Bankruptcy Court.

12      **B.    <u>Estimation</u>.**  In order to establish reserves under this Plan and avoid undue delay in

13  the administration of these Bankruptcy Cases, the Debtors, the Reorganized Debtors, or the

14  Proponents, shall have the right to seek an order of the Bankruptcy Court pursuant to section

15  502(c) of the Bankruptcy Code, estimating the amount of any Claim.

16      **C.    <u>Distributions on Account of Claims Allowed After the Effective Date.</u>**

17          1.    <u>Distributions on Account of Disputed Claims and Estimated Claims</u>.

18  Except as otherwise provided herein, a Final Order, or as agreed by the relevant parties,

19  distributions on account of Disputed Claims and Estimated Claims that become Allowed after the

20  Effective Date shall be made by the Reorganized Debtors within fifteen (15) business days of such

21  Claims becoming Allowed.

22          2.    <u>Distributions of New Common Interests</u>.  Reorganized Technologies will

23  distribute (i) New Common Interests to the holders of Allowed Class 3 General Unsecured Claims

24  Held by Fourth Third and Investment Funding and (ii) New Common Interests to the Holders of

25  Allowed Class 3 Claims that elect the equity option.

26          3.    <u>No Distributions Pending Allowance</u>.  Notwithstanding anything in the Plan

27  to the contrary, no distribution shall be made with respect to any Disputed Claim or Estimated

28  Claim until such Claim becomes an Allowed Claim.  Notwithstanding the above, to the extent that

the Reorganized Debtors dispute the amount owed pursuant to a Claim, but do not dispute some portion of the Claim, the undisputed portion of the Claim shall be treated as an Allowed Claim and only the disputed portion shall be treated as a Disputed Claim.

4.    Objection Deadline.  The Reorganized Debtors shall file all objections to Disputed Claims, and shall file all motions to estimate Claims under section 502(c) of the Bankruptcy Code, on or before the Claims Objection Deadline.

5.    Disputed and Estimated Claims Reserve.

a.    Cash Reserve.  On and after the Effective Date, the Reorganized Debtors shall maintain in reserve such Cash as necessary to satisfy any Cash distributions required to be made to Holders of Disputed Claims and Estimated Claims against the Debtors in full, which reserves shall be held by a third party escrow holder acceptable to the Committee.

b.    Professional Fee Reserve.  Fees incurred by Professionals prior to the Effective Date shall be estimated and placed into a trust account for all Professionals to be paid upon entry of an order approving the final fee applications with any remaining amount to be returned to be Reorganized Debtors to be distributed in accordance with the Plan.

6.    Settling Disputed Claims.  The Reorganized Debtors shall be authorized to settle, or withdraw any objections to any Disputed Claims following the Effective Date without further order of the Court.

**D.    Distributions in Cash.**  The Reorganized Debtors shall make any required Cash payments to the holders of Allowed Claims in U.S. dollars by check and by first-class mail (or by other equivalent or superior means as determined by the Reorganized Debtors).

**E.    Undeliverable Distributions.**  Distributions shall be made to the name and address on the Creditor's proof of claim, if applicable, or if no Claim was filed, to the name and address in the Debtors' records.  If any distribution under the Plan is returned as undeliverable, no further distributions to such Person shall be made unless and until the Reorganized Debtors or other appropriate disbursing agent is notified in writing of such holder's then-current address, at which time the undelivered distributions shall be made to such holder without interest or dividends.

1    Undeliverable distributions shall be returned to the Reorganized Debtors until such distributions

2    are claimed.

3        **F.    Unclaimed Distributions.**  Any entity that fails to claim any Cash within ninety

4    (90) days from the date upon which a distribution of Cash is first made to such entity shall forfeit

5    all rights to any distribution under the Plan, and the Reorganized Debtors shall be authorized to

6    cancel any distribution that is not timely claimed.  Pursuant to section 347(b) of the Bankruptcy

7    Code, upon forfeiture, such Cash (including interest thereon, if any) shall revert to the

8    Reorganized Debtors free of any restrictions under the Plan, the Bankruptcy Code or the

9    Bankruptcy Rules, provided, however, that until Holders of Allowed General Unsecured Claims

10   have received payment in full plus interest at the federal judgment rate, any unclaimed

11   distributions, after forfeiture, shall be distributed, Pro Rata, to the Holders of General Unsecured

12   Claims.  Upon forfeiture, the Claim of a Person with respect to such funds shall be discharged and

13   forever barred notwithstanding any federal or state escheat laws to the contrary, and Holders of

14   such Claims shall have no claim whatsoever against the Debtors or the Reorganized Debtors.

15       **G.    Setoff.**  Nothing contained in the Plan shall constitute a waiver or release by the

16   Debtors of any right of setoff or recoupment the Debtors may have against any Person.  To the

17   extent permitted by applicable law, the Reorganized Debtors may setoff or recoup against any

18   Claim and the payments or other distributions to be made under the Plan in respect of such Claim,

19   claims of any nature whatsoever that arose before the Petition Date that the Debtors may have

20   against the holder of such Claim or Interest.  Notwithstanding the foregoing or anything to the

21   contrary elsewhere in the Plan, nothing in the Plan or the Confirmation Order shall prejudice or

22   affect (1) any rights of any Person to assert Claims, including Administrative Claims, against the

23   Debtors, the Reorganized Debtors, the Estates, or any transferee thereof, by way of offset,

24   recoupment, or counterclaim to the extent permitted by applicable law; and/or (2) any defense to

25   any Causes of Action and Defenses or any other claims asserted by the Debtors, the Reorganized

26   Debtors, the Estates, or any transferee thereof.

27       **H.    Taxes.**  Pursuant to section 346(f) of the Bankruptcy Code, the Reorganized

28   Debtors shall be entitled to deduct any federal, state or local withholding taxes from any Cash

1    payments made with respect to Allowed Claims, as appropriate.  The Reorganized Debtors shall

2    be authorized to take all actions necessary to comply with applicable withholding and recording

3    requirements.  Notwithstanding any other provision of the Plan, each holder of an Allowed Claim

4    that has received a distribution of Cash shall have sole and exclusive responsibility for the

5    satisfaction or payment of any tax obligation imposed by any governmental unit, including

6    income, withholding and other tax obligation, on account of such distribution.  For tax purposes,

7    distributions received in respect of Allowed Claims will be allocated first to the principal amount

8    of such Claims, with any excess allocated to unpaid accrued interest, if any.

9        **I.**    **<u>De Minimis Distributions.</u>**  If any interim distribution under the Plan to the holder

10    of an Allowed Claim would be less than $50.00 or a fractional number of New Common Interests,

11    the Reorganized Debtors may withhold such distribution.  If any final distribution under the Plan

12    to the holder of an Allowed Claim would be less than $25.00, the Reorganized Debtors may

13    cancel such distribution.  Any unclaimed distributions pursuant to this section shall be treated as

14    unclaimed property under the Plan.

15        **J.**    **<u>Preservation of Causes of Action.</u>**  As of the Effective Date, all Causes of Action

16    (other than Avoidance Actions, which shall be released) shall vest in the Reorganized Debtor.

17    Any Person with respect to whom any Debtor has incurred an obligation (whether on account of

18    services, purchase or sale of property, or otherwise), or who has received services from any of the

19    Debtors or a transfer of money or property of any of the Debtors, or who has transacted business

20    with any of the Debtors, or leased equipment or property from any of the Debtors should assume

21    that such obligation, transfer, or transaction may be reviewed by the Reorganized Debtors

22    subsequent to the Effective Date, and may, if appropriate, be the subject of an action after the

23    Effective Date, whether or not (i) such Person has filed a proof of Claim against any of the

24    Debtors; (ii) such Person's proof of Claim has been objected to; (iii) such Person's Claim was

25    included in the Schedules; (iv) such Person's scheduled Claims have been objected to or has been

26    identified by the Debtors as disputed, contingent, or unliquidated; or (v) such Person has

27    previously been notified that the Debtors believe the estate holds Causes of Action against such

28    Person.

## VII.

### EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**A.      Assumption.**  On the Effective Date, pursuant to section 1123(b)(2) of the Bankruptcy Code, the Reorganized Debtors will assume the executory contracts and unexpired leases of the Debtors that:  (a) have been expressly identified in the Plan Supplement for assumption, (b) are subject to a motion for assumption, or (c) are identified in the Successful Bid (as applicable, the "Notice of Assumption").  Each executory contract and unexpired lease listed in the Plan Supplement shall include any modifications, amendments and supplements to such agreement, whether or not listed in the Plan Supplement.

**B.      Rejection.**  Except as set forth in this Article VII of this Plan or the Notice of Assumption, on the Effective Date, pursuant to section 1123(b)(2) of the Bankruptcy Code, the Debtors will reject any and all executory contracts and unexpired leases of the Debtors otherwise not identified in the Notice of Assumption.  Any Person asserting any Claim for damages arising from the rejection of an executory contract or unexpired lease of the Debtors under this Plan shall file such Claim on or before the Rejection Claim Bar Date, or be forever barred from: (a) asserting such Claim against the Debtors, the Reorganized Debtors, or the Estate Assets, and (b) sharing in any distribution under the Plan.

**C.      Assumption Obligations.**  The Reorganized Debtors shall satisfy all Assumption Obligations, if any, by making a Cash payment in the manner provided in Section VI(D) of this Plan or as otherwise permitted by section 365(b)(1)(B) of the Bankruptcy Code, equal to the amount specified in the Notice of Assumption, unless an objection to such proposed amount is filed with the Bankruptcy Court and served on counsel to the Proponents on or prior to the date set by the Bankruptcy Court for filing objections to Confirmation of the Plan and the Bankruptcy Court, after notice and hearing, determines that the applicable Debtor is obligated to pay a different amount under section 365 of the Bankruptcy Code, in which case, the Proponents shall have the right to remove such executory contract or lease from the list of assumed contracts pursuant to Section VII(F) of this Plan, or, if following the Effective Date, file a motion within ten (10) days after such determination to seek an order of the Bankruptcy Court rejecting such

executory contract or unexpired lease.  Any Person that fails to object to the Assumption

Obligation specified in the Plan Supplement on or prior to the date set by the Bankruptcy Court for

filing objections to Confirmation of the Plan and/or other subsequent date(s) set by the Bankruptcy

Court, as applicable, shall be forever barred from: (a) asserting any other, additional or different

amount on account of such obligation against the Debtors, the Reorganized Debtors, or the Estate

Assets, and (b) sharing in any other, additional or different distribution under the Plan on account

of such obligation.  Any cure payments made pursuant to this paragraph shall not reduce the

General Unsecured Creditor Recovery and, under Scenario B, shall increase the amount of the Exit

Facility.

      **D.**      **Effect of Confirmation Order.**  The Confirmation Order shall constitute an order

of the Bankruptcy Court:  (i) approving, as of the Effective Date, the assumption or rejection by

the Reorganized Debtors pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of

all executory contracts and unexpired leases identified under this Article VII of the Plan and/or the

Plan Supplement.  The contracts and leases identified in this Plan will be assumed or rejected,

respectively, only to the extent that such contracts or leases constitute pre-petition executory

contracts or unexpired leases of the Debtors, and the identification of such agreements under this

Plan does not constitute an admission with respect to the characterization of such agreements or

the existence of any unperformed obligations, defaults, or damages thereunder.  This Plan does not

affect any executory contracts or unexpired leases that: (a) have been assumed, rejected or

terminated prior to the Confirmation Date, or (b) are the subject of a pending motion to assume,

reject or terminate as of the Confirmation Date.

      **E.**      **Post-Petition Agreements.**  Unless inconsistent with the provisions of the Plan, all

contracts, leases and other agreements entered into or restated by the Debtors on or after the

Petition Date, or previously assumed by any of the Debtors prior to the Confirmation Date (or the

subject of a pending motion to assume by either of the Debtors as of the Confirmation Date that is

granted by the Bankruptcy Court), which have not expired or been terminated in accordance with

their terms, shall be performed by the Reorganized Debtors in the ordinary course of business and

shall survive and remain in full force and effect following the Effective Date.

**F.** **Modifications to Plan Supplement.**  The Proponents shall have the right, any time prior to the Effective Date, to make additions, deletions, modifications and/or other revisions to the identification of executory contracts and leases to be assumed or rejected by the Debtors; provided, however, that any party to such contract or lease or affected by such action shall be provided notice of such action and an opportunity to object, and if any objection is filed, such action will not be effective until such objection is resolved by the parties or by order of the Bankruptcy Court.

## VIII.

## CONDITIONS PRECEDENT

**A.** **Conditions to Confirmation.**  The following, unless waived by the Proponents in writing, are conditions precedent to confirmation of the Plan and funding of the Exit Facility:

1. No Agreement Termination Event under the Restructuring Support Agreement has occurred;

2. The Bankruptcy Court shall have entered a Final Order approving a Disclosure Statement with respect to the Plan in form and substance satisfactory to the Proponents on or before July 22, 2011;

3. The Plan has not been modified to provide for any terms that are materially adverse from the Proponents Plan Term Sheet, including, but not limited to modifications that would prevent or delay payment in full under Scenario A of the Fourth Third Discounted Payoff and/or the Investment Funding Discounted Payoff on or before August 5, 2011;

4. The Confirmation Order shall be in a form and substance acceptable to the Proponents;

5. No order(s) is entered by the Bankruptcy Court have the practical effect of rendering unachievable compliance with any of the deadlines set forth in the Plan unless such effect is waived by each of the Parties in writing or cured within five (5) business days after the date on which such order(s) is/are entered;

6. The Cases shall not have been converted to cases under chapter 7 of the Bankruptcy Code or to liquidating chapter 11 cases;

1          7.      Neither a trustee under chapter 7 or 11 of the Bankruptcy Code, a

2 responsible officer with enlarged powers, nor an examiner with enlarged powers (i.e., powers

3 beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code) relating to operation

4 of the business under section 1106(b) of the Bankruptcy Code shall have been appointed for the

5 Debtors;

6          8.      Absent agreement of Fourth Third and Investment Funding to the contrary,

7 except as necessary to insure that Holders of General Unsecured Rejection Damage Claims and

8 General Unsecured Claims against International receive the same Pro Rata distribution as Holders

9 of General Unsecured Claims of Fasteel, Steel Corp. and Technologies, in their sole and absolute

10 discretion, the Exit Facility shall not exceed the greater of (1) $3.6 million, or (ii) an amount

11 sufficient to satisfy the DIP Loan, Allowed Secured Claims and Allowed Administrative Claims

12 and  provide a minimum of $1,000,000 to be made available to fund payments to Holders of

13 Allowed General Unsecured Claims Allowed Priority Tax Claims and Allowed Non-Tax Priority

14 Claims; and

15          9.      If the Exit Facility is not sufficient to pay the General Unsecured Creditor

16 Recovery, the Committee shall have consented to such other treatment.

17      **B.**     **Conditions to Effectiveness.**  The following are conditions precedent to the

18 occurrence of the Effective Date:

19          1.      Under <u>Scenario A</u>, Fourth Third and Investment Funding shall have been

20 paid $45.5 million and $8.5 million, in cash, on or before August 5, 2011;

21          2.      Under Scenario A or Scenario B, reserves have been established with a third

22 party escrow holder to pay all Allowed Claims and Disputed Claims in full;

23          3.      Under Scenario B, the Exit Facility has been funded in full;

24          4.      The Confirmation Date shall have occurred;

25          5.      The Confirmation Order shall be a Final order;

26          6.      No request for revocation of the Confirmation Order under section 1144 of

27 the Bankruptcy Code has been made, or, if made, remains pending;

28          7.      The Professional Fee Reserve shall have been funded;

8.    The Proponents shall have determined that all Disputed Claims have been sufficiently resolved or estimated so as to establish the Distribution Reserve; and

9.    All actions, documents and agreements necessary to implement the Plan shall have been effected or executed as determined by the Proponents in their sole and absolute discretion, <u>provided</u>, <u>however</u>, that if under <u>Scenario A</u> all of the other conditions set forth above have been met, then the Debtors in their sole discretion shall determine whether all actions, documents and agreements necessary to implement the Plan have been effected or executed.

**C.    <u>Waiver of Conditions.</u>**  Conditions to Confirmation and the Effective Date may be waived, in whole or in part, by the Proponents adversely affected by such waiver at any time without notice, an order of the Bankruptcy Court, or any further action other than proceeding to Confirmation and consummation of the Plan.

**IX.**

**<u>EFFECTS OF CONFIRMATION</u>**

The rights afforded under the Plan and the treatment of all Claims and Interests under the Plan shall be the sole and exclusive remedy on account of such Claims against, and Interests in the Debtors, the Reorganized Debtors, and the Estate Assets.  The distributions made pursuant to the Plan shall be in full and final satisfaction, settlement, release and discharge of the Allowed Claims on account of which such distributions are made.  Confirmation of the Plan shall bind and govern the acts of the Reorganized Debtors and all holders of all Claims against, and Interests in the Debtors, whether or not: (i) a proof of Claim or proof of Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or Interest is allowed pursuant to section 502 of the Bankruptcy Code, or (iii) the holder of a Claim or Interest has accepted the Plan.

Upon the Effective Date, title to all remaining Estate Assets of the Debtors shall vest in the Reorganized Debtors for the purposes contemplated under the Plan and shall no longer constitute property of the Debtors' Estates.  Except as otherwise provided in the Plan, upon the Effective Date, all Estate Assets shall be free and clear of all Claims and Interests, including Liens, charges or other encumbrances of Creditors of the Debtors.

**A.**      **Release by Debtors**. *As of the Effective Date, for good and valuable consideration, the Debtors, their Estates, and the Reorganized Debtors release the Released Parties from any and all Causes of Action and Defenses (other than the rights, if any, of the Debtors or the Reorganized Debtors to enforce applicable post-petition agreements (including, without limitation, any settlement agreements), any order entered in the Cases, the Plan and any agreements, instruments or other documents delivered thereunder, and the Plan Supplement) held, assertable on behalf of or derivative from the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, based on or relating to or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the conduct of the Debtors' businesses, the Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, and/or the business or contractual arrangements between any Debtor and any Agent thereof, and/or the restructuring of Claims and Interests prior to or in the Cases, which Causes of Action and Defenses are based in whole or in part on any act, omission, transaction, event or other occurrence (except for willful misconduct, ultra vires acts, or gross negligence) taking place before the Effective Date; provided, however, that no Released Party shall be release or discharged from any obligations under the Plan.  Notwithstanding the foregoing, if a Released Party directly or indirectly brings or asserts any Claim or Cause of Action and Defense in any way arising out of or related to any document or transaction that was in existence prior to the Effective Date against the Debtors, the Reorganized Debtors, or any of their Agents, then the release set forth in this section (but not any release or exoneration or any other rights or claims granted under any other section of the Plan or under any other document or agreement) shall automatically and retroactively be null and void ab initio with respect to such Released Party; provided, however, the immediately preceding clause shall not apply to the prosecution in this Court (or any appeal therefrom) of the amount, priority or secured status of any pre-petition Claim or ordinary course Administrative Claim against the Debtors.  As of the Effective Date, the Debtors release holders of General Unsecured Creditors Claims from any and all Avoidance Actions.*

1         1.     **Certain Waivers.** In an abundance of caution, each Debtor shall waive the

2 effect of section 1542 of the California Civil Code to the extent that such section is applicable to

3 the Debtors. Section 1542 of the California Civil Code provides:

4         *§1542. A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE*

5         *CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER*

6         *FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY*

7         *HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER*

8         *SETTLEMENT WITH THE DEBTOR.*

9 *EACH DEBTOR AGREES TO ASSUME THE RISK OF ANY AND ALL UNKNOWN*

10 *UNANTICIPATED OR MISUNDERSTOOD DEFENSES, CLAIMS, CAUSES OF ACTION,*

11 *CONTRACTS, LIABILITIES, INDEBTEDNESS AND OBLIGATIONS WHICH ARE RELEASED*

12 *BY THE PLAN AND EACH DEBTOR HEREBY WAIVES AND RELEASES ALL RIGHTS AND*

13 *BENEFITS WHICH IT MIGHT OTHERWISE HAVE UNDER THE AFOREMENTIONED*

14 *SECTION 1542 OF THE CALIFORNIA CIVIL CODE WITH REGARD TO THE RELEASE OF*

15 *SUCH UNKNOWN UNANTICIPATED OR MISUNDERSTOOD DEFENSES, CLAIMS, CAUSES*

16 *OF ACTION, CONTRACTS, LIABILITIES, INDEBTEDNESS AND OBLIGATIONS. TO THE*

17 *EXTENT (IF ANY) ANY OTHER LAWS SIMILAR TO SECTION 1542 OF THE CALIFORNIA*

18 *CIVIL CODE MAY BE APPLICABLE EACH DEBTOR WAIVES AND RELEASES ANY BENEFIT*

19 *RIGHT OR DEFENSE WHICH IT MIGHT OTHERWISE HAVE UNDER ANY SUCH LAW WITH*

20 *REGARD TO THE RELEASE OF UNKNOWN UNANTICIPATED OR MISUNDERSTOOD*

21 *DEFENSES, CLAIMS, CAUSES OF ACTION, CONTRACTS, LIABILITIES, INDEBTEDNESS*

22 *AND OBLIGATIONS.*

23         **B.**     <u>**Discharge and Permanent Injunction.**</u> *Except as otherwise set forth in the Plan,*

24 *Confirmation of the Plan shall discharge the Debtors and the Reorganized Debtors from all*

25 *Claims or other debts that arose at any time before the Effective Date, and all debts of the kind*

26 *specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not: (a) a proof*

27 *of claim based on such debt is filed or deemed filed under section 501 of the Bankruptcy Code; (b)*

28 *a Claim based on such debt is Allowed under section 502 of the Bankruptcy Code; or (c) the*

1    *holder of a Claim has accepted the Plan.  As of the Effective Date, all entities that have held,*

2    *currently hold or may hold a Claim or other debt or liability that is discharged or any other right*

3    *that is terminated under the Bankruptcy Code or the Plan are permanently enjoined, to the full*

4    *extent provided under section 524(a) of the Bankruptcy Code, from "the commencement or*

5    *continuation of an action, the employment of process, or an act, to collect, recover or offset any*

6    *such debt as a personal liability" of the Debtors or the Reorganized Debtors, except as otherwise*

7    *set forth in the Plan.  Nothing contained in the foregoing discharge shall affect the liability of any*

8    *other entity on, or the property of any other entity for, any debt of the Debtors that is discharged*

9    *under the Plan.*

10        **C.        Limitation of Liability.**  *The Debtors, the Reorganized Debtors, the Proponents*

11    *and each of their respective Agents shall have all of the benefits and protections afforded under*

12    *section 1125(e) of the Bankruptcy Code and applicable law.*

13        **D.        Exoneration and Reliance.**  *The Debtors, the Reorganized Debtors, their Estates,*

14    *the Proponents and each of their respective Agents, shall not be liable, other than for gross*

15    *negligence, willful misconduct, acts taken in violation of an Order of the Bankruptcy Court*

16    *entered in the Cases, or under section 549 of the Bankruptcy Code, to any holder of a Claim or*

17    *Interest or any other entity with respect to any action, omission, forbearance from action,*

18    *decision, or exercise of discretion taken at any time after the Petition Date in connection with the*

19    *Cases or the negotiation, formulation, development, proposal, disclosure, Confirmation or*

20    *implementation of the Plan.  The Debtors, the Reorganized Debtors, their Estates, the Proponents,*

21    *and each of their respective Agents may reasonably rely upon the opinions of their respective*

22    *counsel, accountants, and other experts and professionals and such reliance, if reasonable, shall*

23    *conclusively establish good faith and the absence of gross negligence or willful misconduct;*

24    *provided, however, that a determination that such reliance is unreasonable shall not, by itself,*

25    *constitute a determination or finding of bad faith, gross negligence or willful misconduct.*

26

27

28

# X.

## **RETENTION OF JURISDICTION**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Bankruptcy Cases after the Effective Date to the extent legally permissible, including, without limitation, jurisdiction to:

a. Allow, disallow, determine, liquidate, classify, estimate, or establish the priority or secured or unsecured status of any Claim, including the resolution of any request for payment of any Administrative Claim and the resolution of any objections to the allowance or priority of Claims;

b. Grant or deny any applications for allowance of compensation or reimbursement of expenses authorized under the Bankruptcy Code or the Plan;

c. Resolve any matters related to the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which any Debtor is a party and to hear, determine and, if necessary, liquidate, any Claims arising from, or cure amounts related to, such assumption or rejection;

d. Ensure that distributions to holders of Allowed Claims are accomplished in accordance with the Plan;

e. Decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters and grant or deny any applications or motions involving any Debtor that may be pending on the Effective Date;

f. Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

g. Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or any Person's obligations incurred in connection with the Plan;

h. Modify the Plan before or after the Effective Date under section 1127 of the Bankruptcy Code or modify the Disclosure Statement or any contract, instrument,

1   release, or other agreement or document created in connection with the Plan or the Disclosure

2   Statement; or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy

3   Court order, the Plan, the Disclosure Statement, or any contract, instrument, release, or other

4   agreement or document created in connection with the Plan and the Disclosure Statement, in such

5   manner as may be necessary or appropriate to consummate the Plan, to the extent authorized by

6   the Bankruptcy Code;

7           i.      Enter and implement such orders as are necessary or appropriate if

8   the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

9           j.      Determine any other matters that may arise in connection with or

10   related to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument,

11   release, or other agreement or document created in connection with the Plan, the Disclosure

12   Statement or the Confirmation Order, except as otherwise provided in the Plan;

13           k.      Hear and determine Causes of Action and Defenses commenced by

14   the Debtors or the Reorganized Debtors to the extent the Bankruptcy Court otherwise has

15   jurisdiction over such claims;

16           l.      Hear and determine any and all retained Claims commenced by the

17   Debtors to the extent the Bankruptcy Court otherwise has jurisdiction over such claims;

18           m.      Enter and implement other orders, or take such other actions as may

19   be necessary or appropriate to restrain interference by any entity with consummation or

20   enforcement of the Plan, except as otherwise provided in the Plan; and

21           n.      Enter an order closing the Bankruptcy Cases at the appropriate time.

22                           **XI.**

23                   **AMENDMENT AND WITHDRAWAL OF PLAN**

24       **A.      Amendment of the Plan.**  At any time before the Confirmation Date, the

25   Proponents, acting unanimously, may alter, amend, or modify the Plan, subject only to the

26   restrictions on modifications set forth in section 1127 of the Bankruptcy Code and Bankruptcy

27   Rule 3019, provided, however, that the Plan may be altered, amended or modified without the

28   unanimous approval of all of the Proponents provided that such alteration, amendment or

1 modification does not adversely affect the interests of any Proponent that does not consent to such

2 alteration, amendment or modification.  Specifically, the Proponents shall be entitled to amend the

3 Plan to reflect the results of the Auction and given that the modifications or amendments to the

4 Plan will be an enhancement to the proposed treatment of Claims under the Plan or no worse

5 treatment than currently proposed under the Plan, any such modification or amendments are

6 approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional

7 disclosure or resolicitation under Bankruptcy Code 3019.  After the Confirmation Date, the

8 Proponents may, under section 1127(b) of the Bankruptcy Code, institute proceedings in the

9 Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan,

10 the Disclosure Statement, or the Confirmation Order, or as otherwise may be necessary to carry

11 out the purposes and effects of the Plan so long as such proceedings do not materially and

12 adversely affect the treatment of holders of Claims under the Plan; *provided, however*, that prior

13 notice of such proceedings shall be served in accordance with the Bankruptcy Rules or applicable

14 order of the Bankruptcy Court.

15   **B.**  **Revocation or Withdrawal of the Plan.**  Acting unanimously, the Proponents

16 reserve the right to revoke or withdraw the Plan.  If the Plan is withdrawn or revoked, then the

17 Plan shall be deemed null and void, and nothing contained in the Plan shall be deemed a waiver of

18 any Claims by or against the Proponents or any other Person in any further proceedings involving

19 the Proponents or an admission of any sort, and the Plan and any transaction contemplated by the

20 Plan shall not be admitted into evidence in any proceeding.  To the extent that any Proponent

21 withdraws as a Proponent, the remaining Proponents shall have the right to take all actions

22 necessary to confirm, and consummate, the Plan.

23       **XII.**

24      **MISCELLANEOUS**

25   **A.**  **Effectuating Documents; Further Transactions; Timing.**  The Debtors, the

26 Reorganized Debtors, and the Proponents shall be authorized and directed to execute, deliver, file,

27 or record such contracts, instruments, releases, and other agreements or documents, and to take

28 such actions as may be necessary or appropriate to effectuate and further evidence the terms and

1   conditions of the Plan.  All transactions required to occur on the Effective Date under the terms of

2   the Plan shall be deemed to have occurred simultaneously.

3       **B.**     **<u>Exemption From Transfer Taxes</u>.**  In accordance with section 1146(c) of the

4   Bankruptcy Code, the making, delivery, or recording of a deed or other instrument of transfer

5   under this Plan shall not be subject to any stamp tax or similar tax, fee or assessment, and the

6   appropriate state or local government officials or agents, shall be directed to forego the collection

7   of any such tax, fee or assessment and to accept for filing or recordation any of the foregoing

8   instruments or other documents without the payment of any such tax, fee or assessment.

9       **C.**     **<u>Governing Law</u>.**  Except to the extent that the Bankruptcy Code or other federal

10  law is controlling, the rights, duties and obligations of the Debtors, the Reorganized Debtors, and

11  any other Person arising only under the Plan shall be governed by, and construed and enforced in

12  accordance with, the internal laws of the State of California, without giving effect to California's

13  choice of law provisions.

14      **D.**     **<u>Modification of Payment Terms</u>.**  The Reorganized Debtors may modify the

15  treatment of any Allowed Claim or Interest in any manner adverse only to the holder of such

16  Claim or Interest at any time after the Effective Date upon the prior written consent of the Person

17  whose Allowed Claim or Interest treatment is being adversely affected.

18      **E.**     **<u>Provisions Enforceable</u>.**  The Confirmation Order shall constitute a judicial

19  determination that each term and provision of this Plan is valid and enforceable in accordance with

20  its terms.

21      **F.**     **<u>Quarterly Fees to the United States Trustee</u>.**  All fees payable under 28 U.S.C.

22  § 1930(a)(6) shall be paid by the Debtors in the amounts and at the times such fees may become

23  due up to and including the Effective Date.  Thereafter, the Reorganized Debtors shall pay all fees

24  payable under 28 U.S.C. § 1930(a)(6) until the Bankruptcy Cases are closed, dismissed or

25  converted.

26      **G.**     **<u>Timing of Payment</u>.**  Whenever any payment or distribution to be made under the

27  Plan is due on a day other than a Business Day, such payment or distribution may instead be

28  made, without interest, on the immediately following Business Day.

**H.    Notice of Confirmation.**  As soon as practicable following the Effective Date of the Plan, the Reorganized Debtors shall file and serve a notice of the entry of the Confirmation Order in the manner required under Bankruptcy Rule 2002(f).  The notice shall further identify the Effective Date and shall set forth the Administrative Claim Bar Date, the Professional Fees Bar Date, the Rejection Claims Bar Date and any other deadlines that may be established under the Plan or the Confirmation Order.

**I.    Successors and Assigns.**  The Plan is binding upon and will inure to the benefit of the Debtors, the Reorganized Debtors, and each of their respective Agents, successors, and assigns, including, without limitation, any bankruptcy trustees or estate representatives.

**J.    Notices.**  Except as otherwise provided in the Plan, any notice or other communication required or permitted under the Plan will be in writing and deemed to have been validly served, given, delivered, and received upon the earlier of: (a) the third (3rd) calendar day after transmission by facsimile or hand delivery or deposit with an overnight express service or overnight mail delivery service; or (b) the third (3rd) calendar day after deposit in the United States mail, with proper first class postage prepaid.  If such notice is made to the Debtors, it shall be addressed as follows:

If such notice is made to the Proponents, it shall be addressed as follows:

Debtors
Ori Katz
Sheppard, Mullin, Richter & Hampton LLP
A Limited Liability Partnership
Including Professional Corporations
Four Embarcadero Center, Suite 1700
San Francisco, California  94111
Tel: 415.434.9100
Fax:  415.434.3947

Fourth Third
John D. Fredericks
Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802
Tel:  415.591.1000
Fax: 415.591.1400

1    Investment Funding
     Donald A. English, Esq.
2    English & Gloven, A Professional Corporation
     550 West C Street, Suite 1800
3    San Diego, CA 92101
     Tel: 619-338-6610
4    Fax: 619-338-6657

5    Committee
     Jeff Pomerantz
6    Pachulski Stang Ziehl & Jones LLP
     10100 Santa Monica Blvd., 11th Floor
7    Los Angeles, California 90067-4100
     Tel: 310.277.6910
8    Fax: 310.201.0760

9        **K.**      **Notice to Claim and Interest Holders.**  Notices to Persons holding a Claim or

10   Interest will be sent to the addresses set forth in such Person's proof of Claim or Interest or, if none

11   was filed, at the address set forth in the Schedules.

12       **L.**      **Post-Effective Date Notices.**  Following the Effective Date, notices will only be

13   served on the Reorganized Debtors, the Office of the United States Trustee and those Persons who

14   file with the Court and serve upon the Reorganized Debtors a request, which includes such

15   Person's name, contact person, address, telephone number and facsimile number, that such Person

16   receive notice of post-Effective Date matters.  Persons who had previously filed with the Court

17   requests for special notice of the proceedings and other filings in the Bankruptcy Cases will not

18   receive notice of post-Effective Date matters unless such Persons file a new request for notice.

19       **M.**      **Incorporation by Reference.**  All exhibits, schedules and supplements to the Plan

20   are incorporated and are made a part of the Plan as if set forth in full in the Plan.

21       **N.**      **Computation of Time.**  In computing any period of time prescribed or allowed by

22   the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.  Any reference to "day" or "days"

23   shall mean calendar days, unless otherwise specified herein.

24       **O.**      **Conflict of Terms.**  In the event of a conflict between the terms of this Plan and

25   the Disclosure Statement, the terms of this Plan will control.

26       **P.**      **Severability of Plan Provisions.**  If, prior to Confirmation, any non-material term

27   or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the

28   Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid

1 or enforceable to the maximum extent practicable, consistent with the original purpose of the term

2 or provision held to be invalid, void or unenforceable, and such term or provision will then be

3 applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation,

4 the remainder of the terms and provisions of the Plan will remain in full force and effect and will

5 in no way be affected, Impaired or invalidated by such holding, alteration or interpretation.  The

6 Confirmation Order will constitute a judicial determination that each term and provision of the

7 Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and

8 enforceable pursuant to its terms.  In addition, in the event that certain Debtors are excluded from

9 the scope of the Plan or the Plan is determine to be invalid, void or unenforceable as to such

10 Debtors, the remaining provisions of the Plan shall remain valid and enforceable against the

11 remaining Debtors to the Plan.

**XIII.**

**<u>DEFINITIONS AND RULES OF INTERPRETATION</u>**

14   Any term used in the Plan that is not defined herein but is defined in the Bankruptcy Code

15 or the Bankruptcy Rules retains the meaning specified for such term in the Bankruptcy Code or

16 the Bankruptcy Rules, as applicable.  The words "include", "includes" and "including" are deemed

17 to be followed by the phrase "without limitation."  The meanings given to terms defined herein are

18 equally applicable to both the singular and plural forms of such terms.  Whenever the context may

19 require, any pronoun includes the corresponding masculine, feminine and neuter forms.  Except as

20 otherwise expressly provided herein, all references to "dollars" or "$" are deemed references to the

21 lawful money of the United States of America.

22   As used in the Plan and Disclosure Statement, except as otherwise expressly provided, the

23 following terms have the meanings set forth below:

24   **A.**   **Administrative Claim.**  A Claim for any expense of administration of the

25 Bankruptcy Cases under section 503(b) of the Bankruptcy Code and entitled to priority under

26 section 507(a)(2) of the Bankruptcy Code, including, without limitation: (a) actual and necessary

27 costs and expenses incurred in the ordinary course of the Debtors' businesses; (b) actual and

28 necessary costs and expenses of preserving the Estates or administering the Bankruptcy Cases; (c)

1   all Professional Fees; (d) any amounts owing under an agreement made by the Debtors that

2   satisfies the requirements of section 503(b) of the Bankruptcy Code; and (e) all fees payable under

3   28 U.S.C. § 1930.

4         **B.**      **Administrative Claim Bar Date.**  The tenth (10th) day after the Effective

5   Date, by which date certain entities asserting an Administrative Claim (excluding Professional Fee

6   Claims) against any of the Debtors must have filed a request for payment with the Bankruptcy

7   Court under section 503(a) of the Bankruptcy Code, or be forever barred from asserting an

8   Administrative Claim against the Debtors and/or sharing in any distribution under the Plan.

9         **C.**      **Agent.**  Any former or current shareholder, affiliate, director, officer,

10  employee, partner, member, agent, attorney, accountant, advisor or other representative of any

11  person or entity (solely in their respective capacities as such, and not in any other capacity).

12        **D.**      **Allowed.**  With respect to Claims:  (a) any Claim, proof of which, request

13  for payment of which, or application for allowance of which, was filed on or before the Bar Date,

14  Administrative Claim Bar Date, or Professional Fees Bar Date, as applicable, for Claims of such

15  type against the Debtors; (b) any Claim, if no proof of Claim or Interest is filed, which has been or

16  is listed by the Debtors in the Schedules as liquidated in amount and not disputed or contingent; or

17  (c) any Claim that is expressly allowed by the Plan or under any agreement entered into in

18  connection with the Plan; *provided, however*, that with respect to any Claim described in clauses

19  *(a)* or *(b)* above, such Claim shall be considered Allowed only if either (i) no objection to the

20  allowance thereof has been interposed by the Claims Objection Deadline, or (ii) an objection to the

21  Claim has been interposed and a Final Order has been entered allowing the Claim for distribution

22  purposes, or (iii) the Reorganized Debtors have agreed to settle and allow the Claim, without the

23  need for Bankruptcy Court approval, in accordance with this Plan.  The term "Allowed," when

24  used to describe a reference in the Plan to any Claim, Interest, Class of Claims or Class of

25  Interests, means a Claim or Interest (or any Claim or Interest in any such Class) that is so allowed.

26  The term "Allowed Claim," will not, for purposes of computing distributions under the Plan,

27  include interest on such claim from and after the Petition Date, other than as permitted under the

28  Bankruptcy Code.

1    **E.**      **Assumption Obligations.**  Any monetary amounts payable to the non-

2  debtor party to any executory contract or unexpired lease, pursuant to section 365(b)(1) of the

3  Bankruptcy Code, as a condition to the assumption of such contract or lease.

4    **F.**      **Avoidance Actions.**  All causes of action of the Estates under sections

5  506(c), 506(d), 510, 542, 543, 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code,

6  whether or not such actions seek an affirmative recovery or are raised as a defense to, or offset

7  against, the allowance of a Claim.

8    **G.**      **Bankruptcy Case(s)**.  The case(s) under Chapter 11 of the Bankruptcy

9  Code in which each Debtor is a debtor and debtor-in-possession, currently pending before the

10  Bankruptcy Court.  Bankruptcy Code.  Title 11 of the United States Code, 11 U.S.C. §§ 101-1532,

11  as amended from time to time and as applicable to the Bankruptcy Cases.

12    **H.**      **Bankruptcy Court**.  The United States Bankruptcy Court for the Central

13  District of California, having jurisdiction over the Bankruptcy Cases.

14    **I.**      **Bankruptcy Rules**.  Collectively, the Federal Rules of Bankruptcy

15  Procedure as promulgated under 28 U.S.C. § 2075 and any Local Rules of the Bankruptcy Court,

16  as applicable to the Bankruptcy Cases.

17    **J.**      **Bar Date.**  May 13, 2011 with respect to the all the Debtors other than

18  International, and June 15, 2010 only with respect to International, which was the date or dates

19  fixed by the Bankruptcy Court by which all Persons (except holders of Claims that appear in the

20  Schedules and are **not** scheduled as disputed, contingent or unliquidated) asserting a Claim against

21  the Debtors (except Administrative Claims) were required to file a proof of claim or be forever

22  barred from asserting a Claim against the Debtors or their property, voting on the Plan, and

23  sharing in distributions under the Plan.

24    **K.**      **Bidding Procedures.**  The bidding procedures governing the Investment

25  Banking Process, as specified in Section V(B)(3) of the Disclosure Statement.

26    **L.**      **Business Day.**  Any other day than a Saturday, Sunday, or legal holiday, as

27  defined in Bankruptcy Rule 9006(a).

28

**M.**       **Cash.**  Currency, checks drawn on a bank insured by the Federal Deposit Insurance Corporation, certified checks, money orders, negotiable instruments, and wire transfers of immediately available funds.

**N.**       **Causes of Action and Defenses.**  Any and all claims, causes of action, cross-claims, counterclaims, third-party claims, indemnity claims, contribution claims, defenses, demands, rights, actions, debts, damages, judgments, remedies, Liens, indemnities, guarantees, suits, obligations, liabilities, accounts, offsets, recoupments, rights of subordination or subrogation, powers, privileges, licenses, and franchises of any kind or character whatsoever, known or unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, disputed or undisputed, foreseen or unforeseen, direct or indirect, choate or inchoate, whether arising before, on or after the Petition Date(s), including through the Effective Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law.  "Causes of Action" shall include, but not be limited to: (a) all rights of setoff, counterclaim, or recoupment and claims on contracts or for breaches of duties imposed by law or in equity; (b) the right to object to Claims; (c) all claims pursuant to sections 362 of the Bankruptcy Code, and (d) such claims and defenses as fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code, provided, however, "Causes of Action" shall not include Avoidance Actions.

**O.**       **Charter Documents.**  The articles or certificate of incorporation and the bylaws of a company, as applicable, and any amendments to the foregoing.

**P.**       **Claim.**  A claim as defined in section 101(5) of the Bankruptcy Code, including, without limitation: (a) any right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, arising at any time before the Effective Date; or (b) any right to an equitable remedy arising at any time before the Effective Date for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

1    **Q.    Claim Objection Deadline.**  The last day by which the Debtors may file

2  objections to Claims, which day shall be the latest of (a) fifteen (15) days after the Effective Date,

3  (b) 60 days after the filing of a proof of claim for, or request for payment of, such Claim, or (c)

4  such other date as the Bankruptcy Court may order.  The filing of a motion to extend the Claims

5  Objection Deadline by any party shall automatically extend the Claims Objection Deadline until a

6  Final Order is entered on such motion.  In the event that such motion to extend the Claims

7  Objection Deadline is denied by the Bankruptcy Court, or approved by the Bankruptcy Court and

8  reversed on appeal, the Claims Objection Deadline shall be the later of the then current Claims

9  Objection Deadline (as previously extended, if applicable) or 28 days after entry of a Final Order

10  denying the motion to extend the Claims Objection Deadline.

11    **R.    Class.**  A category of holders of Claims or Interests which are substantially

12  similar in nature to the Claims or Interests of other holders placed in such category, as summarized

13  in Article II of this Plan.

14    **S.    Committee.**  The Official Committee of Unsecured Creditors, appointed by

15  the United States Trustee in the Debtors' Bankruptcy Cases in accordance with section 1102(a)(1)

16  of the Bankruptcy Code, as it may be reconstituted from time to time.

17    **T.    Confirmation.**  Entry of the Confirmation Order by the Bankruptcy Court.

18    **U.    Confirmation Date.**  The date on which the Bankruptcy Court enters the

19  Confirmation Order.

20    **V.    Confirmation Hearing.**  The hearing or hearings to consider confirmation

21  of the Plan under section 1129 of the Bankruptcy Code, as such hearing(s) may be adjourned from

22  time to time.

23    **W.    Confirmation Order.**  The order of the Bankruptcy Court confirming the

24  Plan.

25    **X.    Contingent Claim.**  Any Claim for which a proof of Claim has been filed

26  with the Bankruptcy Court which (a) has not accrued and is dependent on a future event that has

27  not occurred and may never occur, and (b) has not been Allowed.

28

1    **Y.**        **Creditor.**  Has the meaning set forth in section 101(10) of the Bankruptcy

2  Code.

3    **Z.**        **Debtors.**  Has the meaning specified in Article I of this Plan.  To the extent

4  that the context requires any reference to the Debtors after the Effective Date, "Debtors" shall

5  mean the "Reorganized Debtors," as applicable.

6    **AA.**       **DIP Loan.**  That certain loan between MMFX Technologies Corporation,

7  MMFX Steel Corporation of America, and Fasteel Corporation as Borrowers and Lindsey

8  Davidson, as Trustee of the Lindsey Davidson Trust dated April 28, 2009 as Lender, which was

9  approved pursuant to the Final Order Approving Debtors' Emergency Motion for Interim and Final

10  Order (1) Authorizing Post-Petition Financing and Granting Liens and Super-Priority Claims, and

11  (II) Providing Related Relief  dated  March 2, 2011 [Docket No. 228].

12    **BB.**       **DIP Loan Claim.**  A Claim for repayment of the DIP Loan.

13    **CC.**       **Disclosure Statement.**  The disclosure statement relating to the Plan

14  including, without limitation, all exhibits and schedules to such disclosure statement, in the form

15  approved by the Bankruptcy Court under section 1125 of the Bankruptcy Code and Bankruptcy

16  Rule 3017.

17    **DD.**       **Disclosure Statement Approval Order.**  Order Approving Disclosure

18  Statement and Fixing Time for Filing Acceptances or Rejections of Plan entered by the

19  Bankruptcy Court on June 7, 2011.

20    **EE.**       **Disputed.**  With respect to Claims, means any Claim that is not an Allowed

21  Claim or Estimated Claim.  The term "Disputed," when used to modify a reference in the Plan to

22  any Claim, Interest, Class of Claims or Class of Interests, means a Claim or Interest (or any Claim

23  or Interest in any such Class) that is so disputed.

24    **FF.**       **Distribution Reserve.**  The reserve created pursuant to Section VI(C)(5)(a)

25  of the Plan to hold property for distribution to holders of General Unsecured Claims pending

26  resolution of Disputed Claims.

27    **GG.**       **Effective Date.**  The date upon which this Plan becomes effective.  The

28  "Effective Date" shall occur on the first Business Day following the first day upon which all of the

1  conditions to the occurrence of the Effective Date (as set forth in Section VIII(B) of the Plan) have

2  been satisfied or waived in accordance with the Plan.  The Effective Date shall occur no earlier

3  than the first day following the Confirmation Date.

4       **HH.**     **Equity Interests.**  Any equity security of any Debtor within the meaning of

5  section 101(16) of the Bankruptcy Code, including, without limitation, all issued, unissued,

6  authorized or outstanding shares of stock or other equity interests (including common and

7  preferred), together with any warrants, options, convertible securities, liquidating preferred

8  securities or contractual rights to purchase or acquire such equity interests at any time and all

9  rights arising with respect thereto.

10       **II.**     **Estate.**  The estate of each Debtor created in its respective Bankruptcy Case

11  in accordance with section 541 of the Bankruptcy Code or otherwise.

12       **JJ.**     **Estate Assets.**  All of the property of each Estate of each Debtor under

13  section 541 of the Bankruptcy Code.

14       **KK.**     **Estimated.**  With respect to Claims, means any Claim that has been

15  estimated by the Bankruptcy Court pursuant to section 502(c) of the Bankruptcy Code or by

16  agreement of the applicable Debtors and the holder of such Claim.  The term "Estimated," when

17  used to modify a reference in the Plan to any Claim, Interest, Class of Claims or Class of Interests,

18  means a Claim or Interest (or any Claim or Interest in any such Class) that is so estimated.

19       **LL.**     **Exit Facility.**  Under Scenario B, the greater of (a) $3.6 million; or (b) (i)

20  an amount sufficient to pay the Allowed DIP Loan Claim, all Allowed Secured Claims and

21  Administrative Claims in full and (ii) an additional $1 million to be made available for distribution

22  to Holders of Allowed Priority Tax Clams, Allowed Priority Non-Tax Claims and Allowed

23  General Unsecured Claims; to be paid upon the Effective Date by Fourth Third and Investment

24  Funding or a party designated by Fourth Third and Investment Funding, in their sole discretion.

25  The specific terms of the Exit Facility will be set forth in the Plan Supplement.  In addition to the

26  Exit Facility, Fourth Third and Investment Funding are required to fund all Allowed

27  Administrative, Secured, Priority Tax, Priority Non-Tax Claims of International in full plus an

28  amount necessary to ensure that Allowed Rejection Damages Claims of Fasteel, Steel Corp.,

1   International, and Technologies and Allowed General Unsecured Claims of International receive

2   the same Pro  Rata treatment as Allowed General Unsecured Claims of the other Debtors.

3        **MM.**     **Fasteel.**  Has the meaning set forth in Article I of this Plan.

4        **NN.**     **Final Distribution Date.**  The day selected by the Reorganized Debtors in

5   their sole discretion that is after the Initial Distribution Date and is no earlier than twenty-eight

6   (28) calendar days after the date on which all Disputed Claims have become Allowed Claims or

7   have been disallowed.

8        **OO.**     **Final Order.**  A "Final Order" means (i) an order of the Bankruptcy Court

9   as to which the time to appeal, petition for certiorari or motion for re-argument or rehearing has

10  expired and as to which no appeal, petition for certiorari or other proceedings or motion for re-

11  argument or rehearing shall then be pending, or (ii) if an appeal, writ of certiorari, motion for re-

12  argument or rehearing thereof has been filed or sought, such order of the Bankruptcy Court shall

13  not have been stayed.

14       **PP.**     **Fourth Third.**  Has the meaning specified in Article I of the Plan.

15       **QQ.**     **Fourth Third Discounted Payoff.**  $45.5 million provided that such

16  amounts are received on or before August 5, 2011.

17       **RR.**     **Fourth Third Indebtedness**.  The Debtors' indebtedness to Fourth Third in

18  the amount of $52,562,436, pursuant to that certain Credit Agreement, dated as of May 30, 2008,

19  by and among Fourth Third, on the one part, and ST Equipment Inc., ST Welland Real Estate,

20  Inc., MMFX Steel of Canada Inc., the Debtors, and MMFX Canadian Holdings, Inc., on the other

21  part, as amended from time to time.

22       **SS.**     **General Unsecured Claim.**  Any Claim against any Debtor that is not (a)

23  an Administrative Claim, (b) a Priority Tax Claim, (c) a Priority Non-Tax Claim, (d) a Secured

24  Claim, (e) a General Unsecured Rejection Damages Claim or (f) Claims or Interests in another

25  Class (as specified in Article II of this Plan).

26       **TT.**     **General Unsecured Creditor Recovery.**  100% payment to Holders of

27  Allowed General Unsecured Claims consisting of eighty-five percent (85%) payable on the

28

1   Effective Date and fifteen percent (15%) payable on the one year anniversary of the Effective Date

2   plus interest at the federal judgment rate.

3        **UU.**        **General Unsecured Rejection Damages Claim.**  A General Unsecured

4   Claim arising from the Debtor's rejection of an executory contract or unexpired lease as provided

5   for in section 365 of the Bankruptcy Code.

6        **VV.**        **Holder.**  With respect to a Claim or Interest, the holder of such Claim or

7   Interest.

8        **WW.**        **Insider.**  Has the meaning set forth in section 101(31) of the Bankruptcy

9   Code.

10        **XX.**        **Intercompany Claim.**  A Claim held by any of the Debtors against another

11   Debtor, whether or not a proof of Claim is filed or deemed filed pursuant to section 501 of the

12   Bankruptcy Code in either of the Bankruptcy Cases.

13        **YY.**        **International.**  Has the meaning specified in Article I of this Plan.

14        **ZZ.**        **Investment Banking Process.**  Has the meaning specified in Article I of

15   this Plan.

16        **AAA.**        **Investment Funding.**  Has the meaning specified in Article I of this Plan.

17        **BBB.**        **Investment Funding Discounted Payoff.**  $8.5 million provided that such

18   amounts are received on or before August 5, 2011.

19        **CCC.**        **Investment Funding Indebtedness**.  The indebtedness by Technologies to

20   Investment Funding, Inc. in the amount of $11,199,782.34, pursuant to that certain 8%

21   Convertible Secured Note, dated May 9, 2006, in favor of Investment Funding, by Technologies,

22   in the stated principal amount of $5,000,000, as amended from time to time.

23        **DDD.**        **IRS.**  The Internal Revenue Service.

24        **EEE.**        **Lien.**  A lien as defined in section 101(37) of the Bankruptcy Code, but not

25   including a lien to the extent that it has been avoided in accordance with sections 506(d), 510, 544,

26   545, 546, 547, 548, 553, or 549 of the Bankruptcy Code.

27        **FFF.**        **Management Incentive Plan.**  Has the meaning specified in Section

28   V(D)(3) of the Plan.

1   **GGG.    New Common Interests.**  The shares of common stock, no par value, of

2   Reorganized Debtors to be authorized pursuant to the Reorganized Debtor Charter Documents.

3   **HHH.    Permitted Payment.**  A payment on account of an obligation arising prior

4   to the Petition Date made by the Debtors during the Bankruptcy Cases with the permission of the

5   Bankruptcy Court.

6   **III.    Person.**  Any individual, corporation, partnership, joint venture,

7   association, joint-stock company, trust, unincorporated association or organization, or other

8   "person" as defined in Bankruptcy Code § 101, as well as any governmental agency, governmental

9   unit or associated political subdivision.

10  **JJJ.    Petition Date.**  January 5, 2010, December 13, 2010 or December 14, 2010,

11  as applicable, which are the dates when the Debtors commenced their voluntary Bankruptcy

12  Cases.

13  **KKK.    Plan.**  This Chapter 11 plan of reorganization, either in its present form or

14  as it may be amended, supplemented or modified from time to time, including all of its annexed

15  exhibits and schedules.

16  **LLL.    Plan Supplement.**  A compilation of documents and forms of documents,

17  schedules and exhibits to the Plan, including any exhibits to the Plan that are not filed

18  contemporaneously with the filing of the Plan and any amendments to exhibits filed

19  contemporaneously with the filing of the Plan.  The Debtors shall file and serve on parties in

20  interest the Plan Supplement no later than fourteen (14) days prior to the Voting Deadline.

21  **MMM.    Post-Effective Date Charter Documents.**  The respective Charter

22  Documents of the Reorganized Debtors.

23  **NNN.    Priority Non-Tax Claim.**  A Claim (or portion of such Claim) against any

24  Debtor entitled to priority under sections 507(a)(3), (a)(4), (a)(5) or (a)(7) of the Bankruptcy Code.

25  **OOO.    Priority Tax Claim.**  A Claim (or portion of such Claim) of a

26  governmental unit entitled to priority under section 507(a)(8) of the Bankruptcy Code.

27  **PPP.    Pro Rata.**  With respect to Claims within the same Class or sub-Class, the

28  proportion that the Claim bears to the sum of all Claims within such Class or sub-Class.

1      **QQQ.**     **Proceeds.**  All Cash, interest, profits, dividends, proceeds, products, and

2  rents earned, accrued, collected, derived, received or recovered on account of the liquidation, sale,

3  transfer, enforcement or other disposition of property, including all "proceeds" as defined under

4  section 9102(a)(64) of the California Uniform Commercial Code.

5      **RRR.**     **Professional.**  Each Person: (a) employed in accordance with an order of

6  the Bankruptcy Court under sections 327 or 1103 of the Bankruptcy Code and to be compensated

7  for services under sections 327, 328, 329, 330, 331 and 504 of the Bankruptcy Code, or (b) for

8  which compensation or reimbursement is requested under section 503(b)(2)-(b)(6) of the

9  Bankruptcy Code.

10      **SSS.**     **Professional Fee.**  A Claim by a Professional for compensation for services

11  rendered and reimbursement for expenses submitted in accordance with sections 330, 331, or

12  503(b) of the Bankruptcy Code for fees and expenses incurred after the Petition Date and prior to

13  and including the Effective Date.

14      **TTT.**     **Professional Fee Reserve.**  The reserve created pursuant to Section

15  VI(C)(5)(b) of the Plan to hold property for distribution to Professionals on account of

16  Professional Fees.

17      **UUU.**     **Professional Fees Bar Date.**  The sixtieth (60th) day after the Effective

18  Date, by which date any Professional seeking an award of Professional Fees must have filed an

19  application with the Bankruptcy Court under section 330(a) of the Bankruptcy Code, or be forever

20  barred from an award of Professional Fees against the Debtors and/or sharing in any distribution

21  under the Plan.

22      **VVV.**     **Proponents.**  Collectively, the Debtors, Fourth Third, Investment Funding,

23  and the Committee, in their capacity as proponents of this Plan.

24      **WWW.**   **Qualified Bidder.**  Has the meaning specified in Section V(B)(3)(b) of the

25  Disclosure Statement.

26      **XXX.**     **Reimbursement Cap.**  Has the meaning specified in Section

27  V(B)(3)(a)(i)(C) of the Disclosure Statement.

28

**YYY.**     **Rejection Claim Bar Date.**  The thirtieth (30th) day after the Effective Date, by which date any Person asserting a Claim for damages arising from the rejection of an executory contract or unexpired lease under this Plan must have filed a proof of Claim with the Bankruptcy Court under section 502(g) of the Bankruptcy Code, or be forever barred from asserting such Claim against the Debtors and sharing in any distribution under the Plan.

**ZZZ.**     **Released Parties.**  The Committee, Fourth Third and Investment Funding, their members (including the Committee members in their capacity as Committee members) and their respective current and former managers, officers, directors, employees, agents, stockholders, managers, affiliates, partners, advisors and professionals, and the Debtors' former and current managers, directors, officers, employees, agents, and professionals.

**AAAA.**     **Reorganized Debtors.**  The Debtors from and after the Effective Date.

**BBBB.**     **Scenario A**.  The classification and treatment of Claims and Interests under this Plan in the event the Debtors have secured a Successful Bid by the Confirmation Hearing, as specified in Article IV of the Plan.

**CCCC.**     **Scenario B**.  The classification and treatment of Claims and Interests under this Plan in the event the Debtors have not secured a Successful Bid by the Confirmation Hearing, as specified in Article IV of the Plan.

**DDDD.**     **Schedules**.  The schedules of assets and liabilities, the list of holders of Interests, and the statements of financial affairs filed by the Debtors in the Bankruptcy Cases, under section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, as such schedules, lists, and statements may have been or may be supplemented or amended from time to time.

**EEEE.**     **SEC**.  The Securities and Exchange Commission.

**FFFF.**     **Secured Claim**.  A Claim against any Debtor secured by a valid, perfected and enforceable Lien that is not subject to avoidance under bankruptcy or non-bankruptcy law, equal to the lesser of: (a) the Allowed amount of such Claim; or (b) the value, as determined by the Bankruptcy Court pursuant to sections 506(a) and 1129(b) of the Bankruptcy Code and Bankruptcy Rule 3012, of: (i) the interest of the holder of such Claim in the property of the Debtor

1   securing such Claim, or (ii) the amount subject to setoff under section 553 of the Bankruptcy

2   Code.

3          **GGGG.      Securities Act**.  The Securities Act of 1933, 15 U.S.C. §§ 77a - 77aa, as

4   now in effect or hereafter amended, or any similar federal, state, or local law.

5          **HHHH.      Shareholder Agreement**.  The shareholders agreement (or similar

6   agreement) governing the terms and restrictions of the New Common Interests, the terms of which

7   shall be acceptable to Fourth Third and Investment Funding.

8          **IIII.       Steel Corp**.  Has the meaning set forth in Article I of this Plan.

9          **JJJJ.       Subordinated Claim**.  All claims subject to subordination under

10  Bankruptcy Code § 510 or subordinated pursuant to agreement.

11         **KKKK.       Successful Bid**.  Has the meaning specified in Section V(B)(3)(e) of the

12  Disclosure Statement.

13         **LLLL.       Successful Bidder**.  The Person that submits the Successful Bid.

14         **MMMM.      Tax Code**.  Internal Revenue Code of 1986, as amended.

15         **NNNN.       Technologies**.  Has the meaning set forth in Article I of this Plan.

16         **OOOO.      Treasury Regulations**.  Regulations promulgated under the Tax Code..

17         **PPPP.       U.S. Trustee**.  Office of the United States Trustee for the Central District of

18  California.

19         **QQQQ.       Voting Deadline**.  July 8, 2011 at 4:00 P.M. prevailing Pacific Time, the

20  date ordered by the Bankruptcy Court to serve as the voting deadline for submission of ballots in

21  respect of the Plan.

22  Dated:  June 7, 2011                     MMFX TECHNOLOGIES CORPORATION,
                                            FASTEEL CORPORATION, MMFX STEEL
23                                          CORPORATION OF AMERICA, AND MMFX
                                            INTERNATIONAL HOLDINGS, INC.
24

25
                                            By: _____
26                                          Name:  Michael W. Pompay
                                            Title:   President & Corporate Secretary
27

28

1

2   Dated:  June 7, 2011                    OFFICIAL COMMITTEE OF UNSECURED
                                            CREDITORS
3

4                                           By: _Munnia VanDenheuvel_
                                            Name: _Munnia VanDenheuvel_
5                                           Title: _Chair / A/R Credit Manager_

6                                           [Signatures continued]

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated:  June 7, 2011                    INVESTMENT FUNDING, INC.


By: _____
Name:_____
Title: _____


Dated:  June 7, 2011                    FOURTH THIRD LLC


By: _____
Name:_____
Title: _____

# <u>EXHIBIT B</u>

## Disclosure Statement - Exhibit B

### Exit Facility - Key Terms

**Lenders:**     Fourth Third LLC (as to 82.44% of Principal Amount)
Investment Funding, Inc. (as to 17.56% of Principal Amount)

**Borrowers:**   MMFX Technologies, Inc.
MMFX Steel Corporation of America
Fasteel Corporation
MMFX International, Inc.

**Principal Amount:**  The greater of (i) $3.6 million or such lesser amount to pay the DIP Loan, Other Secured Claims, Administrative and Priority Claims, Priority Tax Claims and that portion of the General Unsecured Claim Recovery payable on the Effective Date, including any amounts necessary to fund disputed claims reserves in full; and (ii) the amount necessary to (aa) pay the DIP Loan, Other Secured Claims, and Administrative Claims, and (bb) make available $1,000,000 to fund distributions to Holders of Allowed General Unsecured Claims, Allowed Priority Tax Claims and Allowed Non-Tax Priority Claims.  To the extent that any holder of a General Unsecured Claim opts to receive equity, the Exit Facility shall be reduced by such holder's allowed General Unsecured Claim multiplied by the percentage that all holders of allowed General Unsecured Claims would receive if all holders of allowed General Unsecured Claims elected to receive cash consideration.

**Interest Rate:** 4.0%

**Payments:**  All interest shall be paid in kind and added to the principal and shall constitute principal for all purposes thereafter.

**Default Interest:**  Upon and during the continuance of an event of default, additional interest of 2% per annum, payable quarterly in cash, will accrue and be payable.

**Security Interest:**  The Senior Notes will be secured by a first priority lien on, and security interest in, all of the Borrowers' personal property, now or hereafter acquired.

**Maturity:**  Fifth anniversary of the Effective Date.

**Documentation:**  The Financing documentation will contain customary representations and warranties; conditions precedent; affirmative, negative and financial covenants; indemnities; events of default and remedies as required by Lenders.